IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MEIJER, INC., et al.,

      Plaintiffs,

    v.

WARNER CHILCOTT HOLDINGS COMPANY
III, LTD. et al.,

      Defendants.

Civil Action No. 05-2195 (CKK)

---

WALGREEN CO., et al.,

      Plaintiffs,

    v.

WARNER CHILCOTT HOLDINGS COMPANY
III, LTD., et al.,

      Defendants.

Civil Action No. 06-494 (CKK)

---

CVS PHARMACY, INC., et al.,

      Plaintiffs,

    v.

WARNER CHILCOTT HOLDINGS COMPANY
III, LTD., et al.,

      Defendants.

Civil Action No. 06-795 (CKK)

---

**DIRECT PURCHASER PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT AND
STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

I.  STATEMENT OF UNDISPUTED FACTS ......................................................4

II. THE AGREEMENT IS A *PER SE* VIOLATION OF SECTION 1
    OF THE SHERMAN ACT. ..............................................................................8

   A.  Horizontal Market Allocation Agreements are Per Se
       Illegal....................................................................................................9

   B.  The Agreement Not to Compete Between Warner
       Chilcott and Barr On Its Face Eliminates Competition and
       is a Per Se Illegal Restraint of Trade ...................................................11

III. IN THE ALTERNATIVE, THE AGREEMENT IS UNLAWFUL
     UNDER A "QUICK LOOK" ANALYSIS ........................................................16

   A.  Quick-Look Analysis Is Appropriate Because the
       Anticompetitive Effects of the Agreement Are Obvious .....................16

   B.  There are No Legitimate Procompetitive Justifications
       For The  Agreement............................................................................19

       1.  The "supply problem" defense is not a
           procompetitive justification......................................................21

       2.  The "sampling" defense is legally insufficient. ...........................24

CONCLUSION.................................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. Maricopa County Medical Soc.,*
457 U.S. 332, 337, n.3 (1982) ...........................................................................8

*Athletic Ass'n v. Board of Regents,*
468 U.S. 85, 100-01 (1984) ...........................................................................9

*Blackburn v. Sweeney,*
53 F.3d 825 (7th Cir. 1995)...........................................................................11

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,*
441 U.S. 1, 19-20 (1979) ...........................................................................9

*California Dental Ass'n v. Federal Trade Comm'n,*
526 U.S. 756, 770 (1999) ...................................................................3, 16, 18

*Celotex Corp. v. Catrett,*
477 U.S. 317, 325 (1986) ...........................................................................20

*Chicago Professional Sports Ltd. Partnership v. NBA,*
961 F.2d 667, 674 (7th Cir. 1992)...........................................................................18

*Continental T.V., Inc. v. GTE Sylvania Inc.,*
433 U.S. 36, 50 n.6 (1977) ...........................................................................10

*Copperweld Corp. v. Independence Tube Corp.,*
467 U.S. 752, 768 (1984) ...........................................................................10

*Eastman Kodak Co. v. Image Tech. Services, Inc.,*
504 U.S. 451, 466-67 (1992) ...........................................................................12

*Federal Trade Comm'n v. Indiana Fed'n of Dentists,*
476 U.S. 447, 459 (1986) ...........................................................................15

*FTC v. Superior Court Trial Lawyers Ass'n,*
493 U.S. 411, 432 (1990) ...........................................................................10

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.,*
392 U.S. 481 (1968) ...........................................................................23

*Illinois Brick Co. v. Illinois,*
431 U.S. 720 (1977) ...........................................................................23

*In re Cardizem CD Antitrust Litigation*,
    332 F.3d 896, 905-09 (6th Cir. 2003) ...................................................................2, 8, 9

*In re Terazosin Hydrochloride Antitrust Litig.*,
    352 F. Supp. 2d at 1313 ...............................................................................8, 11, 13

*Kansas v. Utilicorp United, Inc.*,
    497 U.S. 199, 207 (1990) ...................................................................................24

*Kreuzer v. American Academy of Periodontology*,
    735 F.2d 1479, 1492-93 (D.C. Cir. 1984) ...............................................................19

*Law v. NCAA*,
    134 F.3d 1010, 1019 (10th Cir. 1998)....................................................................16

*National Soc. of Professional Engineers v. United States*,
    435 U.S. 679, 692 (1978)) ...........................................................................15, 22

*Northern Pacific Ry. Co. v. United States*,
    356 U.S. 1, 5 (1958) ...................................................................................9, 10

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128, 136 (1998) ..................................................................................2

*Palmer v. BRG of Ga., Inc.*,
    498 U.S. 46, 49-50 (1990) ........................................................................10, 12, 13

*Polygram Holding, Inc. v. FTC*,
    416 F.3d 29, 35 (D.C. Cir. 2005) ....................................................................12, 17

*Serono Laboratories, Inc. v. Shalala*,
    158 F.3d 1313, 1317 (D.C. Cir. 1998) .....................................................................1

*State Oil Co. v. Khan*,
    522 U.S. 3, 10 (1997) .......................................................................................8

*The Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island*,
    373 F.3d 57, 61 (1st Cir. 2004)............................................................................8

*United States v. Brown Univ.*,
    5 F.3d 658, 669 (3d Cir. 1993)...............................................................3, 15, 18, 27

*United States v. Cooperative Theatres of Ohio Inc.*,
    845 F.2d 1367 (6th Cir. 1988)..............................................................................11

*United States v. Microsoft Corp.,*
   253 F.3d 34, 59 (D.C. Cir. 2001) ...........................................................................19, 25

*United States v. Portsmouth Paving Corp.,*
   694 F.2d 312, 317 (4th Cir. 1982)...................................................................................15

*United States v. Topco Assocs., Inc.,*
   405 U.S. 596, 608 (1972) ................................................................................2, 10, 12

*Valley Drug v. Geneva Pharms., Inc.,*
   344 F.3d 1294, 1304 (11th Cir. 2003).............................................................................11

*Worldwide Basketball & Sports Tours, Inc. v. NCAA,*
   273 F. Supp. 2d 933, 949-50. (S.D. Ohio 2003) ...........................................................17

**Statute**

15 U.S.C. § 45(a)(1) ....................................................................................................6

# INTRODUCTION

This action challenges a naked, horizontal restraint of trade whereby two drug manufacturers agreed in writing to eliminate competition among themselves for sales of a popular oral contraceptive, marketed under the brand name Ovcon 35 ("Ovcon"). In or about April 2004, Defendant Warner Chilcott,[1] the exclusive marketer of Ovcon in the United States, and Defendant Barr Pharmaceuticals, Inc. ("Barr"), the only manufacturer then approved by the FDA to sell an AB-rated generic version of Ovcon[2] (collectively "Defendants"), entered into a written agreement providing, among other things, that Warner Chilcott would pay Barr $20 million, and Barr, in return, would refrain from launching its generic version of Ovcon for five years (the "Agreement"). These facts are undisputed and their legal consequences, under black-letter federal antitrust law, are clear. The agreement between Warner Chilcott and Barr allocated all sales of Ovcon 35 and its AB-rated generic equivalents to Warner Chilcott for a period of five years. As such, the agreement falls squarely under the longstanding *per se* rule against horizontal market-allocation agreements.

Plaintiffs, direct purchasers (either in their own right or by assignment) of Ovcon from Warner Chilcott, allege that as a result of Defendants' Agreement, the entry of less

---

1    "Warner Chilcott" collectively refers to Defendants Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corp., Warner Chilcott (US) Inc., Warner Chilcott Co. Inc., and Galen (Chemicals), Ltd and their predecessors, successors, parents and/or subsidiary corporations.

2    Two drugs are "AB rated" when they are bioequivalent and have the same active ingredient, dosage form, route of administration, and dosage strength, making them substitutable at the pharmacy. *See Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1317 (D.C. Cir. 1998).

expensive Ovcon generics was delayed, and thus they were overcharged on their purchases of Ovcon products.[3]  By means of this motion, Plaintiffs seek a ruling by the Court that the horizontal[4] agreement between Warner Chilcott and Barr is a *per se* violation of § 1 of the Sherman Act.[5]  As explained more fully below, the *per se* rule is a well-recognized principle of antitrust analysis which is applied to certain categories of agreements that have conclusively been deemed to be anticompetitive, so that no further inquiry into their purpose or effect is permitted.  Agreements among competitors to allocate markets have long been deemed *per se* illegal.  *See, e.g., United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (agreement among competitors to allocate markets is "[o]ne of the classic examples of a *per se* violation of Section 1"); *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896, 905-09 (6th Cir. 2003) (agreement between branded drug company and generic drug company to delay launch of generic drug is a horizontal market-allocation agreement and therefore illegal *per se*).

In the alternative, Plaintiffs ask the Court to find that a "quick-look" analysis applies to the Agreement, and that under such an analysis, the Agreement violates Section 1 of the Sherman Act as a matter of law.  A "quick-look" analysis may be

---

3    The term "Ovcon products" is used to mean branded Ovcon 35 and its AB-rated generic equivalents.

4    A horizontal agreement is one between actual or potential competitors.  *See, e.g., NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998).

5    Plaintiffs are mindful of the Court's recommendation at the initial status conference that summary judgment motions should be filed after discovery is complete. Fact discovery is now essentially complete, and Plaintiffs are not aware of any outstanding discovery that is (or could be) relevant to the subject matter of the instant motion.

appropriate when "no elaborate industry analysis is required to demonstrate the anticompetitive character" of an inherently suspect restraint. *California Dental Ass'n v. Federal Trade Comm'n*, 526 U.S. 756, 770 (1999) (internal citation omitted). Thus, in the event this Court determines the *per se* rule does not apply to the Agreement, it is appropriate to analyze the Agreement under a quick-look analysis.

Under a quick-look analysis, actual anticompetitive effects of the challenged restraint are presumed, and the defendant has the burden of coming forward with evidence of countervailing procompetitive virtues. *California Dental Ass'n*, 526 U.S. at 775 n.12. If the defendant fails to establish a legitimate procompetitive justification, then the restraint should be condemned as a violation of the antitrust laws. *See United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993). Such an analysis would greatly simplify the trial of this action.[6]

The remainder of this brief is organized as follows. In Part I, Plaintiffs summarize the material undisputed facts. In Part II, we demonstrate that horizontal market-allocation agreements are illegal *per se* under long-settled case law, and that the Agreement at issue is a straightforward horizontal market-allocation agreement. Part III shows that, even if the *per se* rule does not apply, "quick-look" analysis does, and the Agreement does not survive scrutiny under that analysis.

---

[6]    The trial would be simplified by a ruling that quick-look analysis applies even if the Court ultimately determines that a trial is necessary to adjudicate Defendants' asserted procompetitive justifications.

## I.  STATEMENT OF UNDISPUTED FACTS

1.     Warner Chilcott is a pharmaceutical company that develops, manufactures, markets and distributes proprietary women's healthcare and dermatological pharmaceutical products.  Warner Ans. to Class Action Complt. (*Meijer*) ¶ 2 (Appendix Tab 1).[7]   Warner Chilcott markets Ovcon, a branded oral contraceptive, in the United States.  *Id.* ¶¶ 32, 35.  Ovcon was approved by the FDA in 1976 and is not subject to patent protection.  *Id.* ¶ 32.  Prior to Barr's launch of generic Ovcon, Ovcon was one of Warner Chilcott's highest revenue-producing products.  *Id.* ¶ 36.

2.     Barr is a pharmaceutical company that develops, manufactures, markets and distributes pharmaceutical products.  Barr Ans. to Complt. (*Walgreen*) ¶ 14 (App. Tab 2)  In or about September 2001, Barr filed an ANDA with the FDA for approval to market an AB-rated generic version of Ovcon.  *Id.* ¶ 28.

3.     On September 10, 2003, Warner Chilcott and Barr signed a Letter of Intent to enter into an agreement whereby Warner Chilcott would have the option to pay Barr $20 million and obtain, among other things, Barr's agreement not to launch its generic version of Ovcon for five years following final FDA approval.  *Id.* ¶ 38.  On March 24, 2004, Warner Chilcott and Barr signed the agreement contemplated by the Letter of Intent and Warner Chilcott made an initial payment to Barr of $1 million.[8]  *Id.* ¶

---

7     Copies of the pleadings and other documents cited in this Statement of Undisputed Facts are contained in the accompanying Appendix.

8     There were actually two separate agreements—an Option and License Agreement, and a Finished Product Supply Agreement.  The two agreements were executed simultaneously, and each refers to the other.  For convenience, we will refer to them as a single agreement (the "Agreement").

39; Warner Ans. to Class Action Complt. ¶ 50.  Under the terms of the Agreement, Warner obtained an option that could be exercised by paying Barr an additional $19 million within 45 days of Barr's receipt of FDA approval to market its generic version of Ovcon.  March 24, 2004 Option and License Agreement §§ 2.4 - 2.6 (Barr-29-00015) (App. Tab 3).

4.    On April 22, 2004, the FDA granted final approval of Barr's ANDA for generic Ovcon.  Barr Ans. to Complt. (*Walgreen*) ¶ 42.  On April 23, 2004, Barr announced its intent to begin immediately marketing generic Ovcon under the trade name Balziva if Warner Chilcott chose not to exercise its option under the Agreement. News Release, *Barr's Generic Ovcon-35 Tablets Approved* (April 23, 2004) (App. Tab 4).  On May 6, 2004, Warner Chilcott exercised its option and paid Barr the remainder of the promised $20 million payment.  Barr Ans. to Complt. (*Walgreen*) ¶ 45.

5.    Upon receiving the remaining $19 million payment from Warner Chilcott under the Agreement, Barr was obligated to sell its approved generic Ovcon product exclusively to Warner Chilcott and was prohibited from marketing the product in competition with Warner Chilcott for a period of five years.  Barr Ans. to Complt. (*Walgreen*) ¶ 46; March 24, 2004 Option and License Agreement § 3.3 (during the five-year term, "neither Barr nor its Affiliates shall . . . market, commercialize, distribute or sell [generic Ovcon] in [the United States]") (Barr-29-00016); March 24, 2004 Finished Product Supply Agreement § 2.1 ("neither Barr nor any of its Affiliates shall have the right to manufacture or supply [generic Ovcon] for or to any other Person [than Warner]") (WCO0156113) (App. Tab 5).

6.    On November 7, 2005, the FTC filed a complaint in this Court alleging that the Agreement violated Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a)(1).[9] On November 7, 2005, 22 states also filed actions against Warner Chilcott and Barr alleging violations of the antitrust laws.[10]

7.    On September 25, 2006, the FTC filed a motion for preliminary injunction to prevent Warner Chilcott from withdrawing Ovcon 35 from the marketplace as it prepared to introduce Ovcon Chewable. On the same day, or approximately half way through the five-year period set out in the Agreement, Warner Chilcott signed a waiver that terminated the exclusivity provisions of the Agreement. As a result of that waiver, Barr was able to begin marketing its generic version of Ovcon in the United States. Barr launched its generic Ovcon product under the trade name Balziva. News Release, *Barr Announces Warner Chilcott Waives Exclusive License for Ovcon 35* (Sept. 26, 2006) (App. Tab 6).

8.    Barr launched Balziva at approximately a 30% discount to the price of branded Ovcon 35. Warner Chilcott Price Increase Notice dated March 1, 2006 (KGR 0003) (App. Tab 7); Barr Laboratories Letter to Brooks/Eckerd dated October 17, 2006 (BRK 000086-87) (App. Tab 8).

---

9    On December 5, 2005, the FTC filed its First Amended Complaint. The FTC sought a permanent injunction to invalidate the exclusivity provision of the Agreement.

10    In December 2005, the states also filed an amended complaint against Warner Chilcott and Barr (13 additional states joined in this complaint). A second amended complaint was filed by the states on October 3, 2006. Discovery in the states' case is ongoing.

9.     The launch of Barr's generic version of Ovcon has resulted in Warner Chilcott losing more than 80% of its Ovcon sales to the less expensive generic.  News Release, *Warner Chilcott Reports Operating Results for the Quarter Ended March 31, 2007 and Raises 2007 Full Year Guidance*, p.1 (May 11, 2007) ("The decline in Ovcon revenue was due to the introduction of a generic version of Ovcon 35 in late October 2006, which led to an 80.4% decline in filled prescriptions for Ovcon 35 compared to the same quarter last year") (App. Tab 9).

10.     Some time after Barr received FDA approval, Warner Chilcott stopped purchasing its supply of finished Ovcon tablets from Bristol-Myers Squibb (its previous supplier) and began purchasing them from Barr.  Warner Chilcott 2006 Annual Report (SEC Form 10-K), pp. 11-12 (App. Tab 10).  On January 29, 2007, Warner Chilcott and Watson Pharmaceuticals, Inc. ("Watson") announced that Watson had launched a generic version of Ovcon under the name Zenchent, which Warner Chilcott supplies to Watson (i.e., an "authorized" generic).  News Release, *Warner Chilcott and Watson Pharmaceuticals Announce Launch of Zenchent* (Jan. 29, 2007) (App. Tab 11).  Thus, Barr currently supplies Warner Chilcott with the tablets that are resold as branded Ovcon; Barr also supplies Warner Chilcott with the tablets that are sold by Watson as Zenchent; and Barr sells the very same tablets as Balziva in competition with both Ovcon and Zenchent.

11.     The commerce at issue in this case is interstate commerce.  Warner Ans. to Complt. (*Walgreen*) ¶ 17 (Ovcon is sold throughout the United States); Barr website,

www.barrlabs.com ("Barr Pharmaceuticals is a global specialty pharmaceutical company that operates in more than 30 countries worldwide").

## II. THE AGREEMENT IS A *PER SE* VIOLATION OF SECTION 1 OF THE SHERMAN ACT.

The Agreement is in writing and undisputed.  Accordingly, if the Court agrees that the Agreement is subject to the *per se* rule, it necessarily follows that Defendants violated section 1 of the Sherman Act by entering into a prohibited "contract, combination . . . or conspiracy in restraint of trade."  15 U.S.C. § 1.[11]  Whether the Agreement is subject to the *per se* rule is a question of law for the Court.  *See Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 337, n.3 (1982) (the determination of which standard should be used to analyze a challenged restraint under Section 1 of the Sherman Act is a question of law); *The Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island*, 373 F.3d 57, 61 (1st Cir. 2004) (whether to apply a *per se* or rule of reason analysis in determining the reasonableness of the challenged restraint of trade is a question of law for the Court); *In re Cardizem CD Antitrust Litigation*, 105 F. Supp. 2d 682, 694 (E.D. Mich. 2000) (same), *aff'd*, 332 F.3d 896 (6th Cir. 2003).[12]

---

11    This determination would not resolve the issues of causation and damages, which would remain to be litigated at trial.  *See In re Cardizem CD Antitrust Litigation*, 332 F.3d at 909.

12    *See also In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1316 (S.D. Fla. 2005) ("As the instant motions are not ones in which 'motive and intent play important roles in determination of factual issues,' but rather involve legal questions for the Court to decide as a matter of law, disposition of these matters on summary judgment is appropriate") (citation omitted).

### A.    Horizontal Market Allocation Agreements are Per Se Illegal

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal . . . ." 15 U.S.C. § 1. Read literally, section 1 "prohibits *every* agreement in restraint of trade." *Maricopa County*, 457 U.S. at 342. However, the Supreme Court has long recognized that Congress intended to outlaw only "unreasonable" restraints of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997); *Maricopa County,* 457 U.S. at 342-43 (citation omitted).

Most restraints on competition are evaluated using a "rule of reason." *State Oil,* 522 U.S. at 10. Some restraints, however, "are deemed unlawful *per se*" because they "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit." *State Oil*, 522 U.S. at 10 (citing *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)). "*Per se* treatment is appropriate 'once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.'" *State Oil*, 522 U.S. at 10 (quoting *Maricopa County*, 457 U.S. at 344); *see also Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19-20 (1979) (a *per se* rule is applied when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output"). Whether the courts have long experience with a particular industry or fact pattern is irrelevant to the inquiry; what matters is whether the *type of restraint* is one that the Supreme Court has condemned as *per se* unlawful. *Maricopa County*, 457 U.S. at 350-51 & n. 19.

9

The *per se* approach applies a "conclusive presumption" of illegality to certain

types of agreements. *See Maricopa County.*, 457 U.S. at 344. Where it applies, no

consideration is given to the intent behind the restraint, to any claimed pro-competitive

justifications, or to the restraint's actual effect on competition. *See National Collegiate

Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 100-01 (1984); *In re Cardizem CD

Antitrust Litigation*, 332 F.3d 896, 906 (6th Cir. 2003). As the Supreme Court has

explained, "the probability that anticompetitive consequences will result from a practice

and the severity of those consequences must be balanced against its procompetitive

consequences. Cases that do not fit the generalization may arise, but a *per se* rule

reflects the judgment that such cases are not sufficiently common or important to justify

the time and expense necessary to identify them." *Continental T.V., Inc. v. GTE

Sylvania Inc.*, 433 U.S. 36, 50 n.6 (1977).[13]

The Supreme Court has identified certain types of restraints as subject to the *per

se* rule, such as horizontal restraints (agreements between competitors or potential

competitors) pertaining to prices or territories. *See, e.g., Palmer v. BRG of Ga., Inc.*,

498 U.S. 46, 49-50 (1990) (holding that agreements not to compete within certain

territorial limits are obviously anticompetitive); *NCAA*, 468 U.S. at 100 ("Horizontal price

fixing and output limitation are ordinarily condemned as a matter of law under an 'illegal

*per se*' approach because the probability that these practices are anticompetitive is so

---

13    *See also FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 432 (1990)
(the "per se rules avoid 'the necessity for an incredibly complicated and prolonged
economic investigation into the entire history of the industry involved, as well as related
industries, in an effort to determine at large whether a particular restraint has been
unreasonable'") (quoting *Northern Pacific Ry. Co. v. United States*, 356 U.S. at 5).

high"); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)

("Certain agreements, such as horizontal price fixing and market allocation, are thought

so inherently anticompetitive that each is illegal *per se* without inquiry into the harm it

has actually caused"); *Northern Pacific Ry.,* 356 U.S. at 5 ("[a]mong the practices which

the courts have heretofore deemed to be unlawful in and of themselves are price fixing,

division of markets, group boycotts, and tying arrangements" (internal citations

omitted)).

Indeed, the Supreme Court has called such horizontal market allocation

agreements between competitors "[o]ne of the classic examples of a *per se* violation of

§1." *United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972).  *See also In re*

*Terazosin Hydrochloride Antitrust Litig.,* 352 F. Supp. 2d at 1313 ("horizontal

agreements between competitors are antitrust's most 'suspect' classification, which as

a group provoke closer scrutiny than any other arrangement"); *Blackburn v. Sweeney*,

53 F.3d 825 (7th Cir. 1995) (horizontal agreements to allocate markets among

competitors are *per se* violations); *United States v. Cooperative Theatres of Ohio Inc.*,

845 F.2d 1367 (6th Cir. 1988) (same).

### B. The Agreement Not to Compete Between Warner Chilcott and Barr On Its Face Eliminates Competition and is a Per Se Illegal Restraint of Trade

The Agreement is a straightforward horizontal market allocation agreement.

Under the Agreement, Warner Chilcott paid Barr (a potential competitor) $20 million

and, in exchange, Barr agreed (among other things) not to market its AB-rated generic

Ovcon product in competition with Warner Chilcott for five years after receiving final

11

FDA approval of its ANDA. At the time, Barr was Warner Chilcott's only potential AB-rated generic competitor for sales of that drug. Thus, the Agreement eliminated all generic competition to Ovcon for five years.

Since the Agreement is, at its core, a horizontal agreement to eliminate competition for sales of Ovcon and its generic equivalents throughout the United States, it constitutes a classic example of a *per se* illegal restraint of trade. *See Palmer v. BRG of Georgia, Inc.*, 498 U.S. at 49-50; *Valley Drug v. Geneva Pharms., Inc.*, 344 F.3d 1294, 1304 (11th Cir. 2003); *Cardizem CD*, 332 F.3d at 908-09.[14]

While Defendants euphemistically characterize the Agreement as an "exclusive" supply and license agreement, that label does not alter the fact that it is a horizontal market allocation agreement among actual or potential competitors. Antitrust law looks to the substance of the agreement, rather than the label attached to it. *See Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451, 466-67 (1992) (legal analysis based "on formalistic distinctions rather than actual market realities [is] generally disfavored in antitrust law"); *Palmer*, 498 U.S. at 47 (finding that "exclusive license" between competing bar-review firms was illegal *per se*). These types of agreements have long been held *per se* illegal:

> An agreement between competitors to allocate markets is, as the district court noted, clearly anticompetitive. Such an agreement has the obvious tendency to diminish output and raise prices. When a firm pays its only potential competitor

---

14    *See also* I ABA Antitrust Section, ANTITRUST LAW DEVELOPMENTS 58 (5th ed. 2002) ("Certain agreements are treated as illegal *per se* with virtually no factual inquiry. For example...market allocation agreements among competitors rarely have plausible procompetitive justifications, and all a plaintiff usually needs to prove to establish illegality is that such an agreement exists.").

> not to compete in return for a share of the profits that firm
> can obtain by being a monopolist, competition is reduced.
> *See, e.g., Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49-
> 50 (1990) (per curiam) (agreements not to compete within
> certain territorial limits are obviously anticompetitive); *United
> States v. Topco Assocs.*, 405 U.S. 596, 608 (1972)
> (observing that an agreement between competitors to
> allocate territories is a "classic example" of a per se violation
> of the Sherman Act, with no purpose other than reducing
> competition).

*Valley Drug*, 344 F.3d at 1304 (emphasis added).  *See also Polygram Holding, Inc. v.*

*FTC,* 416 F.3d 29, 35 (D.C. Cir. 2005) ("An agreement between joint venturers to

restrain price cutting and advertising with respect to products not part of the joint

venture looks suspiciously like a naked price fixing agreement between competitors,

which would ordinarily be condemned as *per se* unlawful.").

The Agreement between Warner Chilcott and Barr lacks even the fig leaf of

justification relied on by the defendants in *Valley Drug*.  In the Eleventh Circuit's opinion

in that case, the court commented that it would "readily affirm" the district court's order

condemning the agreement at issue as a *per se* violation (and granting the plaintiffs'

motion for partial summary judgment) if not for the complicating factor that, at the time

the agreement was signed, Abbott owned a presumptively valid patent that Geneva's

proposed generic drug unquestionably infringed.  *Valley Drug*, 344 F.3d at 1304.  On

remand, once the district court concluded that the agreement went beyond the scope of

Abbott's patent, it quickly found the agreement illegal *per se* under settled antitrust law.

*See In re Terazosin Hydrochloride Antitrust Litigation*, 352 F. Supp. 2d 1279 (S.D. Fla.

13

2005). In this case, of course, Warner Chilcott has no patent rights that could be used to justify an agreement delaying generic competition.

*Palmer v. BRG of Georgia, Inc.* is also directly analogous. Two companies that had competed in providing bar review courses in Georgia stopped competing pursuant to an agreement whereby one company (BRG) became the exclusive licensee of the other (HBJ) in Georgia and BRG agreed not to compete with HBJ outside Georgia. 498 U.S. at 47. The Court condemned the agreement as "unlawful on its face." *Id.* at 50. "Such agreements are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other." *Id.* at 49-50.

The Sixth Circuit in *Cardizem* likewise held that a similar agreement between branded and generic drug manufacturers involving the drug Cardizem CD constituted a *per se* violation of Section 1 of the Sherman Act. *See Cardizem,* 332 F.3d at 900. Like Defendants here, the defendants in *Cardizem* entered into an agreement whereby the branded manufacturer paid the generic manufacturer millions of dollars not to enter the United States market for the branded product and its generic equivalents. The Sixth Circuit held that the agreement at issue was properly characterized as a horizontal market allocation agreement and that such agreements have long been held *per se* illegal under the antitrust laws. *Id.* at 908 (there was "simply no escaping the conclusion, that the Agreement . . . was, at its core, a horizontal agreement to eliminate competition in the market for Cardizem CD throughout the United States, a classic example of a *per se* illegal restraint of trade."). Moreover, in *Cardizem*, the agreement

not to compete arose in the context of a patent dispute.  *See Cardizem*, 332 F.3d at 902-03.  As noted above, this case is far simpler because there are no patent issues of any kind.

Defendants may argue that, before applying the *per se* rule, the Court should determine whether this particular Agreement is one that would "always or almost always tend to restrict competition" and whether it has any countervailing procompetitive virtues.  Such an argument would "indicate[] a misunderstanding of the *per se* concept." *Maricopa County*, 457 U.S. at 351.  As the Sixth Circuit explained in *Cardizem*, the whole point of *per se* analysis "is that it allows courts to presume that certain behaviors <u>as a class</u> are anticompetitive without expending judicial resources to evaluate the actual anticompetitive effects or procompetitive justifications in a particular case." 332 F.3d at 909 (emphasis added).  If a court were required to determine the anticompetitive effects and procompetitive justifications for a <u>particular</u> restraint before applying the *per se* rule, the whole point of *per se* analysis would be defeated.  That inquiry is done with respect to the <u>class</u> of restraints at issue (i.e., horizontal market-allocation agreements), and it has already been done.

The only question the Court must answer before applying the *per se* rule is whether the Agreement is in fact a horizontal market-allocation agreement.  It plainly is. The Agreement is an agreement between potential competitors in which one party (Barr) agrees not to compete with the other (Warner Chilcott) in a particular territory (the

United States) for a particular amount of time (five years).  As such, the Agreement is unlawful *per se*.[15]

### III.  IN THE ALTERNATIVE, THE AGREEMENT IS UNLAWFUL UNDER A "QUICK LOOK" ANALYSIS

#### A.    Quick-Look Analysis Is Appropriate Because the Anticompetitive Effects of the Agreement Are Obvious

In the event the Court decides not to apply the *per se* rule, the Court should analyze the Agreement under a "quick-look" rule of reason analysis.  *See United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993) ("[Quick-look] applies in cases where *per se* condemnation is inappropriate, but where 'no elaborate industry analysis is required to demonstrate the anticompetitive character' of an inherently suspect restraint.") (quoting *National Soc. of Professional Engineers v. United States*, 435 U.S. 679, 692 (1978)); *see also Federal Trade Comm'n v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (abbreviated rule of reason analysis appropriate for horizontal agreement among dentists to withhold X-Rays from insurers for use in benefit determinations).

The Supreme Court has held that a quick-look analysis is appropriate when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."  *California Dental Ass'n v. FTC*, 526 U.S. 756, 770-71 (1999) (while not using

_____

15     Market-allocation agreements are in some ways more pernicious than horizontal price-fixing agreements.  While price-fixing agreements allow the conspirators to compete in areas other than price, customer- and market-allocation agreements eliminate not only price competition, but all other forms of competition as well.  *See United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 317 (4th Cir. 1982).

the term "quick look," prior Supreme Court decisions supported an abbreviated or "quick look" rule of reason analysis).[16]

In *California Dental*, in considering a dental association's ethical rules restricting advertising, the Supreme Court recognized that advertising restrictions normally harm competition and consumers, but noted that the association had advanced a number of reasons why normal economic conclusions about the impact of advertising restrictions in commercial markets were inapplicable in a market for professional services. *Id.* at 771-72. The Court concluded that, under those circumstances, and given the association's identification of plausible procompetitive justifications, obvious anticompetitive effects had not been shown. *Id.* at 774-78.

Nevertheless, the Supreme Court made clear that, even when plausible justifications are advanced, the "fullest" market analysis is not necessarily required. *See California Dental*, 526 U.S. at 779. The Court stated: "The truth is that our categories of analysis of anticompetitive effect are less fixed than terms like '*per se*,' 'quick look,' and 'rule of reason' tend to make them appear." *Id.* Rather, the analysis should be flexible:

> [T]here is generally no categorical line to be drawn between restraints that give rise to an intuitively obvious inference of anticompetitive effect and those that call for more detailed treatment. What is required, rather, is an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint. The object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick (or at least quicker) look, in place of a more sedulous one.

---

16    *See also Law v. NCAA*, 134 F.3d 1010, 1019 (10th Cir. 1998) ("A naked, effective restraint on market price or volume can establish anticompetitive effect under a truncated rule of reason analysis.").

*California Dental*, 526 U.S at 780-81.  S*ee also Polygram Holding, Inc. v. FTC,* 416

F.3d at 35 (although eschewing the term "quick look" analysis, the court acknowledged

that in some cases a full-blown market analysis is not necessary depending the nature

of the challenged restraint).[17]

Whether called a rule of reason "continuum" (*Polygram*, 416 F.3d at 35), or a

"quick-look" analysis, "the criterion to be used in judging the validity of a restraint on

trade is its impact on competition." *NCAA*, 468 U.S. at 104.  In *NCAA*, for example, the

Supreme Court found that the television plan at issue restricted output and fixed prices,

categories of restraints that generally fall within the *per se* rule.  However, because the

Court recognized that the case involved "an industry in which horizontal restraints on

competition are essential if the product is to be available to all," the Court applied a

quick-look analysis.  *NCAA*, 468 U.S. at 101, 109.

In applying a quick-look analysis, the Court found that due to the obvious nature

of the restraint's anticompetitive effects, the defendant had "a heavy burden of

establishing an affirmative defense which competitively justifies this apparent deviation

from operations of a free market." *NCAA*, 468 U.S. at 113.  The Court rejected the

defendant's proffered procompetitive justifications and found that the restraint was "not

even arguably tailored to serve" the alleged justifications.  *Id.* at 119.  Accordingly, the

Court condemned the restraint as a violation of Section 1 of the Sherman Act. *Id.*

---

17    *See also Worldwide Basketball & Sports Tours, Inc. v. NCAA*, 273 F. Supp. 2d
933, 949-50. (S.D. Ohio 2003) ("if a Plaintiff can show that the restraint has actually
produced significant anti-competitive effects, such as a reduction in output, a formal
market analysis is unnecessary") (citation omitted).

The same considerations which establish that the Agreement is a horizontal market-allocation agreement also show that it had the obvious potential to cause (and did, in fact, cause) anticompetitive effects. By preventing the entry of Barr's competing generic product, the Agreement restricted competition and forced purchasers to pay inflated prices for Ovcon products. *See Valley Drug.*, 344 F.3d at 1313 n.27 (rule-of-reason analysis is unnecessary and inappropriate in cases involving exclusion of generic drugs because "the anticompetitive effects of exclusion cannot seriously be debated"); *Cardizem*, 332 F.3d at 910 ("It is clear, and not disputed on appeal, that the plaintiffs have alleged the type of injury the antitrust laws were meant to prevent."). Application of quick-look analysis therefore is appropriate because "the great likelihood of anticompetitive effects [resulting from the Agreement] can easily be ascertained." *California Dental*, 526 U.S. at 770.

### B.    There are No Legitimate Procompetitive Justifications For The Agreement

Under a quick-look analysis, "competitive harm is presumed" due to the obvious nature of the anticompetitive effects that are likely to result from the restraint at issue. *Brown Univ.*, 5 F.3d at 669.[18] Thus, upon a determination that quick-look analysis is appropriate, the burden shifts to the defendant to justify the restraint based on some countervailing procompetitive benefit. I ABA Antitrust Section, ANTITRUST LAW DEVELOPMENTS 56 ("the plaintiff's initial burden of proving a substantial anticompetitive

---

18    *See also Chicago Professional Sports Ltd. Partnership v. NBA*, 961 F.2d 667, 674 (7th Cir. 1992) (approving application of "quick look" rule of reason analysis that dispensed with market definition and assessment of market power in a case involving an output restriction established by the National Basketball Association).

effect [is] satisfied by proof of a naked restraint on price or output, shifting the burden to

the defendant to prove the restraint's offsetting procompetitive effects"); XI H.

Hovenkamp, ANTITRUST LAW ¶ 1914d (2005) (in quick-look cases, "the plaintiff's

opening proof is equivalent to that offered in a per se case, which is simply adequate

evidence of agreement and of a restraint deemed so likely to have anticompetitive

effects as to be unreasonable 'as a matter of law.'  At that time the burden shifts to the

defendant to offer some procompetitive justification for the restraint").  A procompetitive

justification is "a nonpretextual claim [by the defendant] that its conduct is indeed a form

of competition on the merits."  *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C.

Cir. 2001) (en banc).[19]

Based upon arguments Defendants have made throughout this litigation,

Plaintiffs anticipate that they will offer two purported procompetitive justifications for the

Agreement: (1) prior to the Agreement, Warner Chilcott had difficulty obtaining an

adequate supply of Ovcon from its contract manufacturer, Bristol-Myers Squibb, and the

Agreement purportedly assured Warner Chilcott of an adequate source of supply by

preventing Barr from selling to anyone else (the "supply problem" defense); and (2) if

generic Ovcon had entered in 2004, consumers purportedly would have been worse off

---

19     The D.C. Circuit in *Microsoft* emphasized that, in determining whether the
defendant has successfully made such a claim, the court's "focus is upon the effect of
[the defendant's] conduct, not upon the intent behind it."  *Id.  See also Kreuzer v.
American Academy of Periodontology*, 735 F.2d 1479, 1492-93 (D.C. Cir. 1984) (in
evaluating alleged procompetitive justification, court should evaluate impact of restraint
rather than intent behind it).

because they would have lost the benefit of Warner Chilcott's free samples (the "sampling" defense).

Even accepting for purposes of this motion the erroneous factual premises of these supposed defenses,[20] neither of them establishes a procompetitive justification for the Agreement. Since the burden is on <u>Defendants</u> to establish such a justification, our objective in this section of the brief is merely that of "'showing'---that is, pointing out to the district court"---that Defendants will not be able to meet their burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (party moving for summary judgment is not required to disprove element of case as to which the non-moving party bears the burden of proof).

### 1.    The "supply problem" defense is not a procompetitive justification.

Throughout this litigation, Warner Chilcott has attempted to justify the exclusive Agreement by arguing that preventing Barr from selling generic Ovcon in competition with Warner Chilcott was necessary to ensure that Warner Chilcott had sufficient Ovcon tablets to be able to supply the entire market. In addition to its factual shortcomings (which we will not detail here),[21] the obvious fallacy in this argument is that, if Warner

---

20    Neither defense is consistent with the facts and, if necessary, Plaintiffs will demonstrate their inconsistency with the facts at the appropriate time. We recognize that the Court is not empowered to resolve these factual disputes on a motion for summary judgment. For the reasons given in this motion, there is no need for the Court to entertain these defenses on their facts.

21    For example, an October 2, 2006 e-mail only very recently (and belatedly) produced by Warner Chilcott admits that the purpose of the Agreement was to prevent generic competition and not to solve Warner Chilcott's supposed supply problems. The e-mail admits that the "Barr contract is <u>focused on avoiding the launch of Ovcon generic product</u> by having a manufacturing agreement between Barr and WC." WC00464895 (emphasis supplied).

Chilcott had not prevented Barr from selling generic Ovcon in competition with it, it would not have needed sufficient Ovcon tablets to be able to supply the entire market.

Warner Chilcott's argument incorrectly assumes that, but for the Agreement, Warner Chilcott would have needed to continue supplying branded Ovcon to the entire market. In actuality, the only reason Warner Chilcott continued to supply the entire market was because the Agreement prevented Barr from entering with its competing product. If Barr had been allowed to enter the market with Balziva in 2004, demand for branded Ovcon would have been reduced to a fraction of its former requirements, just as it was when Balziva entered in 2006. If that were allowed to happen, Warner Chilcott would not have needed supply for the entire market, but rather only for the small portion (less than 20%) not taken by generic Ovcon sales.[22]

Furthermore, as it turns out, Barr ultimately was able to supply the entire market. In late September 2006, Warner Chilcott waived the exclusivity provision of the Agreement. Since that time, Barr has had no difficulty supplying itself with tablets, which it markets as generic Ovcon (Balziva), and supplying Warner Chilcott with tablets, which Warner Chilcott resells as branded Ovcon 35 in competition with the Barr product.[23] This same scenario would have occurred had the Agreement not prevented

_____

[22]    Even Defendants do not argue that the exclusivity provision was necessary to meet the diminished demands for branded Ovcon.

[23]    As noted above, Barr currently supplies Warner Chilcott not only with the tablets that Warner Chilcott sells as branded Ovcon 35 but also with the tablets that Warner Chilcott sells to Watson Pharmaceuticals for sale as an "authorized generic."

Barr from launching its competitive product – it just would have happened two and a half years earlier.

For much the same reasons, ensuring Warner Chilcott's ability to supply the entire market with Ovcon tablets is not procompetitive at all, but rather anticompetitive. See National Society of Prof. Engineers v. United States, 435 U.S. 679, 693 (1978) (rejecting proposed defense that "confirm[ed] rather than refute[d] the anticompetitive purpose and effect" of the challenged agreement). Even if we assume that, in a competitive market, it would be procompetitive for a seller to have sufficient quantities to meet the demand of those customers who will elect to buy from it, that assumption would not support Defendants' contention here. This assumption is premised upon the existence of a competitive market. In this case, a competitive market would have been one that included not only branded Ovcon but also one or more AB-rated generic versions of Ovcon. The existence of those competing generics would have caused sales of branded Ovcon to decline rapidly to less than 20% of their pre-generic volume.[24] In fact, this is what happened when the Agreement was unwound 2 ½ years later.

Therefore, even if we assume that it would be procompetitive for Warner Chilcott to ensure that it could supply the 15 to 20% of the market that would have continued to demand branded Ovcon, there is nothing procompetitive about ensuring that Warner

---

24    In addition to losing sales to the generic, the entry of an AB-rated generic would also reduce or eliminate Warner Chilcott's need for samples, which (according to Warner Chilcott) account for as much as 40% of its total unit requirements. Thus, the effects of generic entry in reducing Warner Chilcott's unit requirements would be even more pronounced than indicated in the text.

Chilcott could supply 100% of the market when more than 80% of consumers would prefer to buy the generic at lower prices.

### 2.    The "sampling" defense is legally insufficient.

Plaintiffs in these three cases are not consumers; they are direct purchasers of Ovcon -- wholesalers and retailers who do not get samples.   Nevertheless, Defendants' second proffered defense focuses upon the impact of the Agreement on consumers. Defendants advance the remarkable (and factually inaccurate) claim that consumers actually <u>benefited</u> from the two-and-a half year delay in the entry of generic Ovcon because, on balance, the benefits to consumers of getting free samples from their physicians (a practice that generally ceases upon generic entry) outweigh the harm of being forced to pay for branded Ovcon rather than generic Ovcon when they actually fill a prescription.[25]   In other words, Defendants propose to weigh the "effective discount" <u>to consumers</u> of free samples against the actual discount <u>to consumers</u> in the retail price of generic Ovcon versus branded Ovcon in an attempt to show that <u>consumers</u> were not injured by the Agreement.

Whatever its factual merits (which in our view are nonexistent), this entire inquiry is foreclosed by long-established Supreme Court precedent.   It would require the Court and the parties to engage in very the "pass-on" analysis that the Supreme Court has prohibited in federal antitrust cases.   In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the

---

25    Of course, this defense assumes that the Agreement actually delayed entry of generic Ovcon—i.e., that Barr would have launched in 2004 but for the Agreement.  If Barr would not have launched, then Warner Chilcott would have continued to sample.

Supreme Court adopted the rule that only direct purchasers—in this case, wholesalers and retailers—are permitted to show that they suffered injury in the form of higher prices resulting from an antitrust violation, and that any inquiry into the derivative injury suffered by indirect purchasers (i.e., customers of direct purchasers, customers of those customers, etc.) is precluded as a matter of law.

The rule adopted in *Illinois Brick* and *Hanover Shoe* is equivalent to a conclusive presumption that consumers who purchase indirectly from intermediaries are <u>not</u> injured by antitrust violations because the overcharge is fully absorbed at the direct purchaser level. As the Court explained in *Illinois Brick*, *Hanover Shoe* held that:

> a direct purchaser suing for treble damages under § 4 of the Clayton Act is injured within the meaning of § 4 by the full amount of the overcharge paid by it <u>and that the antitrust defendant is not permitted to introduce evidence that indirect purchasers were in fact injured by the illegal overcharge.</u> The first reason for the Court's rejection of this offer of proof was an unwillingness to complicate treble-damages actions with attempts to trace the effects of the overcharge on the purchaser's prices, sales, costs, and profits, and of showing that these variables would have behaved differently without the overcharge. A second reason for barring the pass-on defense was the Court's concern that unless direct purchasers were allowed to sue for the portion of the overcharge arguably passed on to indirect purchasers, antitrust violators "would retain the fruits of their illegality" because indirect purchasers "would have only a tiny stake in the lawsuit" and hence little incentive to sue.

*Illinois Brick*, 431 U.S. at 724-25 (emphasis added; citations omitted).

Defendants' "sampling" defense is inconsistent with the indirect-purchaser rule in at least three respects.

First, the proposition that Defendants seek to establish—that consumers who purchased Ovcon at retail pharmacies were not injured by the delay in generic entry—is already conclusively presumed as a matter of law. *Hanover Shoe* and *Illinois Brick* establish a conclusive presumption that entities purchasing directly from the antitrust violator absorb the <u>full</u> amount of the illegal overcharge; that the overcharge is <u>not</u> passed on to customers of those direct purchasers in the form of higher prices; and that those customers do <u>not</u> suffer any injury as a result of the violation. *See Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 207 (1990) (in *Illinois Brick*, the Court ruled that the State of Illinois "had suffered no injury" because the defendant in the case "had not sold any concrete blocks to it"); *Illinois Brick*, 431 U.S. at 725 (direct purchaser "is injured within the meaning of § 4 by the full amount of the overcharge"); *Hanover Shoe*, 392 U.S. at 491 (same). There is no need for Defendants to prove that indirect-purchasing consumers were not injured by Defendants' anticompetitive conduct; they never are.[26]

Second, litigation of Defendants' sampling defense would in fact require the Court to determine how much of the illegal overcharge was passed on by wholesalers

---

26    It is true, of course, that preventing injury to consumers in the form of higher prices and reduced output is a motivating purpose behind the antitrust laws. But this does not imply that proof of actual consumer injury is an element of antitrust liability in cases brought by entities higher up in the distribution chain. Such a rule would eviscerate *Hanover Shoe* and *Illinois Brick*. References to consumer injury are a way of keeping antitrust courts focused on the fact that the antitrust laws are designed to protect the competitive process rather than individual competitors. *See, e.g., United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D. C. Cir. 2001) (anticompetitive conduct is conduct which harms the competitive process and thereby harms consumers). That principle is not implicated here. There is no contention in this case that the Agreement harmed individual competitors but not the competitive process; in fact, it made both individual competitors better off.

and retailers to consumers in the form of higher retail prices. As explained above, Defendants are seeking to prove that consumers benefited from the delay in generic entry because consumers are supposedly better off receiving samples and paying higher retail prices for branded Ovcon than not receiving samples and paying lower retail prices for generic Ovcon. This contention would require the Court to determine the difference between the prices charged by pharmacies for branded Ovcon and the prices charged for generic Ovcon—i.e., to determine how much of the higher prices paid by direct purchasers to acquire branded as opposed to generic Ovcon is passed on to consumers in the form of higher retail prices. It is only by calculating that discount that it can be compared to the "effective discount" to consumers resulting from free samples. But it is precisely this inquiry—the "massive efforts" needed to identify the amount of the overcharge absorbed at each level of the distribution chain, "from direct purchasers to middlemen to ultimate consumers"—that is barred by *Illinois Brick*. 431 U.S. at 737.

Third, as a consequence of creating substantive law, *Hanover Shoe* and *Illinois Brick* also created an evidentiary rule that prohibits introduction of evidence relating to downstream prices. *See Illinois Brick*, 431 U.S. at 724-25 (under *Hanover Shoe*, "the antitrust defendant is not permitted to introduce evidence that indirect purchasers were in fact injured by the illegal overcharge"). In this case, Defendants are offering to prove that indirect purchasers were <u>not</u> "injured by the illegal overcharge."[27] If the Court deems this evidence relevant, <u>Plaintiffs</u> will be forced to rebut it by proving that

consumers <u>were</u> injured by the illegal overcharge—i.e., that Plaintiffs pass on a portion of the overcharge to (retailers and) consumers, and that this portion of the overcharge outweighs any benefits that consumers receive in the form of free samples. But the difficulties and complexities that led the Court to bar the introduction of such evidence do not depend on the litigation status of the party introducing it. Whether this "pass on" evidence is introduced by Plaintiffs or Defendants, the result will be "to complicate treble-damages actions with attempts to trace the effects of the overcharge on the purchaser's prices, sales, costs, and profits, and of showing that these variables would have behaved differently without the overcharge." *Illinois Brick*, 431 U.S. at 725. *See also id.* at 741 ("the 'massive evidence and complicated theories' involved in attempting to establish a pass-on defense against a direct purchaser applies *a fortiori* to the attempt to trace the effect of the overcharge through each step of the distribution chain from the direct purchaser to the ultimate consumer"). And of course, since the jury is absolutely prohibited from considering this pass-on evidence in awarding overcharge damages to Plaintiffs, *Hanover Shoe*, 392 U.S. at 494, it would be difficult to imagine evidence more prejudicial to Plaintiffs' case.

\* \* \*

For the reasons outlined above, neither the "supply problem" defense nor the "sampling" defense can save the Agreement from condemnation under a truncated or "quick-look" analysis. Accordingly, should the Court determine not to apply the *per se* rule, the Court should hold in the alternative that the Agreement violates Section 1 of

---

27    As noted above, there is no need for Defendants to prove that consumers were

the Sherman Act under a quick-look rule of reason analysis. *See Polygram Holding*, 416 F.3d at 48 (where the only procompetitive justification offered by the defendant was legally insufficient, the challenged restraint was unlawful); *Brown Univ.*, 5 F.3d at 669 ("If no legitimate justifications are set forth, the presumption of adverse competitive impact prevails and 'the court condemns the practice without ado") (citation omitted).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully seek a ruling that the Agreement was a *per se* violation of § 1 of the Sherman Act. In the event the Court declines to apply the *per se* rule, the Court should analyze the Agreement under a "quick-look" rule of reason analysis and reach the same conclusion—that the Agreement violates § 1 of the Sherman Act.

DATED: June 4, 2007

KENNY NACHWALTER P.A.

By:/s/ Scott Perwin
Robert D.W. Landon III (D.C. Bar No. 441571)
Scott Perwin (admitted pro hac vice)
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL  33131
(305) 373-1000
(305) 372-1861 (Fax)

**Counsel for Plaintiffs Walgreen Co., Inc., et al.:**

Respectfully submitted,

KAPLAN FOX & KILSHEIMER LLP

By: /s/ Linda P. Nussbaum
Linda P. Nussbaum (D.C. Bar No. 483254)
Christine M. Fox
805 Third Avenue, 22nd Floor
New York, NY 10022
(212) 687-1980
(212) 687-7714 (Fax)

---

not injured, since it is presumed to be true as a matter of law.

HANGLEY ARONCHICK SEGAL &
PUDLIN
Steve D. Shadowen
Monica L. Rebuck
30 North Third Street, Suite 700
Harrisburg, PA  17101-1701
(717) 364-1030
(717) 364-1020 (Fax)

**_Counsel for Plaintiffs CVS Pharmacy,
Inc., et al._**

BOIES, SCHILLER & FLEXNER LLP
William Isaacson (D.C. Bar No. 414788)
Tanya Chutkan (D.C. Bar No. 420478)
5301 Wisconsin Avenue, N.W., Suite 800
Washington, D.C. 20015
(202) 237-2727
(202) 237-6131 (Fax)

BOIES, SCHILLER & FLEXNER LLP
Richard B. Drubel (D.C. Bar No. 334359)
Kimberly H. Schultz
26 South Main Street
Hanover, NH 03755
(603) 643-9090
(603) 643-9010 (Fax)

BERGER & MONTAGUE, P.C.
Daniel Berger
David Sorensen
Eric L. Cramer
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (Fax)

GARWIN GERSTEIN & FISHER, LLP
Bruce E. Gerstein
Barry S. Taus
Kevin S. Landau
1501 Broadway, Suite 1416
New York, NY 10011
(212) 398-0055
(212) 764-6620 (Fax)

RODA NAST, P.C.
Dianne M. Nast
801 Estelle Drive
Lancaster, PA 17601
(717) 892-3000
(717) 892-1200 (Fax)

30

HAGENS BERMAN SOBOL &
    SHAPIRO LLP
Thomas M. Sobol
One Main Street, 4th Floor
Cambridge, MA 02142
(617) 482-3700
(617) 482-3003 (Fax)

***Executive Committee for Direct
Purchaser Class Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2007, I caused a true and correct copy of the following documents:

1.  Direct Purchaser Plaintiffs' Motion For Partial Summary Judgment And Statement Of Points And Authorities In Support;
2.  Statement of Undisputed Facts In Support of Direct Purchaser Plaintiffs' Motion For Partial Summary Judgment;
3.  Appendix of Exhibits In Support of Direct Purchaser Plaintiffs' Motion For Partial Summary Judgment;
4.  [Proposed] Order Granting Direct Purchaser Plaintiffs' Motion For Partial Summary Judgment;
5.  Direct Purchaser Plaintiffs' Motion To File Certain Exhibits from the Appendix of Exhibits Under Seal; and
6.  Notice of Manual Filing Under Seal

to be served by Electronic Mail and first-class mail upon the following counsel of record:

Peter C. Thomas, Esq.
Simpson Thatcher & Bartlett, LLP
601 Pennsylvania Avenue, NW
North Building
Washington, DC  20004
-and-

Charles Koob, Esq.
Simpson Thatcher & Bartlett LLP
425 Lexington Avenue
New York, NY  1001-3954

**Counsel for Defendants Warner Chicott Public Limited Company, Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc., Warner Chilcott Company, Inc. Galen (Chemcials) Ltd.**

Karen N. Walker, Esq.
Mark L. Kovner, Esq.
Chong S. Park, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, DC  20005

**Counsel for Defendant Barr Pharmaceuticals, Inc.**

Robert D.W. Landon, III, Esq.
Scott E. Perwin, Esq.
Kenny Nachwalter, P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131

**Counsel for Plaintiffs Walgreen Co., Inc., et al.:**


Steve D. Shadowen, Esq.
Monica L. Rebuck, Esq.
Hangley Aronchick Segal & Pudlin
30 North Third Street, Suite 700
Harrisburg, PA 17101

**Counsel for Plaintiffs CVS Pharmacy, Inc., et al.**

BOIES, SCHILLER & FLEXNER LLP
William Isaacson (D.C. Bar No. 414788)
Tanya Chutkan (D.C. Bar No. 420478)
5301 Wisconsin Avenue, N.W., Suite 800 Washington,
D.C. 20015
(202) 237-2727
(202) 237-6131 (Fax)


BOIES, SCHILLER & FLEXNER LLP
Richard B. Drubel (D.C. Bar No. 334359)
Kimberly H. Schultz
26 South Main Street
Hanover, NH 03755
(603) 643-9090
(603) 643-9010 (Fax)

BERGER & MONTAGUE, P.C.
Daniel Berger
David Sorensen
Eric L. Cramer
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (Fax)

2

GARWIN GERSTEIN & FISHER, LLP
Bruce E. Gerstein
Barry S. Taus
Kevin S. Landau
1501 Broadway, Suite 1416
New York, NY 10011
(212) 398-0055
(212) 764-6620 (Fax)

RODA NAST, P.C.
Dianne M. Nast
801 Estelle Drive
Lancaster, PA 17601
(717) 892-3000
(717) 892-1200 (Fax)

HAGENS BERMAN SOBOL &
   SHAPIRO LLP
Thomas M. Sobol
One Main Street, 4th Floor
Cambridge, MA 02142
(617) 482-3700
(617) 482-3003 (Fax)

***Executive Committee for Direct Purchaser Class
Plaintiffs***


Dated:  June 4, 2007

                                        /s/ Christine M Fox

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MEIJER, INC. et al.,                              Civil Action No. 05-2195 (CKK)

        Plaintiffs,

   v.

WARNER CHILCOTT HOLDINGS COMPANY
III, LTD. et al.,

        Defendants.

_____

WALGREEN CO. et al.,                              Civil Action No. 06-494 (CKK)

        Plaintiffs,

   v.

WARNER CHILCOTT HOLDINGS COMPANY
III, LTD., et al.,

        Defendants.

_____

CVS PHARMACY, INC. et al.,                        Civil Action No. 06-795 (CKK)

        Plaintiffs,

   v.

WARNER CHILCOTT HOLDINGS COMPANY
III, LTD., et al.,

        Defendants.

_____

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
## DIRECT PURCHASER PLAINTIFFS' MOTION FOR
## PARTIAL SUMMARY JUDGMENT

# I.    STATEMENT OF UNDISPUTED FACTS

1.    Warner Chilcott[1] is a pharmaceutical company that develops, manufactures, markets and distributes proprietary women's healthcare and dermatological pharmaceutical products.  Warner Ans. to Class Action Complt. (*Meijer*) ¶ 2 (Appendix Tab 1).[2]  Warner Chilcott markets Ovcon, a branded oral contraceptive, in the United States.  *Id.* ¶¶ 32, 35.  Ovcon was approved by the FDA in 1976 and is not subject to patent protection.  *Id.* at ¶ 32.  Prior to Barr's launch of generic Ovcon, Ovcon was one of Warner Chilcott's highest revenue-producing products.  *Id.* ¶ 36.

2.    Barr is a pharmaceutical company that develops, manufactures, markets and distributes pharmaceutical products.  Barr Ans. to Complt. (*Walgreen*) ¶ 14 (App. Tab 2).  In or about September 2001, Barr filed an ANDA with the FDA for approval to market an AB-rated generic version of Ovcon.  *Id.* ¶ 28.

3.    On September 10, 2003, Warner Chilcott and Barr signed a Letter of Intent to enter into an agreement whereby Warner Chilcott would have the option to pay Barr $20 million and obtain, among other things, Barr's agreement not to launch its generic version of Ovcon for five years following final FDA approval.  *Id.* ¶ 38.  On March 24, 2004, Warner Chilcott and Barr signed the

---

1    "Warner Chilcott" collectively refers to Defendants Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corp., Warner Chilcott (US) Inc., Warner Chilcott Co. Inc., and Galen (Chemicals), Ltd and their predecessors, successors, parents and/or subsidiary corporations.

2    Copies of the pleadings and other documents cited in this Statement of Undisputed Facts are contained in the accompanying Appendix.

agreement contemplated by the Letter of Intent (the "Agreement") and Warner Chilcott made an initial payment to Barr of $1 million.[3] *Id.* ¶ 39; Warner Ans. to Class Action Complt. ¶ 50. Under the terms of the Agreement, Warner obtained an option that could be exercised by paying Barr an additional $19 million within 45 days of Barr's receipt of FDA approval to market its generic version of Ovcon. March 24, 2004 Option and License Agreement §§ 2.4 - 2.6 (Barr-29-00015) (App. Tab 3).

    4.    On April 22, 2004, the FDA granted final approval of Barr's ANDA for generic Ovcon. Barr Ans. to Complt. (*Walgreen*) ¶ 42. On April 23, 2004, Barr announced its intent to begin immediately marketing generic Ovcon under the trade name Balziva if Warner Chilcott chose not to exercise its option under the Agreement. News Release, *Barr's Generic Ovcon-35 Tablets Approved* (April 23, 2004) (App. Tab 4). On May 6, 2004, Warner Chilcott exercised its option and paid Barr the remainder of the promised $20 million payment. Barr Ans. to Complt. (*Walgreen*) ¶ 45.

    5.    Upon receiving the remaining $19 million payment from Warner Chilcott, Barr was obligated to sell its approved generic Ovcon product exclusively to Warner Chilcott and was prohibited from marketing the product in competition with Warner Chilcott for a period of five years. Barr Ans. to Complt. (*Walgreen*) ¶ 46; March 24, 2004 Option and License Agreement § 3.3 (during the five-year term, "neither Barr nor its Affiliates shall . . . market, commercialize,

---

3    There were actually two separate agreements - an Option and License Agreement, and a Finished Product Supply Agreement. The two agreements were executed simultaneously, and each refers to the other. For convenience, they are referred to herein as a single agreement.

distribute or sell [generic Ovcon] in [the United States]") (Barr-29-00016); March 24, 2004 Finished Product Supply Agreement § 2.1 ("neither Barr nor any of its Affiliates shall have the right to manufacture or supply [generic Ovcon] for or to any other Person [than Warner]") (WCO0156113) (App. Tab 5).

6.    On November 7, 2005, the FTC filed a complaint in this Court alleging that the Agreement violated Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a)(1).[4]  On November 7, 2005, 22 states also filed actions against Warner Chilcott and Barr alleging violations of the antitrust laws.[5]

7.    On September 25, 2006, the FTC filed a motion for preliminary injunction to prevent Warner Chilcott from withdrawing Ovcon 35 from the marketplace as it prepared to introduce Ovcon Chewable.  On the same day, or approximately half way through the five-year period, Warner Chilcott signed a waiver that terminated the exclusivity provisions contained in the Agreement.  As a result of that waiver, Barr was able to begin marketing its generic version of Ovcon in the United States.  Barr launched its generic Ovcon product under the trade name Balziva. News Release, *Barr Announces Warner Chilcott Waives Exclusive License for Ovcon 35* (Sept. 26, 2006) (App. Tab 6).

---

4    On December 5, 2005, the FTC filed its First Amended Complaint.  The FTC sought a permanent injunction to invalidate the exclusivity provision of the Agreement.

5    In December 2005, the states also filed an amended complaint against Warner Chilcott and Barr (13 additional states joined in this complaint).  A second amended complaint was filed by the states on October 3, 2006.  Discovery in the states' case is ongoing.

8.    Barr launched Balziva at approximately a 30% discount to the price of branded Ovcon 35.  Warner Chilcott Price Increase Notice dated March 1, 2006 (KGR 0003) (App. Tab 7); Barr Laboratories Letter to Brooks/Eckerd dated October 17, 2006 (BRK 000086-87) (App. Tab 8).

9.    The launch of Barr's generic version of Ovcon has resulted in Warner Chilcott losing more than 80% of its Ovcon sales to the less expensive generic.  News Release, *Warner Chilcott Reports Operating Results for the Quarter Ended March 31, 2007 and Raises 2007 Full Year Guidance*, p.1 (May 11, 2007) ("The decline in Ovcon revenue was due to the introduction of a generic version of Ovcon 35 in late October 2006, which led to an 80.4% decline in filled prescriptions for Ovcon 35 compared to the same quarter last year") (App. Tab 9).

10.    Some time after Barr received FDA approval, Warner Chilcott stopped purchasing finished Ovcon tablets from Bristol-Myers Squibb (its previous supplier) and began purchasing them from Barr.  Warner Chilcott 2006 Annual Report (SEC Form 10-K), pp. 11-12 (App. Tab 10)..  On January 29, 2007, Warner Chilcott and Watson Pharmaceuticals, Inc. ("Watson") announced that Watson had launched an authorized generic version of Ovcon under the name Zenchent, which Warner Chilcott supplies to Watson.  News Release, *Warner Chilcott and Watson Pharmaceuticals Announce Launch of Zenchent* (Jan. 29, 2007) (App. Tab 11).  Thus, Barr currently supplies Warner Chilcott with the tablets that are resold as branded Ovcon; it also supplies Warner Chilcott

with the tablets that are sold by Watson as Zenchent; and it sells the very same tablets as Balziva in competition with both Ovcon and Zenchent.

11.    The commerce at issue in this case is interstate commerce. Warner Ans. to Complt. (*Walgreen*) ¶ 17 (Ovcon is sold throughout the United States); Barr website, www.barrlabs.com ("Barr Pharmaceuticals is a global specialty pharmaceutical company that operates in more than 30 countries worldwide").

DATED: June 4, 2007

KENNY NACHWALTER P.A.

By:/s/ Scott Perwin
Robert D.W. Landon III (D.C. Bar No. 441571)
Scott Perwin (admitted pro hac vice)
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL  33131
(305) 373-1000
(305)  372-1861 (Fax)

**Counsel for Plaintiffs Walgreen Co., Inc., et al.:**

HANGLEY ARONCHICK SEGAL & PUDLIN
Steve D. Shadowen
Monica L. Rebuck
30 North Third Street, Suite 700
Harrisburg, PA  17101-1701
(717) 364-1030
(717) 364-1020 (Fax)

**Counsel for Plaintiffs CVS Pharmacy, Inc., et al.**

Respectfully submitted,

KAPLAN FOX & KILSHEIMER LLP

By: /s/ Linda P. Nussbaum
Linda P. Nussbaum (D.C. Bar No. 483254)
Christine M. Fox
805 Third Avenue, 22nd Floor
New York, NY 10022
(212) 687-1980
(212) 687-7714 (Fax)

BOIES, SCHILLER & FLEXNER LLP
William Isaacson (D.C. Bar No. 414788)
Tanya Chutkan (D.C. Bar No. 420478)
5301 Wisconsin Avenue, N.W., Suite 800 Washington, D.C. 20015
(202) 237-2727
(202) 237-6131 (Fax)

5

BOIES, SCHILLER & FLEXNER LLP
Richard B. Drubel (D.C. Bar No. 334359)
Kimberly H. Schultz
26 South Main Street
Hanover, NH 03755
(603) 643-9090
(603) 643-9010 (Fax)

BERGER & MONTAGUE, P.C.
Daniel Berger
David Sorensen
Eric L. Cramer
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (Fax)

GARWIN GERSTEIN & FISHER, LLP
Bruce E. Gerstein
Barry S. Taus
Kevin S. Landau
1501 Broadway, Suite 1416
New York, NY 10011
(212) 398-0055
(212) 764-6620 (Fax)

RODA NAST, P.C.
Dianne M. Nast
801 Estelle Drive
Lancaster, PA 17601
(717) 892-3000
(717) 892-1200 (Fax)

HAGENS BERMAN SOBOL &
    SHAPIRO LLP
Thomas M. Sobol
One Main Street, 4th Floor
Cambridge, MA 02142
(617) 482-3700
(617) 482-3003 (Fax)

***Executive Committee for Direct
Purchaser Class Plaintiffs***

6