# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MEIJER, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:05-cv-2195-CKK |
| | ) | |
| WARNER CHILCOTT HOLDINGS COMPANY III, LTD., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| WALGREEN CO., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06-cv-494-CKK |
| | ) | |
| WARNER CHILCOTT HOLDINGS COMPANY III, LTD., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| CVS PHARMACY, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06-cv-795-CKK |
| | ) | |
| WARNER CHILCOTT HOLDINGS COMPANY III, LTD., *et al.*, | ) | **PUBLIC VERSION** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**DIRECT PURCHASER PLAINTIFFS' MEMORANDUM
OF POINTS AND AUTHORITIES IN OPPOSITION
TO BARR'S MOTION FOR SUMMARY JUDGMENT**

Linda P. Nussbaum
Kaplan Fox & Kilsheimer LLP
805 Third Avenue
New York, New York 10022

Eric L. Cramer
Peter Kohn
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103

David S. Nalven
Hagens Berman Sobol & Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700

Scott E. Perwin
Kenny Nachwalter P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131

Steve D. Shadowen
Monica L. Rebuck
Hangley Aronchick Segal & Pudlin
30 North Third Street
Harrisburg, Pennsylvania 17101

[Additional counsel listed on signature pages]

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................. 1

ARGUMENT ................................................................... 5

I.     THE AGREEMENT IS A *PER SE* VIOLATION OF THE
       SHERMAN ACT ...................................................... 5

       A.     Horizontal Market-Allocation Agreements are Illegal
              *Per Se* ........................................................... 5

              1.     Barr and Warner Chilcott were potential competitors ......... 6

              2.     Barr and Warner Chilcott agreed that Barr would
                     not compete with Warner Chilcott in the U.S. for
                     five years ............................................... 6

       B.     Barr's Counter-Arguments Are Without Merit ............................... 7

              1.     Plaintiffs are not asking the Court to create a
                     new *per se* rule ................................... 7

              2.     Barr's asserted procompetitive justifications are
                     irrelevant ............................................ 9

              3.     The fact that Barr and Warner Chilcott agreed to
                     other terms does not avoid application of the
                     *per se* rule ......................................... 12

II.    THERE IS SUFFICIENT EVIDENCE FOR THE JURY TO
       CONCLUDE THAT THE AGREEMENT IS UNLAWFUL
       UNDER THE RULE OF REASON ........................................... 14

       A.     Applicable Law ........................................... 14

       B.     Market Power and Market Definition are Merely Surrogates
              For Anticompetitive Effects ........................................... 17

       C.     Plaintiffs Have Shown that the Agreement Preserved
              Warner Chilcott's Market Power In a Properly Defined
              Relevant Market ........................................... 20

i

       1.     Plaintiffs have presented direct evidence that the
challenged conduct preserved substantial market power .....   21

       2.     Plaintiffs have presented indirect evidence that the
challenged conduct preserved substantial market power .....   23

  D.   Barr's Output and Sampling Arguments are Legally Flawed
And Ignore Contrary Evidence ........................................................   29

       1.     Plaintiffs have shown that the Agreement excluded
generic competition and thereby raised average prices
for Ovcon 35 products, and the "output reduction"
measure of harm is inappropriate here .................................   29

       2.     Barr's arguments contravene controlling law .....................   32

            a.     Barr may not argue that competition itself is
unreasonable ..............................................................   32

            b.     Harm to direct purchasers is sufficient to
establish a violation ...................................................   33

            c.     Harm to direct purchasers is the only harm
relevant in these cases ..............................................   34

       3.     Barr's evidence concerning "free samples" is hotly
disputed ..............................................................................   36

  E.   Whether the Agreement's Alleged Procompetitive Benefits
Outweigh Its Substantial Harms Is a Jury Question ........................   38

III.   DIRECT PURCHASER PLAINTIFFS HAVE STANDING TO
PROSECUTE THEIR CLAIMS ..................................................................   40

  A.   The McKesson Assignments Are Not Contractually Barred ...........   40

  B.   The *Meijer* Plaintiffs Have Standing ...............................................   42

  C.   The Contracts Between McKesson and Its Assignees
Are Not "Cost Plus/Fixed Quantity" Contracts ...............................   44

  D.   If the Contracts Were "Cost Plus/Fixed Quantity" Contracts, the
Only Result Would Be To Make the Assignments Unnecessary ....   45

CONCLUSION ......................................................................................................   45

ii

# TABLE OF AUTHORITIES

Page

Cases

*Addyston Pipe & Steel Co. v. United States*,
    175 U.S. 211 (1899) ..................................................................... 7

*Ad-Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp.*,
    849 F.2d 1336 (11th Cir. 1987) ................................... 23

*Aetna Casualty & Surety Co. v. Giesow*,
    412 F.2d 468 (2d Cir. 1975) ....................................... 43

*Arizona v. Maricopa County Medical Society*,
    457 U.S. 332 (1982) .................................................. 8, 9, 10

*Breus v. McGriff*,
    413 S.E.2d 538 (Ga. App. 1991) ................................ 41

*Business Elec. Corp. v. Sharp Elec. Corp.*,
    485 U.S. 717 (1988) .................................................. 1, 5

*California Dental Ass'n v. FTC*,
    526 U.S. 756 (1999) .................................................. 11, 15

*Cedar Point Apartments v. Cedar Point Inv. Corp.*,
    693 F.2d 748 (8th Cir. 1982) .................................... 41, 42

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
    158 F.3d 548 (11th Cir. 1998) ................................... 23

*Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Corp.*,
    579 F.2d 20 (3d Cir. 1978) ....................................... 24

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002) .................................... 30

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984) .................................................. 5

*Davis v. Chevy Chase Financial Ltd.*,
    667 F.2d 160 (D.C. Cir. 1981) ................................... 43

*Eastman Kodak Co. v. Image Tech. Serv., Inc.*,
    504 U.S. 451 (1992) ........................................................... 15

*Engine Specialties, Inc. v. Bombardier, Ltd.*,
    605 F.2d 1 (1ˢᵗ Cir. 1979) ............................................. 6, 14

*FTC v. Arch Coal, Inc.*,
    329 F. Supp. 2d 109 (D.D.C. 2004) ............................... 24

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ...................................... 33

*FTC v. Indiana Federation of Dentists*,
    476 U.S. 447 (1986) ................................................. passim

*FTC. v. Libbey, Inc.*,
    211 F. Supp.2d 34 (D.D.C. 2002) ................................. 17

*FTC v. Schering-Plough Corp.*,
    2003 FTC LEXIS 187 (F.T.C. 2003) ....................... 3, 17, 18, 24

*FTC v. Staples, Inc.*,
    970 F. Supp. 1066 (D.D.C. 1997) ............................. 26-27

*FTC v. Superior Court Trial Lawyers Ass'n*,
    493 U.S. 411 (1990) ...................................................... 9

*FTC v. Swedish Match*,
    131 F. Supp. 2d 151 (D.D.C. 2000) ........................... 26, 27

*Foad Consulting Group, Inc. v. Azzalino*,
    270 F.3d 821 (9ᵗʰ Cir. 2001) ...................................... 42

*Geneva Pharms. Tech. Corp. v. Barr Laboratories, Inc.*,
    386 F.3d 485 (2d Cir. 2004) .............................. 14, 17, 24, 26

*Geneva Pharms. Tech. Corp. v. Barr Laboratories, Inc.*,
    201 F. Supp. 2d 236 (S.D.N.Y. 2002) .......................... 13

*Gordon v. Lewistown Hosp.*,
    423 F.3d 184 (3d Cir. 2005) ........................................ 15

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
    392 U.S. 481 (1968) ................................................. 34, 36

iv

*Heatransfer Corp. v. Volkswagenwerk, A.G.,*
    553 F.2d 964 (5th Cir. 1977) ....................................................... 24

*Heyman v. Commerce & Industry Ins. Co.,*
    524 F.2d 1317 (2d Cir. 1975) ....................................................... 43

*Illinois Brick Co. v. Illinois,*
    431 U.S. 720 (1977) .................................................................. *passim*

*In re Brand Name Prescription Drugs Antitrust Litigation,*
    123 F.3d 599 (7th Cir. 1997) ................................................... 20, 22

*In re Buspirone Patent Litigation,*
    185 F. Supp. 2d 340 (S.D.N.Y. 2003) .......................................... 6

*In re Buspirone Patent Litigation,*
    210 F.R.D. 43 (S.D.N.Y. 2002) ................................................... 45

*In re Cardizem CD Antitrust Litigation,*
    332 F.3d 896 (6th Cir. 2003) .................................................. *passim*

*In re Cardizem CD Antitrust Litigation,*
    105 F. Supp. 2d 618 (E.D. Mich. 2000) ....................................... 24

*In re Ciprofloxacin Hydrochloride Antitrust Litig.,*
    363 F. Supp. 2d 514 (E.D.N.Y. 2005) ...................................... 3, 24

*In re Lorazepam & Clorazepate Antitrust Litigation,*
    467 F. Supp. 2d 74 (D.D.C. 2006) ..........................15, 23, 24, 26

*In re Lorazepam & Clorazepate Antitrust Litigation,*
    202 F.R.D. 12, 18 (D.D.C. 2001) ................................................. 44

*In re Terazosin Hydrochloride Antitrust Litigation,*
    352 F. Supp. 2d 1279 (S.D. Fla.2005) ..................................... *passim*

*In re Wyoming Tight Sands Antitrust Cases,*
    866 F.2d 1286 (10th Cir. 1989) ................................................... 45

*Jefferson Parish Hosp. District No. 2 v. Hyde,*
    466 U.S. 2 (1984) ........................................................................ 9

*Kansas v. Utilicorp United, Inc.,*
    497 U.S. 199 (1990) ............................................................... 34, 45

v

*Knoll Pharmaceuticals Co., Inc. v. Teva Pharmaceuticals USA, Inc.,*
       2001 WL 1001117 (N.D. Ill. Aug. 24, 2001) ............................................. 24

*Kreuzer v. American Academy of Periodontology,*
       735 F.2d 1479 (D.C. Cir. 1984) .................................................. 15, 16, 30

*Landtect Corp. v. State Farm Mutual Life Ins. Co. of America,*
       605 F.2d 75 (3d Cir. 1979) ........................................................ 43

*Law v. NCAA,*
       134 F.3d 1010 (10th Cir. 1998) .................................................. 15

*Leegin Creative Leather Products v. PSKS, Inc.,*
       127 S. Ct. 2705 (2007) ............................................................. 5, 10

*McCarthy v. Recordex Service, Inc.,*
       80 F.3d 842 (3d Cir. 1996) ........................................................ 44

*Mid-West Paper Prods. Co. v. Continental Group, Inc.,*
       596 F.2d 573 (3d Cir. 1979) ...................................................... 44-45

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,*
       924 F.2d 1484 (9th Cir. 1991) .................................................... 23

*Mova Pharmaceuticals Corp. v. Shalala,*
       140 F.3d 1060 (D.C. Cir. 1998) .................................................. 32

*NCAA v. Board of Regents,*
       468 U.S. 85 (1984) .................................................................... 20

*National Society of Professional Engineers v. United States,*
       435 U.S. 679 (1978) ................................................................. 32

*New York v. Kraft General Foods, Inc.,*
       926 F. Supp. 321 (S.D.N.Y. 1995) ............................................ 24-25

*Nilavar v. Mercy Health System ,*
       142 F. Supp. 2d 859 (S.D. Ohio 2000) ....................................... 24

*Palmer v. BRG of Georgia, Inc.,*
       498 U.S. 46 (1990) ................................................................... *passim*

*Palmer v. BRG of Georgia, Inc.,*
       874 F.2d 1417 (11th Cir. 1989) ................................................. 12

vi

*Phillips v. Crown Cent. Petroleum Corp.*,
  602 F.2d 616 (4th Cir. 1979) ....................................................... 44

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ....................................................... 20

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
  173 F.3d 995 (6th Cir. 1999) ....................................................... 17

*R-Ranch Markets #2, Inc. v. Old Stone Bank*,
  21 Cal. Rptr. 2d 21 (Cal. App. 1993) ........................................... 41

*Scott v. Ranch Roy-L, Inc.*,
  182 S.W.3d 627 (Mo. App. 2005) ................................................ 41

*Spirit Airlines, Inc. v. Northwest Airlines, Inc.*,
  431 F.3d 917 (6th Cir. 2005) ....................................................... 19

*Standard Oil Co. of Calif. v. United States*,
  337 U.S. 293 (1949) .................................................................... 13

*Superior Court Trial Lawyers Ass'n v. FTC*,
  856 F.2d 226 (D.C. Cir. 1988) ..................................................... 17

*Syufy Enters. v. American Multicinema Inc.*,
  793 F.2d 990 (9th Cir. 1986) ....................................................... 23-24

*T. Harris Young & Assoc., Inc. v. Marquette Elec., Inc.*,
  931 F.2d 816 (11th Cir. 1991) ..................................................... 23

*Toys "R" Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ....................................................... 17

*United States v. E.I. duPont de Nemours & Co.*,
  351 U.S. 377 (1956) .................................................................... 20

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) (*en banc*) ..................................... *passim*

*United States v. Microsoft Corp.*,
  1998 WL 614485 (D.D.C. Sept. 14, 1998) .................................. 16, 23

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940) .................................................................... 33

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972) ............................................................ *passim*

*United States v. Visa U.S.A., Inc.*,
    163 F. Supp. 2d 322 (S.D.N.Y. 2001) ............................................ 24

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
    344 F.3d 1294 (11th Cir. 2003) ...................................... 6, 7, 18

*Weiss v. York Hosp.*,
    745 F.2d 786 (3d Cir. 1984) ................................................ 24

*Wisconsin Pub. Power, Inc. v. FERC.*,
    493 F.3d 239 (D.C. Cir. 2007) .............................................. 20


Statutes

CAL. COM. CODE § 2210(4) .................................................... 41


Other Authorities

P. Areeda & H. Hovenkamp, ANTITRUST LAW (2d ed. 2005) ................ *passim*

P. Areeda, ANTITRUST LAW (1996) ........................................... 17

P. Areeda & L. Kaplow, ANTITRUST ANALYSIS (1997) ......................... 21

Eric L. Cramer and Daniel Berger, "The Superiority of Direct Proof
    of Monopoly Power and Anticompetitive Effects in Antitrust
    Cases Involving Delayed Entry of Generic Drugs,"
    39 U.S.F. L. REV. 81 (2004) ........................................... 30

Federal Trade Commission, "To Promote Innovation: The Proper Balance
    of Competition and Patent Law and Policy" (Oct. 2003) ............. 30

RESTATEMENT (SECOND) OF CONTRACTS .......................................... 41

## INTRODUCTION

Defendant Barr Pharmaceuticals, Inc.'s ("Barr's") motion for summary judgment misstates virtually every relevant principle of federal antitrust law and ignores the mountains of record evidence that contradict its version of the facts—much of which is contained in Barr's own Appendix.  The motion is meritless and should be denied.[1]

First, for the reasons explained in Plaintiffs' own affirmative motion for summary judgment, the horizontal Agreement[2] between Barr and Warner Chilcott falls into a category of agreement that has been considered *per se* illegal for more than 100 years:  horizontal market allocation agreements. Under longstanding antitrust doctrine, *any* agreement between actual or potential competitors whereby one conspirator agrees not to compete with the other in a particular geographic area for a particular period of time is a *per se* violation of the Sherman Act.  The Supreme Court has held repeatedly that such agreements *are* "manifestly anticompetitive."  *Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988).  Barr's counter-arguments ignore the plain language of the Agreement and are based on the misconception that Plaintiffs are asking the Court to create a *new per se* rule rather than to apply the existing *per se* rule against horizontal market-allocation agreements, which has been settled law for more than 100 years.  The fact that Defendants also agreed to *other* terms does not save such an agreement from illegality.  *See Palmer v. BRG of*

---

[1]    Based on the number of times it is repeated, Barr's principal argument in favor of summary judgment appears to be the FTC's alleged decision not to challenge the Agreement when it was presented to the Commission in 2003.  As explained in the June 21, 2006 FTC Statement to Correct Misrepresentations in Defendants' Opposition to Plaintiff States' Motion for Leave to File Summary Judgment Motion, this is a misrepresentation of the facts.  *See* Plaintiffs' Appendix ("Pl. Appx.") Ex. 51.  It is also irrelevant, and doubly so, given that: (i) the FTC ultimately chose to charge Barr with a *per se* violation of the Sherman Act, a charge that Barr has now settled; and (ii) the FTC's decisions regarding the use of its resources have nothing to do with the legality or illegality of the Agreement.  That issue is decided by the courts.

[2]    Plaintiffs will use the term "Agreement" to refer to the two written agreements between Barr and Defendant Warner Chilcott dated March 24, 2004.

*Georgia, Inc.*, 498 U.S. 46, 49-50 (1990) (horizontal market-allocation agreement in exclusive trademark and copyright license was illegal *per se*).

Second, even if the Court were to decline to apply the *per se* rule, and instead apply the factually intensive "rule of reason" test, Barr still would not be entitled to summary judgment. The Supreme Court has made it clear that, apart from any consideration of either market power or the relevant market, a horizontal restraint should be condemned if there is evidence that it has resulted in anticompetitive effects in the form of higher prices or lower quality goods. *See FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460 (1986) (proof of actual anticompetitive effects "can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects'"). There is ample evidence in the record (including expert reports in Barr's own Appendix) that the Agreement has caused just such effects. Indeed, Barr's own expert, Dr. Bell, has quantified the adverse effects of the Agreement, concluding that direct purchasers would have saved *at least* had Barr launched its generic version of Ovcon in August 2004 (although he disputes that this overcharge constitutes an anticompetitive effect). Bell Report (6/29/07) at 31 (Barr Appx. Ex. 11). While Barr's number is substantially understated,[3] it is more than sufficient evidence of anticompetitive effects for Plaintiffs to reach a jury under the rule of reason.

Third, the record is replete with triable issues of fact regarding Warner Chilcott's ability to maintain market power with respect to Ovcon 35 Products[4] by excluding AB-rated generic

---

[3]    Direct Purchaser Plaintiffs' combined damages (class plus individual Plaintiffs) are nearly , before trebling.  *See* Leffler Report (5/18/07) ¶ 89 (Barr Appx. Ex. 6); Leitzinger Report (5/18/07) at 44 (Pl. Appx. Ex. 73).

[4]    "Ovcon 35 Products" refers to Warner Chilcott's brand-name drug Ovcon 35 and its AB-rated generic equivalents ("generic Ovcon 35"), including Barr's generic version, Balziva, and the generic version sold by Watson Pharmaceuticals ("Watson") under the name Zenchent.

2

competition, as well as with respect to the economically equivalent issue of market definition. While it is obviously true that Ovcon 35 is not the only oral contraceptive on the market, that unremarkable fact does not yield *any* conclusions about market power or market definition. Every single court evaluating an agreement not to market an AB-rated generic version of a branded drug—including the court in *Ciprofloxacin*, where Barr agreed not to market a generic version of Bayer's Cipro—has determined that the relevant market is limited to the brand and corresponding AB-rated generic versions, because of the unique effects the less-expensive generic has on the sales of the corresponding brand.[5] Those same effects are indisputably present here. The record shows that the ***only*** oral contraceptive whose pricing ever threatened Warner Chilcott with the loss of substantial sales was generic Ovcon 35, the drug that Warner Chilcott (not surprisingly) paid to keep off the market. Indeed, these facts are so compelling that Barr itself has adopted them in another case, alleging that a brand-name company preserves monopoly power when it blocks AB-rated generic competition (and, equivalently, that the brand-name drug and its generic equivalents constitute a relevant market). Barr's self-contradictory position in this case should be rejected.

Fourth, Barr's alleged "procompetitive benefits" are either legally insufficient or factually disputed. When generic Ovcon 35 was finally introduced, no overall reduction in output of pharmaceuticals was observed. If Barr's position is that lower consumption of Ovcon 35 Products

---

[5]     *See In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514, 521-23 (E.D.N.Y. 2005) ("it is reasonable to accept plaintiffs' contention and conclude both that the relevant market is for ciprofloxacin and that Bayer had market power within that market") ("*Cipro*"); *In re Terazosin Hydrochloride Antitrust Litigation*, 352 F. Supp. 2d 1279, 1319 n.40 (S.D. Fla.2005) ("the Court is persuaded that Abbott has power in the relevant market, which is the market for Hytrin and its generic bioequivalent forms of terazosin hydrochloride. Indeed, in cases such as this, the very fact that the pioneer finds it worthwhile to pay a large exclusion payment tends to establish market power") (quotation omitted); *FTC v. Schering-Plough Corp.*, 2003 FTC LEXIS 187, *58-59 (F.T.C. 2003) (brand and its generic equivalents "define[] the area of trade we need to focus on" in a delayed generic entry case), *rev'd on other grounds*, 402 F.3d 1056 (11th Cir. 2005).

3

(brand plus AB-rated generics) after generic entry makes generic competition itself anticompetitive, Barr is essentially arguing that virtually all generic entry is anticompetitive. That position contradicts virtually every governmental and academic study regarding the beneficial effects of generic competition, and is particularly bizarre coming from a leading generic drug manufacturer. In fact, as Plaintiffs' experts explain, and Barr's experts acknowledge, the unusual features of the pharmaceutical industry imply that output expansion or contraction with respect to a particular drug molecule is *not* a reliable measure of competitive impact. Barr's "sampling" defense is unavailing because it focuses solely on consumers and ignores the obvious harm to direct purchasers —Plaintiffs in these actions—who do not receive free samples. The defense is also inconsistent with the Supreme Court's decision to disallow litigation of harm to downstream purchasers in *Hanover Shoe* and *Illinois Brick*. In addition, there is ample evidence that the benefits received by consumers in the form of lower retail prices substantially outweigh any harm caused by the loss of free samples.

Finally, Barr's last-ditch standing arguments are unavailing. The distribution agreement between McKesson and Warner Chilcott quoted in Barr's motion only prohibits an assignment *of the distribution agreement*. It does not prohibit an assignment of McKesson's antitrust claims against Barr (a stranger to the agreement). Even if it did, a breach of that prohibition by McKesson would not invalidate the assignments. Barr's alternative effort to show that McKesson lacks standing because it supposedly has "cost plus/fixed quantity" agreements with its assignee customers is simply wrong as a matter of fact and well-established law. There are no contracts that meet the impossibly narrow, and effectively hypothetical, exception to *Illinois Brick* and *Hanover Shoe* that Barr seeks to invoke. However, there is no need for the Court to consider the issue, since the only result of finding the exception applicable would be to render the assignments from McKesson to its customers unnecessary.

4

## ARGUMENT

### I. THE AGREEMENT IS A *PER SE* VIOLATION OF THE SHERMAN ACT.

As explained in Plaintiffs' affirmative motion for summary judgment, the Agreement is a horizontal market-allocation agreement and therefore, under settled antitrust precedent, illegal *per se*. Barr's arguments to the contrary are based primarily on the mistaken impression that Plaintiffs are asking the Court to create a *new per se* rule. In fact, Plaintiffs are merely asking the Court to apply the existing *per se* rule against horizontal market-allocation agreements, which has been the law for more than 100 years.

#### A. HORIZONTAL MARKET-ALLOCATION AGREEMENTS ARE ILLEGAL *PER SE*

As Barr itself acknowledges (Barr Br. at 21), market-allocation agreements between actual or potential competitors are *per se* violations of Section 1 of the Sherman Act. *See, e.g., Leegin Creative Leather Products v. PSKS, Inc.*, 127 S. Ct. 2705, 2713 (2007) ("Restraints that are *per se* unlawful include horizontal agreements . . . to divide markets"); *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49-50 (1990); *Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 734 (1988); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972).

The *per se* rule applies whenever (1) actual or potential competitors (2) agree that they will not compete with one another in particular geographic areas for some period of time. *See Palmer*, 498 U.S. at 49-50 (applying rule where "[e]ach conspirator agreed not to compete in the other's territories"). In this case, the undisputed facts show: (1) that Barr and Warner Chilcott were potential competitors in the spring of 2004; and (2) that they agreed that Barr would not compete with Warner by selling generic Ovcon in the United States for five years.

5

1.     Barr and Warner Chilcott were potential competitors

At the time the Agreement was executed, Barr was pursuing FDA approval to sell a generic version of Ovcon 35 in the United States and was on the verge of receiving that approval. Barr received FDA approval in April 2004 and issued a press release announcing its intention to launch Balziva if Warner Chilcott did not exercise its option under the Agreement, and Barr in fact launched Balziva shortly after Warner Chilcott waived the provision in the Agreement prohibiting Barr from competing. *See* Statement of Undisputed Facts in Support of Plaintiff States' Motion for Summary Judgment and Direct Purchaser Plaintiffs' Motion for Partial Summary Judgment ("SOUF") ¶¶ 3-4, 7.[6] On these facts, Barr and Warner Chilcott are potential competitors as a matter of law. *See Palmer*, 498 U.S. at 49-50; *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 344 F.3d 1294, 1304 (11th Cir. 2003); *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896, 907-08 & n.14 (6th Cir. 2003) (agreement between generic applicant and brand-name manufacturer to delay generic competition is agreement between horizontal competitors); *In re Terazosin Hydrochloride Antitrust Litigation*, 352 F. Supp. 2d 1279, 1314 n.34 (S.D. Fla. 2005) (same); *In re Buspirone Patent Litigation*, 185 F. Supp. 2d 340, 343 (S.D.N.Y. 2003) (same).[7]

2.     Barr and Warner Chilcott agreed that Barr would not compete with Warner
        Chilcott in the U.S. for five years

The second element of a horizontal market-allocation claim—an agreement by one conspirator not to compete "in the other's territor[y]" (*Palmer*, 498 U.S. at 49)—is equally

---

[6]     Plaintiffs' affirmative motion for partial summary judgment is pending before the Court.

[7]     *Cf. Engine Specialties, Inc. v. Bombardier, Ltd.*, 605 F.2d 1, 9 & n.12 (1st Cir. 1979) (issue of whether conspirators were potential competitors was properly submitted to the jury where the facts regarding Bombardier's intention and ability to manufacture minicycles were in dispute). In this case, Barr has not come forward with any evidence disputing that it was a potential competitor of Warner Chilcott in 2004.

undisputed. Under their Agreement, Barr agreed not to compete with Warner Chilcott by selling a generic version of Ovcon 35 in the United States for five years. *See* SOUF ¶ 5. Accordingly, the Agreement is a horizontal agreement allocating all sales of Ovcon to Warner Chilcott in the U.S. for five years, and hence illegal *per se*. *See Palmer*, 498 U.S. at 49-50; *United States v. Topco Assoc., Inc.*, 405 U.S. 596, 608 (1972) (horizontal agreement allocating markets is a "classic example" of a *per se* violation); *Valley Drug*, 344 F.3d at 1304 (agreement whereby a firm without patent rights pays a potential competitor to refrain from entering the market is illegal *per se*); *Cardizem*, 332 F.3d at 908; *Terazosin*, 352 F. Supp. 2d at 1314-15.

### B. BARR'S COUNTER-ARGUMENTS ARE WITHOUT MERIT

The counter-arguments put forward by Barr in an effort to avoid application of the *per se* rule either: (i) wrongly suggest that Plaintiffs are asking the Court to create a *new per se* rule; (ii) depend on legally irrelevant procompetitive justifications; or (iii) are based on the unsound proposition that a horizontal agreement not to compete that also contains additional terms is no longer a horizontal agreement not to compete. As we show below, these arguments are without merit.

#### 1. Plaintiffs are not asking the Court to create a new *per se* rule

Barr argues at length that rule-of-reason treatment is the presumptive standard for assessing collective conduct under Section 1 of the Sherman Act, and that the courts depart from that standard only if long judicial experience shows that such restraints will always or almost always tend to restrict competition. Barr Br. at 1-2, 20-27. These principles are simply irrelevant here. Plaintiffs are not asking the Court to create a new *per se* rule, but simply to apply the *existing* 110-year-old against horizontal market-allocation agreements. *See Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211 (1899).

"Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a *conclusive* presumption that the restraint is unreasonable." *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 344 (1982) (emphasis added). This includes horizontal price fixing and horizontal market allocation. *Id.* at 344 n.15. In *Maricopa County*, the Court held that a written agreement among competing physicians establishing maximum prices was illegal *per se* and that, as a result, the State's motion for partial summary judgment should have been granted. In so ruling, the Court squarely distinguished between judicial application of an existing *per se* rule and a judicial decision to create a *new* rule:

> [T]he argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules, which in part is to avoid "the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken." *Northern Pacific R. Co. v. United States*, 356 U.S., at 5, 78 S. Ct., at 518.

457 U.S. at 349-51. In footnote 19, the Court explained:

> The argument should not be confused with the established position that a *new per se* rule is not justified until the judiciary obtains considerable rule-of-reason experience with the particular type of restraint challenged.

*Id.* at 349 n.19 (emphasis in original).

Consistent with these principles, once the Supreme Court has held that a particular class of restraint is illegal *per se*, the lower federal courts are not free to disregard that holding by applying the rule of reason. In *Maricopa County*, the district court had declined to apply the *per se* rule in part for exactly the reason urged by Barr in this case—that "'a recent antitrust trend appears to be emerging where the Rule of Reason is the preferred method of determining whether a particular

8

practice is in violation of the antitrust law.'" *Maricopa County*, 457 U.S. at 336 n.2 (quoting district court opinion). In reversing, the Supreme Court made it clear that lower federal courts are obligated to apply the *per se* rule to the particular practices that the Supreme Court has previously held to be illegal *per se*, including horizontal price-fixing and horizontal market allocation. *Id.* at 344-48 & nn.15-16. Applying the Rule of Reason to such practices is reversible error. *See also Topco*, 405 U.S. at 608 (reversing lower court's application of the Rule of Reason because horizontal market-allocation agreements are a "classic example" of a *per se* violation).[8]

Plaintiffs are not asking the Court to create a new *per se* rule. There is an existing rule that applies to the horizontal restraint being challenged in this case, and the Court should apply that rule, as other courts have done in similar cases. *See Cardizem*, 332 F.3d at 908; *Terazosin*, 352 F. Supp. 2d at 1314-15.

2.    Barr's asserted procompetitive justifications are irrelevant

Barr's alternative argument is that, since *per se* rules are reserved for conduct that is always or almost always anticompetitive, and since (according to Barr) the Agreement was not anticompetitive, the Court should not apply the *per se* rule. As explained in Plaintiffs' own motion

---

[8]    More recently, in *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 432 (1990), the Supreme Court again emphasized that *per se* rules "have the same force and effect as any other statutory commands" and that federal courts are not free to disregard them. In that case, the Court of Appeals had reversed the Commission's application of the *per se* rule against horizontal price fixing, reasoning that "the antitrust laws permit, but do not require, the condemnation of price fixing and boycotts without proof of market power." *Id.* at 432. The Supreme Court disagreed, explaining that, while "*per se* rules are, of course, the product of judicial interpretations of the Sherman Act," they "nevertheless have the same force and effect as any other statutory commands." *Id.* at 432-33. The lower court was also mistaken in believing that *per se* rules are merely rules of "administrative convenience." While such rules are adopted in part to provide clarity and lower litigation costs, they "also reflect a longstanding judgment that the prohibited practices by their nature have 'a substantial potential for impact on competition.'" *Id.* at 433 (quoting *Jefferson Parish Hosp. District No. 2 v. Hyde*, 466 U.S. 2, 16 (1984)).

for summary judgment, this argument "indicates a misunderstanding of the *per se* concept." *Maricopa County*, 457 U.S. at 351. Claims of procompetitive benefits, whether plausible (as in some cases) or implausible (as in this case), are irrelevant to deciding whether a particular restraint is illegal *per se*. The very purpose of *per se* rules is to provide "business certainty and litigation efficiency" by creating a conclusive presumption that certain categories of conduct are anticompetitive. *Maricopa County*, 457 U.S. at 344. *See also Topco*, 405 U.S. at 609 ("Whether or not we would decide this case the same way under the rule of reason . . . is irrelevant to the issue before us").

Contrary to Barr's urging, the Supreme Court has *never* permitted an antitrust defendant to obtain an exemption from a *per se* rule by arguing that the particular agreement it entered into was not anticompetitive or that the procompetitive benefits of the agreement outweigh its anticompetitive effects. The law is exactly the opposite. *See Leegin*, 127 S. Ct. at 2712 (district court, applying *per se* rule, excluded proffered expert testimony showing alleged procompetitive effects of defendant's pricing policy, and the Court of Appeals "correct[ly]" affirmed); *Maricopa County*, 457 U.S. at 351; *Topco*, 405 U.S. at 610. And the lower federal courts have consistently applied that law in rejecting, as irrelevant, procompetitive justifications similar to the ones offered by Barr. *See Cardizem*, 332 F.3d at 908-09 ("the defendants' claims that the Agreement lacked anticompetitive effects and had procompetitive benefits are simply irrelevant"); *Terazosin*, 352 F. Supp. 2d at 1316 ("any alleged procompetitive justifications" for horizontal agreement between brand-name company and generic applicant "are irrelevant and should not be considered").[9]

---

[9]     As Professor Hovenkamp explains: "The per se rule is based on the premise that particular restraints are unreasonable *as a class*. As a result, once the tribunal concludes that the restraint at issue is within the class, further inquiry into the merits of that particular restraint is unwarranted."

(continued...)

Barr contends that the Supreme Court's 1999 decision in *California Dental Ass'n v. FTC*, 526 U.S. 756 (1999), somehow overruled *Maricopa County*, and that an antitrust defendant is now permitted to avoid application of a *per se* rule simply by articulating "plausible" procompetitive justifications for its conduct. Barr is mistaken. Most obviously, the restraint challenged in *California Dental*—an agreement adopted by members of a dental association not to engage in certain forms of advertising—was ***not*** illegal *per se*, and none of the parties to the case alleged that it was. The Court did not, therefore, reject *per se* treatment, as Barr contends (Br. at 27).[10] *California Dental* thus has nothing to do with the proper treatment of an alleged procompetitive justification in a case involving a class of restraint accorded *per se* illegal treatment. In such cases, anticompetitive harm is *conclusively* presumed, and the defendant is not permitted to rebut that presumption by showing that its particular restraint is an exception to the rule. *See Maricopa County*, 457 U.S. at 351. While Barr offers to show that the elimination of generic competition permitted Warner Chilcott to compete more "aggressively" with other oral contraceptive manufacturers (Barr Br. at 28), Barr "has no authority under the Sherman Act to determine the respective values of competition in various sectors of the economy." *Topco*, 405 U.S. at 610-11.

---

[9](...continued)
XI H. Hovenkamp, ANTITRUST LAW ¶ 1910b at 281 (2d ed. 2005).

[10]     The only relevant issue addressed by the Court was whether a "quick look" analysis was appropriate, *id.* at 759, which is equivalent to asking whether the Court should adopt a rebuttable presumption of anticompetitive harm (as opposed to the conclusive presumption that follows from *per se* treatment). *See* XI H. Hovenkamp, ANTITRUST LAW ¶ 1914d at 355 (2005) (plaintiff's opening proof in a quick-look case is the same as in a *per se* case, but, unlike in a *per se* case, the defendant is permitted to offer procompetitive justifications). In that context, it made perfect sense for the Court to consider the defendant's asserted procompetitive justifications in deciding whether to *create* a presumption of harm. Indeed, since the presumption in quick-look cases is rebuttable, the association's procompetitive justifications would have been relevant even if the Supreme Court had agreed that quick-look analysis applied.

11

3.    The fact that Barr and Warner Chilcott agreed to other terms does not avoid application of the *per se* rule

Finally, Barr argues throughout this section of its motion that, because the Agreement included other terms, such as an agreement to supply, the *per se* rule does not apply. While there is ample evidence in the record to show that the supply relationship was merely a fig leaf designed to cover up the true purpose of the agreement,[11] Barr is in any case mistaken about the law. Courts routinely condemn horizontal market-allocation agreements containing additional, competitively neutral terms.

For example, in *Palmer*, the agreement between HBJ and BRG included an exclusive license permitting BRG to market and use HBJ's trademarked and copyrighted bar-review materials in Georgia—a quintessentially vertical relationship. 498 U.S. at 47. The Eleventh Circuit declined to apply the *per se* rule in part because it accepted the defendants' contention that the relationship between them was vertical, rather than horizontal. *See Palmer v. BRG of Georgia, Inc.*, 874 F.2d 1417, 1423 (11th Cir. 1989) ("BRG and HBJ assert that they were in a vertical supplier-retailer relationship at the time of the first license agreement").[12] In reversing, the Supreme Court had no difficulty finding that BRG and HBJ were actual competitors in Georgia and potential competitors

---

[11]    For example, a 2006 internal Warner Chilcott e-mail candidly acknowledges that the "

                " Pl. Appx. Ex. 45. As discussed below, the question of whether Barr's asserted "procompetitive justification" is sincere or pretextual must be determined by the trier of fact and cannot be resolved on summary judgment.

[12]    The dissent warned the majority that such a ruling was error. *See id.* at 1432 (Clark, J., dissenting) ("[i]t is firmly established that entities in a seemingly vertical relationship may be capable of horizontal restraints if they are actual or potential competitors"). As Judge Clark pointed out in his dissent, a contrary rule "would essentially nullify the *per se* rule because horizontal competitors could avoid antitrust liability by simply entering into anticompetitive agreements that have vertical aspects." 874 F.2d at 1433.

in the rest of the country, and thus that the *per se* rule applied.  498 U.S. at 49.  This conclusion was

unquestionably correct, as Professor Hovenkamp explains in his treatise:

> The lower courts were incorrect, being misled by the "vertical"
> nature of the transaction at issue, which was a license arrangement
> governing intellectual property rights. . . .  But the challenge in
> [*Palmer*] was not to the vertical transfer of the right to use another's
> copyrighted bar review materials; it was to an agreement between
> *competing* bar review schools dividing the entire United States into
> exclusive territories.

ANTITRUST LAW ¶ 1908, at 269 (emphasis in original).

Likewise, the challenge in this case is not to Barr's agreement to supply Warner Chilcott,

which is still in effect, but to Barr's agreement not to compete with Warner Chilcott.  Barr's promise

to supply is separate from its promise not to compete,[13] and the competitive impact of the two

promises must be analyzed separately.  It is no answer to an allegation that one provision of a

horizontal agreement is illegal to say that the agreement also includes other provisions that are not

illegal.[14]

_____

[13]     There is nothing about a supply relationship that necessarily entails an agreement not to compete.  Barr is currently both supplying and competing with Warner Chilcott.

[14]     Barr's citation of cases involving "exclusive supply contracts" is misleading.  Several involve mere "requirements contracts," *i.e.*, contracts requiring the buyer to buy all of its requirements of a particular product from the seller.  *See ,e.g., Standard Oil Co. of Calif. v. United States*, 337 U.S. 293, 296 (1949) (contracts between oil company and independent gas stations requiring gas stations to purchase all of their requirements of certain products from oil company).  Requirements contracts do not restrain the seller from competing with its customers and are not remotely analogous to market-allocation agreements.  Other cases cited by Barr involve "output contracts," *i.e.*, contracts by a seller to sell all of its output of a particular product to a particular buyer.  So long as the contracting parties are *solely* in a vertical relationship (that is, are not actual or potential competitors), such "exclusive dealing" contracts are evaluated under the Rule of Reason.  *See, e.g., Geneva Pharms. Tech. Corp. v. Barr Laboratories, Inc.*, 201 F. Supp. 2d 236 (S.D.N.Y. 2002) (output contract between Barr and manufacturer of active pharmaceutical ingredient used to make finished dosage form).  Incredibly, Barr neglects to mention that the district court's decision in the *Geneva* case (cited at page 24 of its brief) was *reversed* by the Second Circuit, which ruled

(continued...)

The agreement condemned as illegal *per se* in *Cardizem* similarly had a number of additional, "vertical" aspects.[15]  These provisions were competitively neutral and were not challenged by any of the plaintiffs in the case.  But they certainly did not save the market-allocation provision of the agreement from *per se* scrutiny.  *See also Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1 (1st Cir. 1979) (an agreement between potential competitors which eliminates that potential competition is illegal *per se* whether or not it establishes a vertical relationship between the parties).

For the reasons stated above and in Plaintiffs' own affirmative motion for summary judgment, the Agreement is a *per se* violation of the Sherman Act, and the Court should so hold. As we show next, Barr would not be entitled to summary judgment even if the Court were to decline to apply the *per se* rule.

II.     **THERE IS SUFFICIENT EVIDENCE FOR THE JURY TO CONCLUDE THAT THE AGREEMENT IS UNLAWFUL UNDER THE RULE OF REASON.**

A.     APPLICABLE LAW

The rules governing application of the rule of reason are well established.  *See United States v. Microsoft Corp.*, 253 F.3d 34, 58-59 (D.C. Cir. 2001) (*en banc*) (rule of reason standards are identical in Section 1 and Section 2 cases).  First, Plaintiffs must produce sufficient evidence for a

---

[14](...continued)
that the plaintiffs' section 1 case against Barr raised triable issues of fact and should not have been terminated on summary judgment. *See Geneva Pharms. Tech. Corp. v. Barr Laboratories, Inc.*, 386 F.3d 485, 508-10 (2d Cir. 2004).

[15]     The agreement included, among other things, a provision that Andrx would receive an option to acquire a nonexclusive license to all intellectual property owned by Hoechst Marion Roussel that Andrx might need to market its generic drug in the United States.  332 F.3d at 903 n.6.

14

jury to find that the Agreement between Warner Chilcott had an "anticompetitive effect." *Id.* at 59.[16]

Plaintiffs can do so *either* by proving that the Agreement permitted Warner Chilcott to (for example) keep average prices for Ovcon 35 Products higher by forestalling generic competition, *or* by showing that the Agreement established or maintained Warner Chilcott's market power. *See Indiana Federation*, 476 U.S. at 460-61. If Plaintiffs elect the latter approach, market power in turn may be proven either directly (by showing Warner Chilcott's ability to keep average prices for Ovcon 35 Products above the competitive level) or indirectly (by showing that Warner Chilcott had a dominant share of the relevant market). *See Microsoft*, 253 F.3d at 51.[17] As shown below, Plaintiffs have produced massive record evidence satisfying each of these approaches. Far less evidence than Plaintiffs have produced here would require denial of Barr's motion. *See Kreuzer v. American Academy of Periodontology*, 735 F.2d 1479, 1496 n.25 (D.C. Cir. 1984) (warning district court it "should well be cautious in granting summary judgment on this record," because plaintiff showed evidence of "*some potential* for anticompetitive effect") (emphasis added).

---

[16]    Cognizable anticompetitive effects include higher prices, reduced output, reduced quality, or reduced consumer choice. *E.g.*, *In re Lorazepam & Clorazepate Antitrust Litigation*, 467 F. Supp. 2d 74, 81 (D.D.C. 2006) ("Plaintiffs had to prove . . . Defendants' actions had a substantially harmful effect on overall competition in that relevant market, for example, by raising prices or reducing output"); *see also Indiana Federation*, 476 U.S. at 459 (reduced consumer choice); *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005) ("reduced output, raised prices or reduced quality"); *Law v. NCAA*, 134 F.3d 1010, 1016 (10th Cir. 1998) ("output or price"). This showing is unnecessary in cases subject to "quick look" analysis, *i.e.*, those in which "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *California Dental*, 526 U.S. at 770. If the Court declines to treat the Agreement as illegal *per se*, Plaintiffs believe that quick-look analysis is appropriate. However, this section of our brief proceeds on the assumption that full rule-of-reason analysis is necessary.

[17]    A lesser showing of market power is required under Section 1 than is required to demonstrate "monopoly power" under Section 2. *See Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451, 481 (1992).

Once Plaintiffs meet their burden of production on the issue of anticompetitive effect, the burden shifts to Barr to demonstrate a cognizable, non-pretextual, procompetitive justification for the Agreement. *Microsoft*, 253 F.3d at 59. Thereafter, Plaintiffs can win in two ways: either the jury can determine that Plaintiffs have rebutted Barr's asserted "procompetitive justification" as incredible, pretextual, or achievable through less restrictive means; or, alternatively, even if Plaintiffs did not seek to rebut Barr's asserted "procompetitive justification," the jury can find that, on balance, the anticompetitive effects of Barr's conduct outweighs the asserted procompetitive benefits. *Microsoft*, 253 F.3d at 59; *Kreuzer*, 735 F.2d at 1495.[18]

Barr seeks to short-circuit this entire process simply by asserting that it had good reasons to enter into the Agreement and therefore deserves to be declared the winner as a matter of law. The Court of Appeals has squarely rejected this approach. *See Kreuzer*, 735 F.2d at 1492-93 (district court erred in granting summary judgment based on alleged absence of anticompetitive intent). So long as the record contains evidence on both sides of the issue, the weighing of anticompetitive harms and purported procompetitive benefits is the responsibility of the jury. *See id.* at 1490 ("the *factfinder* must weigh all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on trade") (emphasis added); *U.S. v. Microsoft Corp.*, 1998 WL 614485, *22 (D.D.C. Sept. 14, 1998) ("[t]his difficult balancing of potentially legitimate business justifications against what plaintiffs contend are exclusionary effects are fact-bound questions that generally cannot be resolved on summary judgment").

---

[18]     Though unnecessary to defeat summary judgment, Plaintiffs show below that Barr lacks a cognizable procompetitive justification for the Agreement, and those justifications it does assert are clearly pretextual.

### B.    MARKET POWER AND MARKET DEFINITION ARE MERELY SURROGATES FOR ANTICOMPETITIVE EFFECTS

In *Indiana Federation*, the Supreme Court ruled that "'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" 476 U.S. at 460-61 (quoting VII P. Areeda, ANTITRUST LAW ¶ 1511 at 429 (1986)).   The Court found that evidence "of actual, sustained adverse effects on competition" among participating dentists in the affected areas was sufficient to support a finding that the restraint was unlawful "even in the absence of elaborate market analysis." 476 U.S. at 461. The lower federal courts have heeded the Supreme Court's guidance and have condemned restraints under the rule of reason with or without proof of the defendant's market power.   *E.g., Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 509 (2d Cir. 2004) ("[i]f plaintiff can demonstrate an actual adverse effect on competition . . . there is no need to show market power in addition"); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (series of agreements whereby toy manufacturers withheld key products from discounters had actual anticompetitive effects, eliminating need for proof of market power); *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1014-15 (6th Cir. 1999) (discussing and applying *Indiana Federation*).[19]

A directly analogous application of the rule of *Indiana Federation* appears in the FTC's decision in *Schering*.   There, on facts virtually identical to those at bar (a would-be generic competitor's agreement with a branded drug maker not to come to market), the Commission unanimously agreed that the actual competitive effects of an agreement not to launch a generic version of a branded drug obviated any need to define a relevant market.  *Schering*, 2003 FTC

---

[19]      *See also Microsoft*, 253 F.3d at 51 (acknowledging "anticompetitive effects" approach and citing *Indiana Federation*); *Superior Court Trial Lawyers Ass'n v. FTC*, 856 F.2d 226, 251-52 (D.C. Cir. 1988) (same); *FTC. v. Libbey, Inc.*, 211 F. Supp.2d 34, 49-50 (D.D.C. 2002) (same).

LEXIS 187, *39 & n.31, *41 n.32, *42 ("it is not necessary to rely on indirect proof that Schering [the brand-name manufacturer] has a monopoly share in a relevant market when the competitive effects of the 'restraint' [which delayed generic entry] can be shown directly"). That the agreement at issue in that case delayed AB-rated generic competition sufficiently demonstrated those anticompetitive effects without the need to prove market power or define a relevant market, because, the Commission recognized, generic drug competition yields "uniquely significant" procompetitive benefits that non-AB-rated drugs, no matter how functionally similar, do not:

> This case, however, is precisely concerned with that more substantial threat of generic competition, and there is credible evidence in the record — largely ignored in the Initial Decision — which indicates that generic entry was *a uniquely significant market event*, and recognized as such by both parties.
>
> . . .
>
> *The entry of a lower-cost generic is a direct consumer benefit*, by itself, *wholly apart from the impact on other potassium chloride supplements.* A settlement with Upsher that provided for delayed entry of this lower-cost generic product would enable Schering to maintain its sales of, and profits from, K-Dur 20 for a considerable period of time — but at significant cost to consumers. Schering's anticipated loss of sales because of generic entry provides an indication of the magnitude of the settlement's anticompetitive effects.

*Id.* at *46, *48 (emphasis added); *see also id.* at *56 ("well-recognized unique impact of generic competition"); *Valley Drug*, 344 F.3d at 1311 n.27 ("the anticompetitive effects of exclusion [of an AB-rated generic drug] cannot be seriously debated").[20]

---

[20]     Plaintiffs have adduced substantial evidence that, like Schering, Warner Chilcott viewed competition from generic Ovcon as a uniquely significant market event, to be avoided at all costs. *See* Rubinfeld Rebuttal Report (1/8/07) ¶ 32 (discussing various Warner Chilcott documents, including one characterizing generic Ovcon competition as "                              ") (Barr Appx. Ex. 9); Leitzinger Report (5/18/07) at 23-24 (reviewing various Warner Chilcott forecasts
(continued...)

18

Evidence Plaintiffs have adduced in this case overwhelmingly shows actual, anticompetitive effects resulting from the Agreement—higher average prices for Ovcon 35 Products—easily satisfying Plaintiffs' burden under the rule of reason.[21]  Barr has not challenged the admissibility of Plaintiffs' experts' opinions, and they are sufficient by themselves to defeat Barr's motion.  *E.g., Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 945, 958-59 (6th Cir. 2005) (disagreement among parties' experts was for the jury to resolve).

Nor could Barr credibly challenge those opinions.  Barr's own expert, Dr. Bell, quantified in his own expert report the cost savings that direct purchasers would have achieved had Barr launched its generic Ovcon 35 (Balziva) in 2004, and thus showed the anticompetitive effect of the provision in the Agreement delaying that competition.[22]  Dr. Bell was constrained to concede at his deposition that Warner Chilcott considered the competitive impact of the entry of Barr's generic Ovcon 35 to be substantial.[23]  Barr's other experts, Drs. Hausman and Mishell, likewise implicitly confirmed the anticompetitive effects of a delay in that competition.[24]

---

[20](...continued)
characterizing generic Ovcon competition as a "                                    ") (Pl. Appx. Ex. 73).  Barr's own experts have conceded the unique significance of generic Ovcon competition.  *See* Hausman Dep. (1/31/07) at 220:24-221:12 (agreeing that generic Ovcon has a different competitive effect on branded Ovcon than on other branded oral contraceptives) (Pl. Appx. Ex. 79).

[21]    *See* Plaintiff States' and Direct Purchaser Plaintiffs' Joint Opposition to Barr's L. Civ. R. 56.1 Statement of Facts and Counter-Statement of Material Facts ("JSOF") ¶¶ 43-47, 60, 66, 70-72, 96-97, 102-04.

[22]    JSOF ¶ 103.

[23]    Bell. Dep. (8/15/07) at 47:14-22 (Pl. Appx. Ex. 75).

[24]    JSOF ¶¶ 34, 103-04.

C.   PLAINTIFFS HAVE SHOWN THAT THE AGREEMENT PRESERVED WARNER CHILCOTT'S MARKET POWER IN A PROPERLY DEFINED RELEVANT MARKET

Even if Plaintiffs were required to show that the Agreement maintained Warner Chilcott's market power with respect to Ovcon 35 Products, Plaintiffs easily do so. "Market power is defined as the power to control prices or exclude competition." *U.S. v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Market power can be shown in one (or both) of two ways. First, it can be shown directly, by proving that the defendant has the ability to "profitably raise prices substantially above the competitive level." *Microsoft*, 253 F.3d at 51; *NCAA v. Board of Regents*, 468 U.S. 85, 109 n.38 (1984) (market power is the power to charge prices higher than a competitive market would have allowed).[25] Second, it can be shown indirectly, *i.e.*, market power "may be *inferred* from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Microsoft*, at 51 (emphasis supplied). In this case, both types of proof are available, and both lead to the conclusion that Warner Chilcott had market power in a relevant market for Ovcon 35 Products. *E.g.*, Leffler Report (5/18/07) ¶ 7B ("Warner had substantial market power in the relevant economic market for the sale of Ovcon 35 in the U.S.") (Barr Appx. Ex. 6); *id.* ¶¶ 12-41 (basis for Dr. Leffler's opinion that, prior to generic entry, Warner Chilcott had substantial market power in the relevant economic market for the sale of Ovcon 35).

---

[25]   In competitive markets, price is approximately equal to marginal cost. Thus, the competitive level is one in which price is approximately equal to marginal cost. *See Wisconsin Pub. Power, Inc. v. FERC.*, 493 F.3d 239, 262 (D.C. Cir. 2007) (in a competitive market, price is close to marginal cost); *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 & n.4 (9th Cir. 1995). Any increase in price above marginal cost results in a deadweight loss to society. *Rebel Oil*, 51 F.3d at 1434 n.4. Thus, many courts define market power as the ability to charge more than marginal cost. *See In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 603 (7th Cir. 1997) (market power is "the power to raise price above cost without losing so many sales as to the make the price rise unsustainable"). *See generally* Areeda & Hovenkamp, ANTITRUST LAW ¶ 503. Plaintiffs' experts concur. JSOF ¶ 106.

1.    Plaintiffs have presented direct evidence that the challenged conduct preserved substantial market power

Here, there is ample evidence of Warner Chilcott's ability, through the Agreement, to exclude generic Ovcon 35 competition and thereby keep the average prices paid for Ovcon 35 Products artificially high. First, evidence showing the likely and actual effects that unimpeded generic Ovcon 35 competition would (and ultimately did) have on the average prices for Ovcon 35 products demonstrates conclusively the effects that Warner Chilcott, by means of the Agreement, was able to forestall. *See Microsoft*, 253 F.3d at 51 ("Where evidence indicates that a firm has in fact profitably [maintained prices above the competitive level], the existence of monopoly power is clear").[26]

Second, there is no genuine dispute that the Agreement, by delaying the entry of generic Ovcon 35, maintained Warner Chilcott's ability to charge substantially above marginal cost for Ovcon 35 Products without losing substantial sales. As Professor Leffler explains in his expert report, prior to generic entry, Warner Chilcott was able to sell Ovcon 35

.[27] Even Barr's own expert, Dr. Bell, conceded that Warner Chilcott's pricing for Ovcon                  . Dr. Bell testified that, "from an economist's perspective," market power exists in situations "where an individual producer or manufacturer is facing a downward-sloping demand curve for the product that that individual producer or manufacturer creates,"[28] and that this implies that the manufacturer is able "to price the product at a price that

---

[26]    JSOF ¶¶ 43-47, 60,  66, 70-72, 96-97, 102-04.

[27]    JSOF ¶ 107.

[28]    Sellers without market power face a flat (horizontal) demand curve rather than a downward-sloping one. *See* P. Areeda & L. Kaplow, ANTITRUST ANALYSIS 15 n.29 (1997).

exceeds the marginal cost of production."  Professor Bell went on to acknowledge that, "by virtue

of the fact that                                    , . . . that would satisfy an economist's sort of

classical definition in some sense of the existence of market power."  Bell Dep. (1/24/07) at 149:2-

151:4 (Pl. Appx. Ex. 74).  This indicates that Warner Chilcott has been able to profitably sell Ovcon

                                    , which is the definition of market power.

Indeed, Barr itself has adopted the proposition that the seller of a brand-name drug lacking

AB-rated generic competition typically enjoys monopoly or market power.[29]  Barr recently filed an

answer and antitrust counterclaim in a patent case styled *Celgene Corp. v. Barr Laboratories, Inc.*,

Civil Action No. 07-286 (SDW) (D.N.J.) (Pl. Appx. Ex. 52).  In the *Celgene* case, Barr complains

that competition has been harmed because it has been delayed from entering the market with a

generic version of Thalomid, a drug used to treat a form of blood cancer and certain skin disorders.[30]

According to Barr, Celgene Corporation (the manufacturer of Thalomid and plaintiff in the case)

is the only seller of Thalomid products in the United States.  Barr alleged in its counterclaim that

Celgene filed a patent infringement action against Barr that was objectively baseless and

"subjectively motivated . . . to monopolize and restrain trade in the relevant market by . . . delaying

approval of [Barr's] competing FDA-approved thalidomide drug product."  *Id.* ¶ 139.

According to Barr, Celgene's lawsuit was an antitrust violation because ***preventing AB-rated***

***generic competition to a particular branded drug maintains the branded manufacturer's***

---

[29]     This is not a controversial proposition.  As Judge Posner pointed out in the *Brand Name* case,
"[e]veryone knows" that manufacturers of branded prescription drugs "have market power."  *In re
Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d 781, 786 (7th Cir. 1999).

[30]     There are other drugs used to treat these conditions.  *See* http://www.multiplemyeloma.org/
treatments/index.php (other treatments for blood cancer); http://en.wikipedia.org/
wiki/Erythema_nodosum (other treatments for skin disorders).

22

*monopoly power*.  Barr alleged in its counterclaim that "Celgene has monopoly power and market power in the market for FDA-approved thalidomide drug products *because it is the only company with FDA approval to market a thalidomide drug product in the United States*.  Celgene has sufficient market power to keep prices of FDA-approved thalidomide drug products artificially high and quantities artificially low."  *Id.* ¶ 143 (emphasis supplied).  Barr also explicitly alleges that "[t]he relevant product market . . . is the market for FDA-approved thalidomide drug products."  *Id.* ¶ 141.  These allegations perfectly mirror Plaintiffs' allegations in this case—that Warner Chilcott had market power in selling Ovcon 35; that prevention of generic competition maintained that market power; and (equivalently) that Ovcon 35 Products constitute a relevant product market.  Barr's counterclaim in *Celgene* is sufficient to defeat its motion for summary judgment.[31]

2.    <u>Plaintiffs have presented indirect evidence that the challenged conduct preserved substantial market power</u>

In addition to direct evidence that Warner Chilcott possessed market power over Ovcon 35 Products and that the Agreement maintained that power, Plaintiffs have adduced substantial evidence that the relevant market in this case is Ovcon 35 Products (*i.e.*, branded Ovcon 35 and its FDA-approved AB-rated generic Ovcon 35), a market in which Warner Chilcott enjoyed a 100% share prior to the entry of generic Ovcon 35.[32]  That evidence is consistent with the conclusions of

---

[31]    *See City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 568 (11th Cir. 1998) (defendant's admission is sufficient to defeat summary judgment).

[32]    *E.g.,* Leffler Report (5/18/07) ¶ 7A (Barr Appx. Ex. 6).  Like the issue of market power, the definition of the relevant product market is typically a question of fact for the jury.  *E.g., United States v. Microsoft Corp.*, 1998 WL 614485, *3 n.3 (D.D. C. Sept. 14, 1998); *Lorazepam*, 467 F. Supp. 2d at 81-82.  *See also T. Harris Young & Assoc., Inc. v. Marquette Elec., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991) (market definition is a jury question); *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489 (9th Cir. 1991) (same); *Ad-Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp.*,  849 F.2d 1336, 1341 (11th Cir. 1987) (same); *Syufy*
(continued...)

23

other courts that a brand-name drug and its AB-rated generic equivalents constitute a relevant

antitrust market to the exclusion of other drugs in the same therapeutic class.[33]

"[A] market is properly defined when a hypothetical profit-maximizing firm selling all of

the product in that market could charge significantly more than a competitive price, *i.e.*, without

losing too many sales to other products to make its price unprofitable." *U.S. v. Visa U.S.A., Inc.*, 163

F. Supp. 2d 322, 335 (S.D.N.Y. 2001).  This is referred to as the "hypothetical monopolist" test,

which derives from the 1992 Joint FTC/Department of Justice Horizontal Merger Guidelines.[34]  It

is critical to recognize that the relevant product market is the "smallest possible group of products"

that satisfies this test.  *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 120 (D.D.C. 2004); *New York*

---

[32](...continued)
*Enters. v. American Multicinema Inc.*, 793 F.2d 990, 994 (9th Cir. 1986) (same); *Weiss v. York Hosp.*, 745 F.2d 786, 825 (3d Cir. 1984) (same); *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Corp.*, 579 F.2d 20, 28 (3d Cir. 1978) (same); *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 979-81 (5th Cir. 1977) (same); *Nilavar v. Mercy Health System*, 142 F. Supp. 2d 859, 874 (S.D. Ohio 2000) (same).

[33]     *E.g.*, *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 496-99 (2d Cir. 2004) (relevant market limited to generic versions of warfarin sodium); *In re Lorazepam & Clorazepate Antitrust Litigation*, 467 F. Supp. 2d 74, 81-82 (D.D.C. 2006) (relevant markets limited to generic versions of lorazepam and clorazepate, respectively); *Cipro*, 363 F. Supp. 2d at 522-23 (relevant market limited to drug product ciprofloxacin, excluding other flourouquinolone antibiotics); *Terazosin*, 352 F. Supp.2d at 1319 n.40 (relevant market properly limited to branded and generic terazosin hydrochloride); *Schering*, 2003 FTC LEXIS 187, *57-58 (brand and its generic equivalents "define[] the area of trade we need to focus on" in a delayed generic entry case); *Knoll Pharmaceuticals Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 2001 WL 1001117, *3-4 (N.D. Ill. Aug. 24, 2001) (Rule 12 motion denied where complaint defined relevant antitrust product market as limited to hydrocodone bitartrate/ibuprofen); *In re Cardizem CD Antitrust Litigation*, 105 F. Supp. 2d 618, 680-81 (E.D. Mich. 2000) (Rule 12 motion denied where complaint defined relevant antitrust product market as limited to branded and generic versions of Cardizem CD).

[34]     The Merger Guidelines are available at http://www.usdoj.gov/atr/public/guidelines/hmg.htm. The price increase utilized in the test is generally taken to be 5%.

*v. Kraft General Foods, Inc.*, 926 F.Supp. 321, 360 (S.D.N.Y. 1995).[35]  Stated in less technical terms, a relevant market is the smallest set of relevant products that it pays to control.

As explained above, Warner Chilcott was able to charge prices

without losing significant sales simply by being the only seller of Ovcon 35 Products in the United States (a status it maintained for an additional two and a half years as a result of the Agreement).  It follows that a "hypothetical" monopolist could charge such prices without losing sales to other sellers and, therefore, that Ovcon 35 and its generic equivalents constitute a relevant market.  *See* Leitzinger Report (5/18/07) at 26-27 (average monthly price for Ovcon products dropped from        before generic entry to        after Barr's entry, to        after Watson's entry) (Pl. Appx. Ex. 73); Leffler Report (5/18/07) ¶ 66 (average monthly price for Ovcon products dropped        following Barr's entry, and dropped to        of pre-generic-entry level following Watson's entry) (Barr Appx. Ex. 6).[36]  Thus, "[t]here is . . . a relevant economic market for the sale of Ovcon 35 and its AB rated generics; that is, if a single seller controlled the sales of both branded Ovcon 35 and generic Ovcon 35, that seller would be able to set profitable prices that were significantly above the competitive level."  Leffler Report (5/18/07) ¶ 24 at 13 n.27.[37]

---

[35]    *See also* Areeda & Hovenkamp, ANTITRUST LAW ¶ 536; Merger Guidelines § 1.11 (a court or agency attempting to define the relevant market for antitrust purposes seeks to identify the *smallest* set of products and a geographic area such that, if a single firm were the only seller of those products in that area, it would have the ability to impose a "small but significant and nontransitory" price increase without losing sufficient sales to make the increase unprofitable) (emphasis added).

[36]    Dr. Leffler expressly used the Merger Guidelines test. Leffler Report (5/18/07) ¶¶ 21, 24 (Barr Appx. Ex. 6); Leffler Dep. (7/25/07) at 11:17-12:5; *id.* at 14:22-15:16 (Pl. Appx. Ex. 80).

[37]    Importantly, Barr's experts have expressly admitted that their opinions in this case are based upon a *rejection* of the standard "hypothetical monopolist" test for defining a relevant antitrust product market.  *E.g.*, Bell Dep. (8/15/07) at 77:1-15 (disagreeing with hypothetical monopolist test) (Pl. Appx. Ex. 75); *id.* at 78:14-79:5 (did not utilize merger guidelines "SSNIP" test); Bell Dep.
(continued...)

25

Barr argues that the existence of non-Ovcon oral contraceptive products that also prevent pregnancy means that those other drug products must necessarily occupy the relevant antitrust product market with Ovcon 35 Products. This argument confuses *therapeutic alternatives* with *economic substitutes*.[38] Functional similarities between Ovcon 35 and non-Ovcon oral contraceptive products are insufficient to permit the inclusion of those other oral contraceptive products in the relevant market. Such products would constitute economic substitutes for Ovcon 35 only if they prevented Barr and Warner Chilcott from maintaining the price of Ovcon 35 Products above the levels that would obtain in a competitive market (i.e., in a market where price approximates marginal cost). *See, e.g., Geneva Pharms Tech. Corp.*, 386 F.3d at 496 (although therapeutically equivalent, branded and generic Coumadin were not economic substitutes and were in separate antitrust markets); *Lorazepam*, 467 F. Supp. 2d at 81-82 ("[t]he fact that products are just functionally interchangeable does not compel a finding that they belong in the same market");[39] *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 158-60 (D.D.C. 2000) ("[f]inding two products to be functionally interchangeable, however, does not end the analysis" and recognizing that cross-elasticity of demand is the essential consideration); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1074

---

[37](...continued)
(1/24/07) at 60:1-4 (same). Thus, Barr's expert opinions concerning the composition of the relevant antitrust market in this case are, among their other flaws, contrary to law. Barr's expert admitted that he had never before testified in court, testified at a deposition, or written an expert report using the "relevant market" test he utilized in this case, nor could he name a single instance where any court anywhere had ever accepted the technique he used in this case. Bell Dep. (1/24/07) at 79:11-23; *id.* at 91:10-92:7; *id.* at 93:2-9; *id.* at 103:14-19 (Pl. Appx. Ex. 74).

[38]     Barr's argument also ignores evidence that Ovcon 35 is not therapeutically interchangeable with other oral contraceptives for many patients. *See* JSOF ¶¶ 2, 117-119.

[39]     All parties agree that both Ovcon 35 and generic Ovcon 35 are included in the relevant market. Barr argues that other oral contraceptives should be *in*cluded, not that branded Ovcon should be *ex*cluded.

(D.D.C. 1997) (finding, on basis of absence of cross-elasticity of demand, that products reside in separate product markets despite functional interchangeability); *id.* at 1075 ("the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes").[40]

Thus, as Chief Judge Hogan explained in *Swedish Match*, to find that other oral contraceptives should be included in the relevant market with Ovcon 35 and AB-rated generic versions of Ovcon 35, the finder of fact would have to conclude that "sufficient [non-Ovcon 35 oral contraceptive] substitution occurs to defeat [Ovcon 35] price increases." *Swedish Match*, 131 F. Supp. 2d at 157. The undisputed facts in this case show that the existence of other oral contraceptives did not constrain Warner Chilcott from charging supracompetitive prices for Ovcon 35.[41] As explained above, it is undisputed that the price of Ovcon 35 has always been substantially

and that, by delaying generic competition, Warner Chilcott was able to maintain those prices without losing significant sales.

---

[40]    That Warner Chilcott may have considered such other oral contraceptives their "business competition" is not determinative, as Barr's own expert has explained. Hausman Dep. (1/31/07) at 97:8-98:13 ("of course, business people use the word 'market' different than an antitrust relevant market") (Pl. Appx. Ex. 79). *See also* Rubinfeld Rebuttal Report (1/8/07) ¶ 34 (documents where Warner Chilcott considers the pricing of other oral contraceptive products are not inconsistent with Warner Chilcott's possession of market power with respect to Ovcon 35) (Barr Appx. Ex. 9); Leffler Rebuttal Report (7/20/07) ¶ 13 n.23 (same) (Barr Appx. Ex. 7). If the contents of business documents were determinative, Plaintiffs would surely win on the issue of market definition, given Barr's internal business judgment that

.  JSOF ¶ 120.

[41]    The lack of price sensitivity in this market should not be surprising. The selection of an oral contraceptive is made by physicians, and physicians do not select products on the basis of price. Barr's own medical expert, Dr. Mishell, testified at his deposition that the repeated price increases for Ovcon 35 had no impact on his (or his residents') prescribing patterns. Mishell Dep. (8/22/07) at 37:2 - 45:3 (Pl. Appx. Ex. 82). Dr. Mishell was not even aware that generic versions of Ovcon 35 (Balziva and Zenchent) were available. *Id.* 36:11-18.

Other evidence bearing on this issue points to the same conclusion. As Barr's own experts concede, the magnitude of switching between Ovcon and other oral contraceptives is small. JSOF ¶ 112. Moreover, switching between and among oral contraceptives is *not* based on price, and it is uncontested that Warner Chilcott never lowered the price of Ovcon 35 in response to any other oral contraceptive product. In fact, Barr's experts *admitted* that the reasons for the very small amount of switching they found between and among oral contraceptive products are not related to price. *Id.* ¶¶ 113-114. Barr's very own medical expert, Dr. Mishell, nicely proved this point when he revealed that, as a practicing physician and prescriber (or supervisor of prescribers) of oral contraceptive products, he himself was utterly unaware of the relative price differences between and among them. Mishell Dep. (8/22/07) at 45:8-57:9 (Pl. Appx. Ex. 82).[42] This inattention to price differences allows pharmaceutical manufacturers to avoid price competition and maintain monopoly prices so long as AB-rated generic alternatives to their drugs are not available—a fact that Barr, as a generic manufacturer, well knows.

Barr appears to claim that switching between oral contraceptives based upon the availability of samples represents price-based and price-constraining competition. Barr Br. at 39. Plaintiffs' experts strongly disagree.[43] Nevertheless, even assuming *arguendo* that sampling is a form of price competition, Plaintiffs' experts have shown that Warner Chilcott did not react by increasing sampling during periods when entry of other branded and less expensive generic non-Ovcon oral contraceptives occurred. Leffler Rebuttal Report (7/20/07) ¶ 27 (Barr Appx. Ex. 7).

─────────────────

[42]     Consequently, as Plaintiffs' economist Dr. Leffler states, "there's no connection between Dr. Bell's switching analysis and economic substitutability." Leffler Dep. (7/25/07) 305:25-306:3 (Pl. Appx. Ex. 80).

[43]     JSOF ¶ 115.

By contrast, and consistent with a relevant market limited to Ovcon 35 Products, Plaintiffs have adduced substantial evidence of significant price-based switching between Ovcon 35 and generic versions of Ovcon 35.[44]

### D.   BARR'S OUTPUT AND SAMPLING ARGUMENTS ARE LEGALLY FLAWED AND IGNORE CONTRARY EVIDENCE

Barr argues that, because the Agreement purportedly "preserve[d] or expand[ed] output," and maintained Warner Chilcott's incentive to provide free samples, anticompetitive effects of the Agreement are absent.  Barr Br. at 35-37.  These arguments are both legally and factually flawed. **First,** as discussed extensively above, Plaintiffs have shown uncontradicted proof of the Agreement's anticompetitive effects in the nature of higher prices.  Higher prices are sufficient to establish anticompetitive harm without regard to output effects and, in any event, the output effects of generic entry in this case are in dispute.  **Second**, Barr's effort to show that generic competition injured consumers is legally flawed because it: (a) contravenes Supreme Court precedent disallowing the argument that competition itself is harmful; (b) ignores the unrefuted harm to direct purchasers (Plaintiffs in these cases); and (c) would require the Court to conduct the pass-on analysis prohibited by the Supreme Court in *Hanover Shoe* and *Illinois Brick*.  And **third**, to the extent it is deemed to be relevant, Barr's own Appendix contains contrary evidence showing that consumers in fact would have benefited from earlier generic entry.

1.   Plaintiffs have shown that the Agreement excluded generic competition and thereby raised average prices for Ovcon 35 products, and the "output reduction" measure of harm is inappropriate here

As discussed above, there is overwhelming and uncontradicted evidence of actual anticompetitive effects resulting from the Agreement, in the form of higher average prices for Ovcon

---

[44]     JSOF ¶ 116.

35 products.  *See* Part II.B *supra*.  That alone requires a denial of summary judgment.  Restricted output is not the only measure of anticompetitive effects.  *See* note 16 *supra* (citing decisions identifying various alternative forms of cognizable anticompetitive effects).[45]  A reduction in output is only one way of showing an anticompetitive effect.  *See Indiana Federation*, 467 U.S. at 460 ("*such as* a reduction in output") (emphasis added).  Higher prices and reduced consumer choice are other independently sufficient showings of anticompetitive effect.  A far lesser showing would require denial of Barr's motion.  *Kreuzer*, 735 F.2d at 1496 n.25 (summary judgment improper where "*some potential* for anticompetitive effect" existed) (emphasis added).[46]

Barr argues that the entry of generic Ovcon 35 competition caused "reduced output" of oral contraceptive products and was therefore itself anticompetitive.  Barr is wrong.  Generic competition does not cause reduced output of oral contraceptive products.  *See* Leffler Rebuttal Report (7/20/07) ¶ 37 (generic entry *increases* output of pharmaceuticals) (Barr Appx. Ex. 7); Leffler Report (5/18/07) ¶ 60 (lessened promotion for Ovcon 35 following generic entry does not decrease output of sum of Ovcon 35 and other oral contraceptives) (Barr Appx. Ex. 6).[47]

---

[45]     *See also Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 789 (6th Cir. 2002) (although output rose, evidence of higher prices and reduced consumer choice each sufficiently supported jury finding of anticompetitive effect).

[46]     *See also Indiana Federation*, 467 U.S. at 460-64 (horizontal agreement to withhold information desired by consumers "may be condemned *even absent proof that it resulted in higher prices . . . than would occur in its absence*") (emphasis added).

[47]     *See also* FTC, "To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy," ch.3, p. 11 (Oct. 2003) ("[t]he generic competition spurred by Hatch-Waxman has forced brand-name firms to come up with new products to replenish their revenue streams"); Eric L. Cramer and Daniel Berger, "The Superiority of Direct Proof of Monopoly Power and Anticompetitive Effects in Antitrust Cases Involving Delayed Entry of Generic Drugs," 39 U.S.F. L. REV. 81, 133 (2004) ("it is simply a fallacy to suggest that generic entry causes 'output' to fall in any sense that would be harmful to consumers").

30

It is true that generic competition typically causes a downward trend over time in the consumption of a particular drug product subject to generic competition (*i.e.*, the sum of the particular brand and its AB-rated generics). *E.g.*, Leffler Rebuttal Report (7/20/07) ¶ 34 (Barr Appx. Ex. 7); Rubinfeld Rebuttal Report (1/8/07) ¶ 81 (Barr Appx. Ex. 9). There are well-known reasons for this phenomenon.[48]  Even if it were true that downward-trending consumption of Ovcon 35 Products implied "restricted output" in a relevant respect, Plaintiffs have adduced substantial expert economic evidence that such effects are an improper metric for gauging anticompetitive effects in the pharmaceutical industry.[49]

Significantly, even Barr's own expert conceded that output effects alone are not determinative of the presence or absence of an anticompetitive effect.[50]  No other answer is possible. To accept Barr's "output" argument is to find that generic entry almost always has an adverse effect on competition (and blocking generic competition almost always has a procompetitive effect), because total sales of a molecule (brand and corresponding AB-rated generics combined) typically fall over time once a generic has entered.[51]  Such a finding would be incoherent.  By enacting the Hatch Waxman Act, Congress made the determination, based on extensive economic evidence, that generic entry, because it lowers the price of pharmaceuticals, is *good* for competition, *good* for

---

[48]     *See* Leffler Report (5/18/07) ¶¶ 53-54, 60 (following inception of generic competition for particular drug product, demand-expanding effects of lowered average price for the total drug product (brand plus AB-rated generics) works against decrease in promotion of branded version of drug following inception of generic competition, but no adverse consumer welfare effects can be implied if on net consumption decreases) (Barr Appx. Ex. 6); Leffler Rebuttal Report (7/20/07) ¶ 33 (same) (Barr Appx. Ex. 7).

[49]     JSOF ¶ 33.

[50]     *Id.*

[51]     *Id.*

consumers and *good* for end-payors.[52]  Barr is not entitled to conspire with its competitor to deprive its customers of competition that has been specifically facilitated by Congress.  *See Indiana Federation*, 476 U.S. at 462 ("The Federation is not entitled to pre-empt the working of the market by deciding for itself that its customers do not need that which they demand").

### 2.    Barr's arguments contravene controlling law

In multiple ways, Barr's perverse and implausible argument—that a two-and-a-half year delay in generic competition actually *benefited* consumers—is contrary to controlling law from the Supreme Court and the Court of Appeals.

### a.    *Barr may not argue that competition itself is unreasonable.*

Barr's sampling defense is an effort to show that, under the circumstances of this case, generic competition is economically undesirable.  However, "the Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable."  *National Society of Professional Engineers v. United States*, 435 U.S. 679, 696 (1978).  In *Professional Engineers*, defendants argued that their agreed ban on competitive bidding, which kept rival engineers from bidding on work which another engineer sought, actually benefitted consumers by ensuring safer bridges and buildings.  The Supreme Court would have none of it, and declared that any and all justifications for restricting competition were precluded as a matter of law, regardless of the facts. *Id.* at 695 ("[e]ven assuming occasional exceptions to the presumed consequences of competition, the statutory policy precludes inquiry into the question whether competition is good or bad").  *See also Indiana Federation*, 476 U.S. at 463 (rejecting defendant's argument that additional

---

[52]     *See Mova Pharmaceuticals Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998) (Congress' principal purpose in enacting the Hatch-Waxman Amendments was "to bring generic drugs onto the market as rapidly as possible").

competition will lead consumers "to make unwise and even dangerous choices).[53]   Generic

competition is by definition competition, and settled antitrust doctrine prevents Barr from engaging

the Court in a debate as to whether such competition is good or bad.

b.     *Harm to direct purchasers is sufficient to establish a violation.*

Barr's argument also ignores the fact that harm to direct purchasers (in this case, wholesalers

and retailers) is sufficient to establish a violation of the Sherman Act whether or not that harm is

passed on to consumers and felt at the consumer level.  *See FTC v. H.J. Heinz Co.*, 246 F.3d 708,

719 (D.C. Cir. 2001) ("no court has ever held that a reduction in competition for wholesale

purchasers is not relevant unless the plaintiff can prove impact at the consumer level").  Barr has

not cited a case, and Plaintiffs are not aware of one, holding that harm to consumers is the only harm

of concern to the antitrust laws.  In fact, as we show in the next section, harm to indirect-purchasing

consumers is irrelevant and inadmissible in a direct purchaser case.

c.     *Harm to direct purchasers is the only harm relevant in these cases.*

Harm to direct purchasers is not only sufficient to establish a violation; it is the only kind of

harm relevant in the Direct Purchaser cases.  Determining whether consumers were or were not

---

[53]     Barr's argument about Warner Chilcott's samples of Ovcon 35 is based upon the additional legally-impermissible premise that the "generosity" of an antitrust co-conspirator in allegedly keeping Ovcon 35 prices "reasonable" (here, purportedly through voluntary distribution of samples), can immunize an agreement to suppress horizontal competition.  Over 60 years ago, the Supreme Court rejected the idea that an antitrust defendant's interference with the "free play of market forces" can be justified by the hope that he or she will exercise that market power benevolently.  *See U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221-22 (1940) ("[t]hose who fixed reasonable prices today would perpetuate unreasonable prices tomorrow, since those prices would not be subject to continuous administrative supervision and readjustment in light of changed conditions. . . . Any combination which tampers with price structures is engaged in an unlawful activity. . . . [T]o the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces.  The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference.  Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive").

injured by the Agreement would require the court to engage in the "pass-on" analysis that the Supreme Court disallowed in federal antitrust cases in *Hanover Shoe* and *Illinois Brick*.

In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court adopted the rule that only direct purchasers—in this case, wholesalers and retailers—are permitted to show that they suffered injury in the form of higher prices resulting from an antitrust violation, and that any inquiry into the derivative injury suffered by indirect purchasers (*i.e.,* customers of direct purchasers, customers of those customers, *etc.*) is precluded as a matter of law.  As the Court explained in *Illinois Brick*, *Hanover Shoe* held that "a direct purchaser suing for treble damages under § 4 of the Clayton Act is injured within the meaning of § 4 by the full amount of the overcharge paid by it and . . . ***the antitrust defendant is not permitted to introduce evidence that indirect purchasers were in fact injured by the illegal overcharge***."  *Illinois Brick*, 431 U.S. at 724-25 (emphasis added; citations omitted).

With narrow exceptions inapplicable here, *Hanover Shoe* and *Illinois Brick* establish a conclusive presumption that entities purchasing directly from the antitrust violator absorb the *full* amount of the illegal overcharge; that the overcharge is *not* passed on to customers of those direct purchasers in the form of higher prices; and hence that those downstream customers do *not* suffer any injury as a result of the violation.  *See Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 207 (1990) (in *Illinois Brick*, Court ruled that the State of Illinois "had suffered no injury" because the defendant in the case "had not sold any concrete blocks to it"); *Illinois Brick*, 431 U.S. at 725 (direct purchaser "is injured within the meaning of § 4 by the full amount of the overcharge"); *Hanover Shoe*, 392 U.S. at 491 (same).  Barr's arguments, and the proof purportedly supporting them, impermissibly seek to rebut that presumption.

34

Moreover, litigation of Barr's sampling defense would impermissibly require the Court and the jury to determine how much of the illegal overcharge was passed on by wholesalers and retailers to consumers in the form of higher retail prices.  As explained above, Barr is offering to prove that consumers benefited from the delay in generic entry because consumers are supposedly better off receiving samples and paying higher retail prices for branded Ovcon than not receiving samples and paying lower retail prices for generic Ovcon.  This contention necessarily requires the Court to determine the difference between the prices charged by pharmacies for branded Ovcon and the prices charged for generic Ovcon—*i.e.*, to determine how much of the higher prices paid by direct purchasers to acquire branded as opposed to generic Ovcon is passed on to consumers in the form of higher retail prices.  It is only by calculating that discount that it can be compared to the "effective discount" to consumers resulting from free samples.  But it is precisely this inquiry—the "massive efforts" needed to identify the amount of the overcharge absorbed at each level of the distribution chain, "from direct purchasers to middlemen to ultimate consumers"—that is barred by *Illinois Brick*.  431 U.S. at 737.

Finally, as a consequence of creating substantive law, *Hanover Shoe* and *Illinois Brick* also created an evidentiary rule that absolutely prohibits introduction of evidence relating to downstream prices.  *See Illinois Brick*, 431 U.S. at 724-25 (under *Hanover Shoe*, "the antitrust defendant is not permitted to introduce evidence that indirect purchasers were in fact injured by the illegal overcharge").  In this case, Barr is asking to prove that indirect purchasers were *not* "injured by the illegal overcharge."  If the Court deems this evidence relevant and exculpatory, *Plaintiffs* will be forced to rebut it by proving that consumers *were* injured by the illegal overcharge—*i.e.*, that Plaintiffs pass on a portion of the overcharge to (retailers and) consumers, and that this portion of the overcharge outweighs any benefits that consumers receive in the form of free samples.  But the

35

difficulties and complexities that led the Supreme Court to bar the introduction of such evidence do not depend on the litigation status of the party introducing it. Whether this "pass on" evidence is introduced by Plaintiffs or Barr, the result will be "to complicate treble-damages actions with attempts to trace the effects of the overcharge on the purchaser's prices, sales, costs, and profits, and of showing that these variables would have behaved differently without the overcharge." *Illinois Brick*, 431 U.S. at 725. *See also id.* at 741 ("the 'massive evidence and complicated theories' involved in attempting to establish a pass-on defense against a direct purchaser applies *a fortiori* to the attempt to trace the effect of the overcharge through each step of the distribution chain from the direct purchaser to the ultimate consumer"). And of course, since the jury is absolutely prohibited from considering this pass-on evidence in awarding overcharge damages to Plaintiffs, *Hanover Shoe*, 392 U.S. at 494, it would be difficult to imagine evidence more prejudicial to Plaintiffs' case.

           3.     Barr's evidence concerning "free samples" is hotly disputed

Finally, insofar as harm to indirect-purchasing consumers is deemed relevant, there is substantial evidence in the record refuting Barr's contention.

As an initial matter, none of Barr's experts has actually compared the harms resulting from higher retail prices to the benefits associated with increased sampling and reached the opinion that the benefits outweigh the harms. Dr. Bell acknowledged at his deposition that he had "formed no opinion" as to whether consumers as a whole were better off without Balziva on the market than with Balziva on the market. Bell Dep. (8/15/07) at 135:12-18 (Pl. Appx. Ex. 75). Dr. Hausman likewise acknowledged that he had not attempted to quantify the effective discount resulting from free samples and compare it to the actual discount in retail prices caused by generic entry. Hausman Dep. (8/24/07) at 92:15-19 (Pl. Appx. Ex. 125). Thus, Barr's argument is devoid of evidentiary support.

Even if Barr had properly supported its argument, summary judgment would be improper, because the issue is hotly disputed.  Barr's own CEO acknowledged at his deposition that consumers would "probably save some money" as a result of the launch of Balziva.  Downey Dep. (10/17/06) at 38:19-24 (Pl. Appx. Ex. 96).

Plaintiffs' experts are in accord.  Dr. Leffler has opined that calculations of the "savings" associated with Ovcon 35 samples are inherently unreliable.[54]  He performed his own calculation, and found that consumers would have experienced an increase in "consumer surplus" in the amount of $99 million but for the Agreement.  Leffler Rebuttal Report (7/20/07) ¶¶ 38-50 (Barr Appx. Ex. 7).  Another expert retained by Plaintiffs, Dr. Karp, concluded that, even accepting Barr's premise that sampling ceases at the time of generic entry, consumers nevertheless would have paid less money for Ovcon 35 in the presence of generic competition than in its absence.[55]  Dr. Karp also observed that it is far from clear that Warner Chilcott would have ceased sampling upon the entry of generic Ovcon 35,

---

[54]    *See* Leffler Report (5/18/07) ¶ 61 at 34 n.63 ("[i]t is very difficult if not impossible to calculate what the overall average effect of samples is on the amount consumers pay.  Samples are given to physicians.  It is certainly not legitimate to assume all samples are passed on to consumers.  Even if one could estimate the amount of samples given to consumers, this is not sufficient to calculate how price is affected.  The problem is that samples are likely given to many patients that otherwise would not fill their prescription. . . . Without properly taking account of this, the impact of prices cannot be estimated") (Barr Appx. Ex. 6); Leffler Rebuttal Report (7/20/07) ¶ 5D (Barr's experts "incorrectly assume samples have the same value as purchased Ovcon 35") (Barr Appx. Ex. 7); *id.* ¶ 20 (with one exception, "the free sample is not equivalent to a price reduction.  Defendants' experts simply assume that free samples are treated like an expected, predictable continuing price discount.  There is no basis for such an assumption and the defendants' experts cite none").

[55]    Karp Report (7/20/07) at 5 ("[a] correct analysis reveals that consumers were materially worse off because of the arrangement between Warner Chilcott and its putative competitor Barr") (Barr Appx. Ex. 5); *id.* at 27-32 (performing calculations showing that, even utilizing conservative assumptions (such as the immediate cessation by Warner Chilcott of Ovcon 35 sampling upon generic entry), earlier entry of generic Ovcon 35 would have benefitted consumers in terms of their expenditures, compared with delayed generic Ovcon 35 entry).

.[56]

Barr's arguments relating to output expansion and free samples are legally and factually unsound.  These issues cannot be resolved on summary judgment, except in Plaintiffs' favor.

> E.  WHETHER THE AGREEMENT'S ALLEGED PROCOMPETITIVE BENEFITS OUTWEIGH ITS SUBSTANTIAL HARMS IS A JURY QUESTION

As discussed above, because Plaintiffs have adduced massive evidence of anticompetitive effect, the burden shifts to Barr to demonstrate a cognizable procompetitive justification for the restraint created by the Agreement.  Then Plaintiffs have an opportunity to rebut that evidence, and whether or not Plaintiffs do so, it is up to the *finder of fact*, not the Court, to balance Barr's asserted justification against the anticompetitive effects of the restraint.  *See* Part II.A, *supra*.

At various points in its motion, Barr asserts that a principal procompetitive justification for the Agreement was that it "ensured a safe, stable and reliable supply of Ovcon 35 to consumers" and "enabled Ovcon 35 to compete aggressively against the numerous other hormonal contraceptives in the marketplace."[57]  To the extent those are even cognizable procompetitive justifications for an agreement to suppress generic drug competition (*see* Part II.D.2 *supra*), there is substantial evidence to the contrary.

***First***, Barr's supply argument ignores the fact that Warner Chilcott's need for continued large supplies of Ovcon 35 was perpetuated by the very Agreement that Barr points to as the

---

[56]     Karp Report (7/20/07) at 7, 13 (Barr Appx. Ex. 5).  There is support in the record for Dr. Karp's observation.

[57]     *E.g.,* Barr Br. at 28.  Barr's other alleged justification is that the Agreement allegedly preserved Warner Chilcott's incentive to sample, which has been addressed above.

solution to that need.  It is undisputed that the launch of generic Ovcon—the very event that the
Agreement prevented—would have radically decreased Warner Chilcott's need for a continued
supply of the drug.[58]   Barr has not even attempted to show that BMS was incapable of supplying
Warner Chilcott with the drastically reduced quantities of Ovcon 35 Warner Chilcott would have
required *after* generic entry.  Nor has Barr attempted to show that there was anything procompetitive
about ensuring a "stable and reliable" supply of branded Ovcon 35 in the face of imminent generic
entry that would have eliminated 80-90% of branded sales.

*Second*, Plaintiffs have adduced substantial evidence that Barr's asserted justifications are
pretextual.  For instance, the sincerity of Barr's "supply difficulty" justifications are called into
question by a candid Warner Chilcott e-mail, which revealed Barr and Warner Chilcott's true goals:
that the Agreement was "

."  Pl. Appx. Ex. 45.  Other evidence of
pretext in the record is equally weighty.[59]

*Third*, Plaintiffs have produced substantial evidence that the provision in the Agreement
prohibiting Barr from competing with Warner Chilcott by selling generic Ovcon 35—the challenged
conduct here—was not only not the "least restrictive means" of addressing purported "supply
difficulties," but was in fact totally unnecessary to achieve any justification Barr has offered.[60]  Barr
bears the burden of proof on the issue of "least restrictive means," *Kreuzer*, 735 F.2d at 1494-95
(placing burden on defendant), and has failed to meet that burden.

---

[58]                                                                    ; Leffler Report (5/18/07), ¶ 48 (Barr Appx.
Ex. 6).

[59]        JSOF ¶ 7-12, 87-92, 121-135.

[60]        JSOF ¶ 89-91.

Thus, to the extent that Barr has met its burden of production and advanced a cognizable procompetitive justification, Plaintiffs have rebutted Barr's assertions.  If a jury is permitted even to hear Barr's asserted justifications, it will have to consider them in light of Plaintiffs' substantial rebuttal, and weigh them against the anticompetitive harm Plaintiffs earlier demonstrated.  As previously discussed (Part II.A., *supra*), balancing under the Rule of Reason is not appropriate for summary judgment.

### III.  DIRECT PURCHASER PLAINTIFFS HAVE STANDING TO PROSECUTE THEIR CLAIMS

Barr's final arguments attacking the standing of certain Direct Purchaser Plaintiffs border on the frivolous.  As we show below, the assignments that certain Plaintiffs received from McKesson are not contractually barred; the *Meijer* Plaintiffs have standing; the contracts between McKesson and its assignees are not "cost plus/fixed quantity" contracts; and if they were, the only result would be to make the assignments unnecessary.

### A.  THE McKESSON ASSIGNMENTS ARE NOT CONTRACTUALLY BARRED

Barr contends that an anti-assignment provision in the distribution agreement between McKesson and Warner Chilcott renders invalid McKesson's assignment of its federal antitrust claims against Barr.  Barr Br. at 41-42.  This contention is patently false.  As the quotation from the distribution agreement makes clear, it provides only that "

."  *Id.* (emphasis added).  Under settled contract law, a prohibition in a contract against assigning "the contract" (or "the agreement") merely prohibits the parties from assigning (i.e., delegating) their *duties under that contract*.  Such a provision does not prohibit assignment of a party's *rights* under the contract (such as a right to receive payments); even less does it prohibit assignment of statutory rights that do not arise from and have nothing to do with the

40

contract. RESTATEMENT (SECOND) OF CONTRACTS § 322(1); *Cedar Point Apartments v. Cedar Point Inv. Corp.*, 693 F.2d 748, 752-53 (8th Cir. 1982).[61]  Of course, McKesson has not assigned its duties under the distribution agreement to Safeway or any other Plaintiff; it has assigned certain federal antitrust claims it has against Barr.

Even if the Warner Chilcott-McKesson distribution agreement barred an assignment of McKesson's antitrust claims against Barr (which it plainly does not), McKesson's supposed breach of that provision would not invalidate the assignments.  The only result would be that *Warner Chilcott* would have a claim for breach of contract against McKesson.  Barr, as a stranger to the distribution agreement, lacks standing to attack the assignments.  RESTATEMENT (SECOND) OF CONTRACTS § 322, cmt. d ("third parties cannot assert the invalidity of a prohibited assignment if the obligor makes no objection"); *Scott v. Ranch Roy-L, Inc.*, 182 S.W.3d 627, 634 (Mo. App. 2005) (litigants could not "challenge the validity of that assignment . . . because they were not parties to the assignment"); *Breus v. McGriff*, 413 S.E.2d 538, 539 (Ga. App. 1991) ("[a]ppellants are strangers to the assignment contract . . . and thus have no standing to challenge its validity").[62] Moreover, breach of an anti-assignment provision does not invalidate the resulting assignment, but merely gives the other party to the contract a claim for breach of contract.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 322(2)(b) ("A contract term prohibiting assignment of rights under the contract . . . gives the obligor a right to damages for breach of the terms forbidding assignment *but*

---

[61]     This rule is codified in California law, which governs the Warner Chilcott-McKesson agreement.  *See* CAL. COM. CODE § 2210(4) (West 2007).

[62]     In fact, Warner Chilcott has not only not challenged the McKesson assignments; it has settled the claims brought against it pursuant to those assignments.  Under these circumstances, any such anti-assignment provision has been waived.  *See R-Ranch Markets #2, Inc. v. Old Stone Bank*, 21 Cal. Rptr. 2d 21, 25 (Cal. App. 1993).

*does not render the assignment ineffective*") (emphasis supplied).  The assignor retains the power

to assign, even if it has no contractual right to do so.  *See Foad Consulting Group, Inc. v. Azzalino*,

270 F.3d 821, 831 (9th Cir. 2001) (assignment was valid even if prohibited by anti-assignment

provision) (California law); *Cedar Point Apartments v. Cedar Point Inv. Corp.*, 693 F.2d at 754

(same).

### B.     THE *MEIJER* PLAINTIFFS HAVE STANDING

The *Meijer* Plaintiffs have standing to sue as direct purchasers based on the assignment of

claims from Frank W. Kerr Company ("Kerr") dated October 4, 2002.[63]  *See* Pl. Appx. Ex. 47; *see*

*also* Pl. Appx. Ex. 48 (showing Kerr's purchases of Ovcon and Chewable Ovcon on Meijer's behalf

within the class period).  Indeed, as this Court found in rejecting Defendants' argument in opposition

to class certification, "Meijer [plaintiffs] . . . sue as assignees, and thus stand in the shoes of, direct

purchaser drug wholesalers."  Mem. Opinion dated October 22, 2007 at 14.[64]

Barr argues, under a misinterpretation of Meijer's assignment contract, that the scope of

Meijer's assignment does not extend to claims relating to purchases after October 4, 2002.  Barr Br.

---

[63]     The relevant portions of that assignment are as follows:

> 2.  Kerr hereby conveys, assigns and transfers to Meijer all rights, title and interest in and to all causes of action and any resulting proceeds Kerr may have under the antitrust laws . . . relating to Kerr's purchase of any pharmaceutical products which were subsequently resold to Meijer during the period of January 1, 1987 to the Effective Date of this Agreement.
> 3.  All sales transactions between Meijer and Kerr pertaining to pharmaceutical products occurring after the date of this Agreement shall incorporate, without further action of the parties, an assignment to Meijer by Kerr of all causes of action described in paragraph 2 above.  Kerr agrees that, upon Meijer's request, Kerr shall execute an assignment of claims containing language substantially similar to the language contained in Paragraph 2 above as further evidence of such assignment.

[64]     The Court did not opine at that time as to the validity or scope of Meijer's assignment.  *See* Mem. Opinion dated October 22, 2007 at 15.

at 42-43. In fact, the assignment provides that with respect to all pharmaceutical product sales transactions between Meijer and Kerr occurring from and after October 4, 2002, such transactions "shall incorporate, without further action of the parties, an assignment to Meijer by Kerr of all causes of action[.]" Thus, the agreement plainly assigns to Meijer all legal claims relating to post-October 4, 2002 purchases. The agreement further states that for such purchases, upon Meijer's request, Kerr would execute an assignment of claims containing certain additional language "as *further evidence* of such assignment." Pl. Appx. Ex. 47 (emphasis added).

Completely disregarding this language, Barr argues that Meijer did not receive any assignment of claims relating to these purchases until Kerr executed a May 8, 2007 agreement, and thus argues that Meijer did not have standing at the time it filed a complaint. This is patently false. The May 8, 2007 agreement was provided as "further evidence" of the existing assignment—it did not invalidate or supplant that agreement. Thus, the cases Barr cites, all of which relate to retroactive claims assignments, are inapposite and Barr's argument is wholly without merit.

Furthermore, if there were any reasonable ambiguity as to whether the language of the 2002 agreement created a valid assignment of the present claims, the proper resolution of any such ambiguity constitutes a *factual* question which cannot be resolved on summary judgment.[65] Resolution of such a question will depend on the Court's examination of considerable extrinsic

---

[65]     *See Davis v. Chevy Chase Financial Ltd.*, 667 F.2d 160, 169-70 (D.C. Cir. 1981) ("summary judgment on a contract is appropriate only when the relevant provisions are so straightforward that they can be read in but one way"); *see also Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975) ("Where contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment would be improper") (quoting *Aetna Casualty & Surety Co. v. Giesow*, 412 F.2d 468, 471 (2d Cir. 1975)); *Landtect Corp. v. State Farm Mutual Life Ins. Co. of America*, 605 F.2d 75, 79-80 (3d Cir. 1979) (same).

evidence, including documents and testimony[66] relating to the assignment at issue.  Therefore, Barr's

motion with respect to Meijer should be denied in its entirety.

C.      THE CONTRACTS BETWEEN McKESSON AND ITS ASSIGNEES ARE
NOT "COST PLUS/FIXED QUANTITY" CONTRACTS

Barr suggests that certain Plaintiffs lack standing under section 4 of the Clayton Act because

they are parties to contracts with one of the national wholesalers that purportedly satisfy the narrow

"cost plus/fixed quantity regardless of price" exception to *Illinois Brick v. Illinois*, 431 U.S. 720

(1977).  Barr is wrong.

It is true, at least in theory, that satisfaction of that exception might divest a direct purchaser

of standing under the Clayton Act and effectuate a transfer of that standing to the direct purchaser's

customer.  However, the exception is impossibly hard to satisfy,[67] and Barr does not and cannot

satisfy it.  In order for the exception to apply, Barr would have to show, among other things, that the

direct purchaser's contract with its customer obligated the customer to purchase a *fixed quantity* of

Ovcon 35 *regardless of the price*.  *See In re Lorazepam & Clorazepate Antitrust Litigation*, 202

F.R.D 12, 18 (D.D.C. 2001) (fixed amount required because "[i]n such situations, the buyer is

insulated from any decrease in sales when attempting to pass on the overcharge because its customer

must purchase a fixed quantity regardless of price") (citing *Illinois Brick*, 431 U.S. at 736); *see also*

*Phillips v. Crown Cent. Petroleum Corp.*, 602 F.2d 616, 633 n.4 (4th Cir. 1979) (same); *Mid-West*

---

[66]     For example, Jacquelyn DeBruler, a pharmacy and over-the-counter buyer/merchandiser for Meijer, Inc., testified about the negotiation of the assignment and the consideration received by the parties—testimony relevant to any analysis of the validity and meaning of the assignment.  *See* Pl. Appx. Ex. 93.

[67]     There is not a single reported decision of which we are aware that has found the exception satisfied.  *See also McCarthy v. Recordex Service, Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) ("[t]he vitality of the 'pre-existing cost-plus contract' exception is doubtful").

44

*Paper Prods. Co. v. Continental Group, Inc.*, 596 F.2d 573, 577 & n.9 (3d Cir. 1979) (same).[68] Not a single one of the contracts to which Barr refers requires the retailer to purchase a *fixed* quantity of Ovcon 35 regardless of price (as the exception requires). *See* Barr Appx. Exs. 27-28, 30-35. In fact, none of the documents even *mentions* Ovcon 35. Other courts in analogous cases have come to the same conclusion: this impossibly narrow and effectively hypothetical exception simply does not apply to contracts between McKesson or Cardinal Health and its customers.[69]

> D.     IF THE CONTRACTS WERE "COST PLUS/FIXED QUANTITY" CONTRACTS, THE ONLY RESULT WOULD BE TO MAKE THE ASSIGNMENTS UNNECESSARY

The outcome of Barr's motion would not change if Barr's argument were accepted, because the result would simply be to make the assignments unnecessary. The "cost plus/fixed quantity" exception, to the extent it exists, is an exception to **both** *Hanover Shoe* **and** *Illinois Brick*. *See Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 218 (1990) (exception allows "indirect purchasers to sue . . . when, by hypothesis, the direct purchaser will bear no portion of the overcharge"). If the exception were found to apply, McKesson's standing would necessarily pass to its customers, who would bear the overcharge and thus have standing to sue in their own behalf.

## CONCLUSION

For the reasons stated above, Barr's motion for summary judgment should be denied.

---

[68]     Requiring the customer to purchase a *minimum* (rather than *fixed*) quantity of Ovcon 35 is insufficient to satisfy the exception, because the customer, while satisfying the minimums, may nevertheless, due to the overcharge, purchase fewer units than it otherwise would have. *See In re Wyoming Tight Sands Antitrust Cases*, 866 F.2d 1286, 1292 (10th Cir. 1989), *aff'd sub nom. Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990).

[69]     *See In re Buspirone Patent Litigation*, 210 F.R.D. 43, 60 (S.D.N.Y. 2002) ("[t]here is no evidence that [McKesson Corp., Cardinal Health, Inc., and AmerisourceBergen Corp.] had cost-plus contracts that fell within the *Hanover Shoe* exception").

Respectfully submitted,

/s/ Scott E. Perwin
Scott E. Perwin
Lauren C. Ravkind
KENNY NACHWALTER P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 373-1000

*Counsel for Walgreen Plaintiffs*

/s/ Steve D. Shadowen
Steve D. Shadowen
Monica L. Rebuck
HANGLEY ARONCHICK SEGAL
        & PUDLIN
30 North Third Street, Suite 700
Harrisburg, Pennsylvania 17101
Telephone: (717) 364-1010

*Counsel for Plaintiffs Rite Aid Corp. and Rite Aid Hdqtrs. Corp.*

/s/ Linda P. Nussbaum
Linda P. Nussbaum (D.C. Bar No. 483254)
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, New York 10022
Telephone: (212) 687-1980

William Isaacson (D.C. Bar No. 414788)
Tanya Chutkan (D.C. Bar No. 420478)
BOIES SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Suite 800
Washington, D.C. 20015
Telephone: (202) 237-2727

Richard B. Drubel (D.C. Bar No. 334359)
Kimberly H. Schultz
BOIES SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, New Hampshire 03755
Telephone: (603) 643-9090

Daniel Berger
Eric L. Cramer
Peter Kohn
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 875-3000

Bruce E. Gerstein
Kevin S. Landau
GARWIN GERSTEIN & FISHER LLP
1501 Broadway, Suite 1416
New York, New York 10011
Telephone: (212) 398-0055

Dianne M. Nast
RODA NAST P.C.
801 Estelle Drive
Lancaster, PA 17601
Telephone: (717) 892-3000

46

Thomas M. Sobol
David S. Nalven
HAGENS BERMAN SOBOL
      & SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700

*Executive Committee for the Direct Purchaser Class*

317988.2