**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| STATE OF COLORADO, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. Action No. 1:05-CV-02182-CKK |
| v. | ) | |
| | ) | Judge Colleen Kollar-Kotelly |
| WARNER CHILCOTT HOLDINGS | ) | |
| COMPANY III, LTD., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| MEIJER, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. Action No. 1:05-CV-02195-CKK |
| v. | ) | |
| | ) | Judge Colleen Kollar-Kotelly |
| WARNER CHILCOTT HOLDINGS | ) | |
| COMPANY III, LTD., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| WALGREEN CO., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. Action No. 1:06-CV-00494-CKK |
| v. | ) | |
| | ) | Judge Colleen Kollar-Kotelly |
| WARNER CHILCOTT HOLDINGS | ) | |
| COMPANY III, LTD., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| CVS PHARMACY, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. Action No. 1:06-CV-00795-CKK |
| v. | ) | |
| | ) | Judge Colleen Kollar-Kotelly |
| WARNER CHILCOTT HOLDINGS | ) | |
| COMPANY III, LTD., *et al.*, | ) | **FILED UNDER SEAL PURSUANT TO** |
| | ) | **PROTECTIVE ORDER DATED APRIL 4,** |
| Defendants. | ) | **2006** |

**BARR PHARMACEUTICALS, INC.'S REPLY BRIEF IN SUPPORT OF**
**ITS MOTION FOR SUMMARY JUDGMENT ON STATE AND**
**DIRECT PURCHASER PLAINTIFFS' FEDERAL ANTITRUST CLAIMS**

## **Table of Contents**

INTRODUCTION ..............................................................................................................1

ARGUMENT ...................................................................................................................3

I.     PLAINTIFFS' ATTEMPTS TO REVIVE *PER SE* TREATMENT ARE BASELESS SINCE THE AGREEMENT HERE IS NOT WITHIN THE NARROW CATEGORY OF "NAKED" RESTRAINTS DEEMED *PER SE* UNLAWFUL. ....................................................................................3

       A.     No "Existing" Rule Equates Exclusive Supply Agreements With Naked Market Allocation Agreements Subject To The *Per Se* Rule ........... 3

       B.     In Assessing Whether Conduct Constitutes A "Naked" Market Allocation, The Court Must Consider Defendants' Agreement As A Whole. ...................................................................................6

       C.     *Per Se* Treatment Is Inappropriate Here Because The License And Supply Agreement Was Not "Manifestly Anti-Competitive" But Had Plausible Pro-Competitive Benefits. ............................................9

            1.     The Agreement Was Not Manifestly Anti-Competitive. ................9

            2.     Barr Has Offered Plausible Evidence Of The Pro-Competitive Effects Of Defendants' Agreement. ...........................12

       D.     Mixed Vertical And Horizontal Commercial Arrangements Are Ill-Suited For *Per Se* Treatment. ...................................................................14

II.    PLAINTIFFS' CLAIMS FAIL UNDER THE RULE OF REASON BECAUSE THEY HAVE NOT SHOWN ANY ACTUAL ADVERSE EFFECT ON COMPETITION IN A PROPERLY DEFINED RELEVANT MARKET. ...................................................................................15

       A.     Plaintiffs Cannot Presume An Actual Adverse Impact On Competition. ................................................................................16

       B.     Plaintiffs' So-Called Direct Evidence Of Anticompetitive Effects Is Legally And Factually Flawed. ...........................................................18

       C.     Direct Purchaser Plaintiffs' So-Called Proof Of Market Power Is Legally Irrelevant. ........................................................................21

       D.     The Undisputed Facts Demonstrate That The Relevant Antitrust Product Market Must Include Numerous Other Oral Contraceptive Products. ....................................................................................23

       E.     Defendants' License And Supply Agreement Did Not Preclude Any Competitor From Entering The Marketplace. ...................................26

III.   THE SUBSTANTIAL PRO-COMPETITIVE BENEFITS OF INCREASING OUTPUT AND PRESERVING SUBSTANTIAL DISCOUNTING OUTWEIGH ANY ANTI-COMPETITIVE EFFECTS. ...........26

A.    The Agreement Had Significant Pro-Competitive Benefits That Plaintiffs Do Not Rebut. ...............................................................27

B.    The Fact That Plaintiffs Would Have Preferred A "Less Restrictive" Alternative Is Irrelevant. .........................................31

IV.    APART FROM THE RULE OF REASON ANALYSIS, PLAINTIFFS' CLAIMS FAIL BASED ON MOOTNESS AND STANDING GROUNDS. ..............................................................................................32

A.    State Plaintiffs' Federal Injunctive Relief Claims Are Moot....................32

B.    Direct Purchaser Plaintiffs Lack Standing. ............................................33

1.    Direct Purchasers' Assignments Of Claims Are Contractually Barred. ...............................................................33

2.    The *Meijer* Plaintiffs' Purported Assignment Is Facially Defective. ......................................................................................34

3.    Several Direct Purchaser Plaintiffs Lack Standing Under The Well Established "Cost Plus" Exception To *Hanover Shoe*. ..........................................................................................35

CONCLUSION .........................................................................................................36

**Table of Authorities**

**Cases**

*Addamax Corp. v. Open Software Found., Inc.,*
    152 F.3d 48 (1st Cir. 1998) .................................................................... 14

*Amboy Nat'l Bank v. Generali-U.S. Branch,*
    930 F. Supp. 1053 (D.N.J. 1996) ......................................................... 34

*Anesthesia Advantage, Inc. v. Metz Group,*
    759 F. Supp. 638 (D. Colo. 1991) ........................................................ 10

*Athridge v. Aetna Cas. & Sur. Co.,*
    351 F.3d 1166 (D.C. Cir. 2003) ........................................................... 34

*Augusta News Co. v. Hudson News Co.,*
    269 F.3d 41 (1st Cir. 2001) ......................................................... 5, 14, 15

*Barry Wright Corp. v. ITT Grinnell Corp.,*
    724 F.2d 227 (1st Cir. 1983) ................................................................. 4

*Broadcast Music, Inc. v. CBS, Inc.,*
    441 U.S. 1 (1979) .................................................................................. 7

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962) ............................................................................ 25

*Cal. Dental Ass'n v. FTC,*
    526 U.S. 756 (1999) ............................................................................ 12

*Chicago Bd. of Trade v. United States,*
    246 U.S. 231 (1918) ....................................................................... 5, 17

*Copy-Data Sys., Inc. v. Toshiba Am., Inc.,*
    663 F.2d 405 (2d Cir. 1981) ................................................................ 14

*County of Los Angeles v. Davis,*
    440 U.S. 625 (1979) ............................................................................ 33

*Craftsmen Limousine, Inc. v. Ford Motor Co.,*
    491 F.3d 380 (8th Cir. 2007) ............................................................... 18

*Douglas v. Donovan,*
    704 F.2d 1276 (D.C. Cir. 1983) ........................................................... 33

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
    504 U.S. 451 (1992) .............................................................................. 7

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs (TOC), Inc.*,
528 U.S. 167 (2000) ................................................................. 32

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) ................................................. 29

*FTC v. Ind. Fed'n of Dentists*,
476 U.S.447 (1986) .................................................................. 16

*Generac Corp. v. Caterpillar Inc.*,
172 F.3d 971 (7th Cir. 1999) ............................................... 8, 10

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
386 F.3d 485 (2d Cir. 2004) ............................................... 3, 19

*Greenbrier Cinemas, Inc. v. Attorney Gen. of United States*,
511 F. Supp. 1046 (W.D. Va. 1981) ........................................ 10

*Gulf Stream III Assocs. v. Gulfstream Aerospace Corp.*,
995 F.2d 425 (3d Cir. 1993) .................................................... 34

*Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.*,
889 F.2d 751 (7th Cir. 1989) .................................................. 14

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ................................................................. 29

*In re Beef Indus. Antitrust Litig.*,
600 F.2d 1148 (5th Cir. 1979),
*cert. denied*, 499 U.S. 905 (1980) ......................................... 35

*In re Brand Name Antitrust Litig.*,
186 F.3d 781 (7th Cir. 1999) .............................................. 22, 25

*In re Cardizem CD Antitrust Litig.*,
332 F.3d 896 (6th Cir. 2003) .................................................. 15

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
261 F. Supp. 2d 188 (E.D.N.Y. 2003) ................................ 10, 32

*In re Ditropan XL Antitrust Litig.*,
No. M:06-CV-01761-JSW, 2007 WL 2978329 (N.D. Cal. Oct. 11, 2007) .................... 33

*In the Matter of Schering-Plough Corp.*,
2003 WL 22989651 (F.T.C. Dec. 8, 2003) ............................... 17

*Int'l Logistics Group, Ltd. v. Chrysler Corp.*,
884 F.2d 904 (6th Cir. 1989) .................................................. 14

v

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.,*
    No. 1:01-CV-704, 1:03-CV-701, 2005 WL 1396940 (S.D. Ohio Jun. 13, 2005) ............ 24

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
    466 U.S. 2 (1984)............................................................................................ 6, 9

*Kreuzer v. Am. Acad. of Periodontology,*
    735 F.2d 1479 (D.C. Cir. 1984) ............................................................... 18, 27

*Leegin Creative Leather Prods. v. PSKS, Inc.,*
    127 S. Ct. 2705 (2007) ............................................................................ 11, 20

*Los Angeles Mem'l Coliseum Comm'n v. NFL,*
    468 F. Supp. 154 (C.D. Cal. 1979),
    *aff'd,* 726 F.2d 1381, 1387 (9th Cir. 1984) ................................................... 10

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986).................................................................................... 18

*Merit Motors, Inc. v. Chrysler Corp.,*
    417 F. Supp. 263 (D.D.C. 1976),
    *aff'd,* 569 F.2d 666 (D.C. Cir. 1977) ........................................................... 27

*Nat'l Soc'y of Prof'l Eng'rs v. United States,*
    435 U.S. 679 (1978)................................................................................ 16, 28

*NYNEX Corp. v. Discon, Inc.,*
    525 U.S. 128 (1998)................................................................................... 28

*Oksanen v. Page Mem'l Hosp.,*
    945 F.2d 696 (4th Cir. 1991) ............................................................... passim

*Palmer v. BRG of Ga., Inc.,*
    498 U.S. 46 (1990)....................................................................................... 4

*Polk Bros., Inc. v. Forest City Enters., Inc.,*
    776 F.2d 185 (7th Cir. 1985) ........................................................................ 8

*Polygram Holding, Inc. v. FTC,*
    416 F.3d 29 (D.C. Cir. 2005) ..................................................................... 17

*Proctor v. State Farm Auto. Ins. Co.,*
    561 F.2d 262, 275 (D.C. Cir. 1977),
    *vacated on other grounds,* 440 U.S. 942 (1979)............................................. 18

*Radio Corp. of Am. v. Hohenstein,*
    289 F. 757 (2d Cir. 1923) ........................................................................... 34

vi

*Richardson v. Richardson-Merrell, Inc.,*
   857 F.2d 823 (D.C. Cir. 1988) ................................................................. 22

*Roland Mach. Co. v. Dresser Indus., Inc.,*
   749 F.2d 380 (7th Cir. 1984) ................................................................. 26

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
   792 F.2d 210 (D.C. Cir. 1986) ................................................................. 14

*Rozema v. Marshfield Clinic,*
   977 F. Supp. 1362 (W.D. Wis. 1997) ................................................................. 14

*Ryko Mfg. Co. v. Eden Servs.,*
   823 F.2d 1215 (8th Cir. 1987) ................................................................. 14

*Satellite T.V. & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc.,*
   714 F.2d 351 (4th Cir. 1983) ................................................................. 10

*Schering-Plough Corp. v. FTC,*
   402 F.3d 1056 (11th Cir. 2005) ................................................................. 16, 17

*Smalley & Co. v. Emerson & Cuming, Inc.,*
   13 F.3d 366 (10th Cir. 1993) ................................................................. 14

*Smith v. Pro Football, Inc.,*
   593 F.2d 1173 (D.C. Cir. 1978) ................................................................. 12

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.,*
   373 F.3d 57 (1st Cir. 2004) ................................................................. 9

*Texaco Inc. v. Dagher,*
   547 U.S. 1 (2006) ................................................................. 7

*Tops Mkts., Inc. v. Quality Mkts., Inc.,*
   142 F.3d 90 (2d Cir. 1998) ................................................................. 1, 2, 20, 29

*Toys 'R' Us, Inc. v. FTC,*
   221 F.3d 928 (7th Cir. 2000) ................................................................. 20

*United States v. Cont'l Can Co.,*
   378 U.S. 441 (1964) ................................................................. 25

*United States v. E.I. du Pont Nemours & Co.,*
   351 U.S. 377 (1956) ................................................................. 21, 23

*United States v. Grinnell Corp.,*
   384 U.S. 563 (1966) ................................................................. 23

*United States v. Microsoft Corp.,
    253 F.3d 34 (D.C. Cir. 2001) ................................................................................ passim

United States v. Topco Assocs., Inc.,
    405 U.S. 596 (1972) ........................................................................................... 5

Valley Drug Co. v. Geneva Pharm., Inc.,
    344 F.3d 1294 (11th Cir. 2003) .......................................................................... 8

Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,
    540 U.S. 298 (2004) ..................................................................................... 31, 32

**Rules**

72 Fed. Reg. 56769 (Dep't of Health & Human Servs., Oct. 4, 2007) ......................................... 24

Fed. R. Civ. P. 56 ....................................................................................................... 27

**Other Authorities**

11 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW (2d ed. 2005) ...................... 6, 12

6A C.J.S. Assignments (2007) ............................................................................................. 34

7 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW (2d ed. 2003) ........................ 27, 31

Carlton, Dennis W. and Perloff, Jeffrey M., MODERN INDUSTRIAL ORGANIZATION (4th ed.
    2005) .................................................................................................................. 22

Gary Haber, Prescription Power from the Pharmacist,
    THE NEWS JOURNAL (Wilmington, DE), Nov. 4, 2007 ................................................ 24

Pindyck, Roberts S. and Rubinfeld, Daniel L., MICROECONOMICS (6th ed. 2005) ...................... 24

## INTRODUCTION

Plaintiffs oppose Barr's motion for summary judgment by repeating their erroneous arguments for *per se* treatment and by incorrectly dismissing the pro-competitive aspects of the agreement under the Rule of Reason. *First*, Plaintiffs try to resurrect the *per se* rule by repeating that the defendants' agreement is a *per se* unlawful market allocation, that "other terms" of the defendants' agreement should be ignored, and that pro-competitive justifications are irrelevant. The agreement here, however, was not a naked market allocation of the type that has "long" been forbidden, but an exclusive license and supply agreement of the type that has never been treated as a *per se* market allocation. *See* Part I.A. Moreover, there is no basis on which to "separate" the exclusivity provision from the "other terms" of the defendants' agreement, and doing so would mean that *every* exclusive supply agreement would be illegal, which is clearly not the law. *See* Part I.B. Finally, Barr has never asserted that a naked restraint can be "saved" from *per se* treatment based on pro-competitive justifications, but has shown the agreement is not "manifestly anticompetitive" given the pro-competitive benefits of exclusive dealing arrangements generally and the defendants' agreement in particular. *See* Part I.C.

*Second,* Plaintiffs argue that Barr is not entitled to summary judgment because they claim that they have presented sufficient evidence of competitive harm under the Rule of Reason. To do so, Plaintiffs must establish an "actual adverse effect on competition *as a whole*."[1] *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998). Plaintiffs first assert that harm can be "presumed." But the Rule of Reason demands more. *See* Part II.A. Plaintiffs also claim "direct evidence" of wholesale pricing is sufficient to show an "actual adverse effect," but the Sherman Act requires plaintiff to show harm to competition and that "the reasonableness of a

---

[1]    Unless otherwise noted, all *emphasis* is added and internal quotation marks and citations omitted.

restraint is evaluated based on its impact on *competition as a whole within the relevant market*."
*Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 708 (4th Cir. 1991). *See* Part II.B.

Nor have Plaintiffs demonstrated, in the alternative, an indirect evidence of an adverse effect by showing "market power" in the properly defined market. *Tops Mkts.*, 142 F.3d at 97. As an initial matter, Plaintiffs have failed to demonstrate "market power" in this case at all. *See* Part II.C. Plaintiffs have also failed to properly define the market. *See* Part II.D. Nor do they show that other competitors were foreclosed, or provide any additional ground for believing that competition as a whole was harmed. *See* Part II.E.

*Finally*, even if Plaintiffs could get past the initial hurdle of showing an adverse effect, they have not raised material disputes as to the numerous *pro-competitive* benefits Barr has put forward. Instead, Plaintiffs try to dismiss these Rule of Reason balancing factors as irrelevant. But clearly if impact on competition "as a whole" is relevant to the threshold inquiry, it is likewise relevant in weighing the effects in the final step of the Rule of Reason analysis. *See* Part III.A. Nor are these factors negated simply because Plaintiffs would have preferred an alternative arrangement (such as a non-exclusive supply agreement). *See* Part III.B.

Even apart from the Rule of Reason analysis, the claims of the State Plaintiffs and Direct Purchasers fail for independent reasons. The State Plaintiffs' federal claims (at issue here) are mooted by the November 27 Final Order, because these federal claims are for injunctive relief only and such injunctive relief has already been entered by this Court. *See* Part IV.A. The Direct Purchaser Plaintiffs lack standing to sue, because they rely on assignments of claims that are either contractually barred or facially defective, or because they lack standing under the "cost-plus" exception to the *Hanover Shoe* doctrine. *See* Part IV.B.

**ARGUMENT**

I.    **PLAINTIFFS' ATTEMPTS TO REVIVE *PER SE* TREATMENT ARE BASELESS SINCE THE AGREEMENT HERE IS NOT WITHIN THE NARROW CATEGORY OF "NAKED" RESTRAINTS DEEMED *PER SE* UNLAWFUL.**

Plaintiffs mischaracterize the defendants' agreement by attempting to pull out one term—the exclusivity provision—and arguing that isolated term constitutes a "market allocation agreement," subject to the *per se* rule.  In other words, Plaintiffs argue that the supply and exclusivity provisions should be analyzed "separately" and that the exclusivity provision alone deserves *per se* treatment.  This argument proves too much.  *Every* exclusive supply agreement would entail the supplier providing product and not separately marketing the product itself—that is the essence of an exclusive supply contract.  Yet the courts have never declared exclusive supply or dealing agreements to be the type of naked restraints that qualify for *per se* treatment. *See, e.g., Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 508 (2d Cir. 2004) (stating that exclusive supply contracts "have pro-competitive purposes and effects").

A.    **No "Existing" Rule Equates Exclusive Supply Agreements With Naked Market Allocation Agreements Subject To The *Per Se* Rule.**

Plaintiffs' attempt to shoehorn defendants' license and supply agreement into the narrow *per se* exception must be rejected.  Plaintiffs erroneously contend that Barr's motion for summary judgment is based on "the misconception that Plaintiffs are asking the Court to create a *new per se* rule rather than to apply the existing *per se* rule against horizontal market-allocation agreements." (Direct Purchaser Pls.' Opp'n to Barr's Mot. for Summ. J. ("DPP Opp'n") at 1 (emphasis in original); *see also id.* at 7-9.)  Having constructed this "straw man," Plaintiffs argue that defendants' license and supply agreement was a "classic" market allocation agreement subject to a "110-year-old" *per se* rule such that the pro-competitive benefits of the challenged conduct are "irrelevant." (*Id.* at 7.)  The law and undisputed facts, however, demonstrate that

3

defendants' license and supply agreement does not fall within the narrow category of "naked" restraints for which the Supreme Court has reserved *per se* treatment. Thus, the Rule of Reason, not the *per se* rule, must be applied here.

Plaintiffs erroneously contend that "[t]he *per se* rule applies whenever (1) actual or potential competitors (2) agree that they will not compete with one another . . . for some period of time." (DPP Opp'n at 5 (citing *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).) This misstates the law. As an initial matter, Plaintiffs' simplistic view would require the Court to condemn virtually *all* exclusive supply arrangements as *per se* unlawful. Virtually any manufacturer that agrees to supply another party a given product for resale could compete with its buyer by selling the product directly on its own. The manufacturer thus would be a "potential competitor" of its buyer. Thus, under Plaintiffs' view of the law, any exclusive supply agreement between such a manufacturer and its buyer—which, by definition, requires a manufacturer to sell only to a particular buyer and to refrain from competing with that buyer—would be "*per se*" unlawful. But, as the D.C. Circuit observed, this cannot be—and is not—the law because, accepting Plaintiffs' view, and "[p]ermitting an antitrust action to proceed any time a firm enters into an exclusive deal would both discourage a presumptively legitimate business practice and encourage costly antitrust actions." *United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001) (applying Rule of Reason to alleged unlawful exclusive contracts).

As Justice Breyer observed, "virtually *every* [exclusive] contract to buy 'forecloses' or 'excludes' alternative sellers from *some* portion of the market," but such foreclosure of actual or potential competition does not render an exclusive contract presumptively unlawful, as the Plaintiffs contend here. *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983) (J., Breyer) (emphasis in original). *See also Chicago Bd. of Trade v. United States*, 246

4

U.S. 231, 238 (1918). Rather, the Supreme Court has carefully limited application of the *per se* rule to only "naked" market allocation agreements between horizontal competitors, agreements having no purpose but to stifle competition. *See, e.g., United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972); *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) (per curiam).

In *Topco*, for example, approximately two dozen supermarket chains formed an association that assigned exclusive geographic territories to each member, and gave each member the ability to prohibit competing sales in its territory of Topco-brand products. In *Palmer*, two providers of bar review courses in Georgia agreed that one would withdraw from that state entirely, in exchange for a promise by the other that it would not offer courses anywhere else in the United States. The Supreme Court condemned each of these agreements as *per se* unlawful because—unlike here—they were merely "naked" restraints having no plausible pro-competitive purpose or benefits. *Cf. Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 48 (1st Cir. 2001) (observing that, since *Topco*, "it is commonly understood today that *per se* condemnation is limited to 'naked' market division agreements, that is, to those that are not part of a larger pro-competitive joint venture," and that *Palmer* involved "more or less a sham transaction to disguise a naked market division arrangement . . . ."). Thus, rather than support Plaintiffs' view, *Topco* and *Palmer* (and their progeny) merely demonstrate that the Supreme Court has reserved *per se* treatment for purely "naked" market allocation agreements.

In contrast, because exclusive contracts (like the challenged agreement here) may, in fact, be pro-competitive, the Supreme Court has held that such agreements must be assessed under the Rule of Reason, not the *per se* rule. *See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 44-45 (1984) (O'Connor, J., concurring) ("Exclusive dealing arrangements are independently subject to scrutiny under § 1 of the Sherman Act, and are also analyzed under the

Rule of Reason."), *overruled on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).   *See also Microsoft*, 253 F.3d at 69 (applying Rule of Reason because "exclusivity provisions in contracts may serve many useful purposes" and be pro-competitive); 11 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1810 (2d ed. 2005) (noting exclusive contracts may be pro-competitive and "should be presumptively lawful in all but a few carefully defined circumstances.").   Notably, Plaintiffs' own expert agrees that exclusive supply agreements, such as the one at issue here, "can be pro-competitive,"              **REDACTED**

**REDACTED**              and, in fact, concludes that any presumption of anticompetitive harm is especially inappropriate here.

**REDACTED**

**B.**    **In Assessing Whether Conduct Constitutes A "Naked" Market Allocation, The Court Must Consider Defendants' Agreement As A Whole.**

Plaintiffs similarly misstate the law regarding the appropriate analysis in this case. Specifically, Plaintiffs contend that the "challenge in this case" is only to Barr's so-called "agreement not to compete with Warner Chilcott" and *not* to Barr's agreement to supply Warner Chilcott. (DPP Opp'n at 13; *see also id.* ("Barr's promise to supply is separate from its promise not to compete, and the competitive impact of the two promises must be analyzed separately.")) As discussed above this makes no sense because any exclusive supply agreement, by definition,

---

[2]    For the convenience of the Court, all brief and tab references herein refer to Barr's Statement of Material Facts Not in Dispute ("Barr's 7(h) Stmnt.") and Amended Appendix of Exhibits ("Am. App.") submitted in connection with Barr's Motion for Summary Judgment on State and Direct Purchasers Federal Claims on Nov. 14, 2007.  In addition, Plaintiffs' brief and tab references herein refer to Plaintiffs' Appendix of Exhibits ("Pls.' App.") submitted in connection with State Plaintiffs' Motion for Summary Judgment and Direct Purchaser Plaintiffs' Motion for Partial Summary Judgment on Nov. 14, 207, and Plaintiffs' Appendix of Exhibits to their Oppositions to Barr's Motion for Summary Judgment ("Pls.' Opp'n App.") submitted on Dec. 19, 2007.

includes a promise not to compete. In any event, Plaintiffs' attempt to parse the defendants' license and supply agreement down to a single term (*i.e.*, the exclusivity provision) must fail.

As discussed in Barr's opening memorandum, Plaintiffs' conclusory characterization of the exclusivity provision of defendants' supply agreement as a "horizontal agreement" adds nothing and plainly does not justify application of the *per se* rule. (*See* Barr's Mot. for Summ. J. ("Barr Mem.") at 22-23.) Simply put, "easy labels," such as those that Plaintiffs seek to apply here, "do not [] supply ready answers." *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 8-9 (1979) ("*BMI*"); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992) ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law."). Rather, the Supreme Court has warned that, as a threshold matter, "it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label *per se*," *BMI*, 441 U.S. at 9, and that process requires an initial understanding of the history, nature, and purpose of a challenged agreement. *Id.* Importantly, this process of "characterization" requires the Court to consider the defendants' commercial arrangement *in its entirety*. *BMI*, 441 U.S. at 8-9; *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006).

In other words, Plaintiffs' invitation to focus solely on the exclusivity provision of the defendants' agreement and ignore the undisputed facts and circumstances regarding the pro-competitive purpose and scope of that agreement must be rejected.[3] Tellingly, the very authority Plaintiffs cite in their opposition briefs underscores this point. (*E.g.*, DPP Opp'n at 6-7 (citing

---

[3]  Notably, Plaintiffs provide no support for their conclusory assertion that "Barr's promise to supply is separate from" the "exclusivity" provision of the defendants' license and supply agreement. (DPP Opp'n at 13.) The reason for this is clear: the undisputed facts show that the exclusivity provision was inextricably linked term of the defendants' business venture. *See, e.g.*,

**REDACTED**

7

*Valley Drug Co. v. Geneva Pharm., Inc.*, 344 F.3d 1294 (11th Cir. 2003).) In *Valley Drug*, the Eleventh Circuit reversed the district court's finding that a patent settlement agreement between a brand name drug manufacturer and two generic competitors was *per se* unlawful. *Valley Drug*, 344 F.3d 1313. In doing so, the Eleventh Circuit observed that "agreements that are anticompetitive when considered in isolation (such as covenants not to compete) can still be lawful if they are ancillary to another agreement and, ***when viewed in combination***, will have the overall effect of enhancing competition." *Id.* n.31. Therefore, the Eleventh Circuit directed the district court to consider the entirety of the record, including the scope of the brand name manufacturer's patents, in assessing whether the alleged restraint was a "naked" restraint subject to the *per se* rule. *See id.* at 1313.

As the Seventh Circuit explained, a threshold inquiry in any antitrust case is to determine whether the challenged conduct is a "naked restraint[]" warranting *per se* treatment or an "ancillary restraint[], those that are part of a larger endeavor whose success they promote." *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188-89 (7th Cir. 1985). This threshold inquiry requires the Court to assess the defendants' business enterprise "*as a whole*" and determine whether the net impact of the enterprise plausibly "expands output and competition." *Id.* at 188. *See also Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 976-77 (7th Cir. 1999) (applying Rule of Reason to express market allocation agreement between companies that competed for sale of generators because the restraint was ancillary to a legitimate transfer of intellectual property). As next discussed, viewing defendants' conduct as a whole, it is clear that the exclusive license and supply agreement at issue here is far from a "naked" restraint having no "redeeming virtue." Therefore, the Rule of Reason, not the *per se* rule, must apply here.

**C.    *Per Se* Treatment Is Inappropriate Here Because The License And Supply Agreement Was Not "Manifestly Anti-Competitive" But Had Plausible Pro-Competitive Benefits.**

Plaintiffs mischaracterize Barr's arguments, asserting that a *per se* illegal agreement cannot be justified by pro-competitive benefits. That is not what Barr has argued at all. Rather, Barr has pointed out in detail why it is clear that the defendants' agreement here is not "manifestly anti-competitive" and therefore cannot receive *per se* treatment.

**1.    The Agreement Was Not Manifestly Anti-Competitive.**

As an initial matter, given the history of this case it is simply incredible to say this agreement was a "naked" restraint, deserving no thorough analysis. As previously stated, the FTC

**REDACTED**

This alone demonstrates that the defendants' agreement—reviewed by the very agency charged with enforcing the antitrust laws—is not a "naked" restraint.[4]    In any event, Barr has clearly established the Agreement was not "manifestly anticompetitive."

*First*, as noted above, exclusive supply agreements of the sort at issue here have long been seen as potentially pro-competitive, and therefore have been judged under the Rule of Reason, not the *per se* rule. *See, e.g., Jefferson Parish Hosp.*, 466 U.S. at 44-45. *See also Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 62 (1st Cir. 2004)

---

[4]    As discussed in Barr's opening memorandum, only after    **REDACTED**    . (*See* Barr Mem. at 23-24.) Plaintiffs suggest that Barr somehow "misrepresent[ed]" the facts regarding the :    (*See* DPP Opp'n at 1 n.1; Pl. States' Opp'n to Barr's Mot. for Summ. J. ("State Pls.' Opp'n") at 1 n.1.) In support, Plaintiffs point to a 2006 filing by the FTC. (*Id.* (citing Pls.' Opp'n App. Tab 51).) But nothing in that filing contests *any* statement made by Barr in support of its motion for summary judgment. In particular, nothing in that filing disputes the fact that

**REDACTED**

Indeed, the FTC has never disputed – and cannot dispute – these facts and Plaintiffs' statement to the contrary is just wrong.

9

("[E]xclusive dealing arrangement[s] . . . [are] not a per se violation of the antitrust laws."); *Satellite T.V. & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 354 (4th Cir. 1983) ("Exclusive dealing contracts which might function to increase interbrand competition have never been held to be a *per se* violation of the antitrust laws by the Supreme Court."). This is so even where the challenged conduct can be facially characterized as a horizontal market division. *See, e.g., Generac Corp.*, 172 F.3d at 976-77 (refusing to apply *per se* treatment to arrangement whereby plaintiff and defendant, who were competitors in selling the same product, each had exclusivity over certain territories); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 257 (E.D.N.Y. 2003) (applying Rule of Reason to brand-generic patent settlement and supply agreement despite plaintiffs' characterization of such agreement it as a "market allocation"); *Greenbrier Cinemas, Inc. v. Attorney Gen. of United States*, 511 F. Supp. 1046, 1059-60 (W.D. Va. 1981) (concluding that motion picture product allocation agreement was not so likely to stifle competition as to deserve *per se* condemnation); *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 468 F. Supp. 154, 165-66 (C.D. Cal. 1979) (applying Rule of Reason rather than *per se* approach, despite fact that athletic league's bylaws controlling franchise locations allocated territories among member teams), *aff'd*, 726 F.2d 1381, 1387 (9th Cir. 1984). Simply put, "Plaintiffs' market allocation allegation [] does not require *per se* analysis," *Anesthesia Advantage, Inc. v. Metz Group*, 759 F. Supp. 638, 646 (D. Colo. 1991); rather, in the context of an exclusive supply agreement, a Rule of Reason analysis is required.

**Second**, the undisputed facts demonstrate that the *per se* rule is especially inappropriate here because any alleged restraint on competition was ancillary to the legitimate (indeed, pro-competitive) business venture. Specifically, the exclusivity provision of the defendants' agreement was inextricably linked to legitimate ends of the defendants' business venture — an

10

agreement to provide a safe and reliable supply of Ovcon 35.  As Plaintiffs' own experts

concede, Warner Chilcott had encountered major problems with its former supplier (BMS), *see,*

*e.g.*                                    **REDACTED**

                                                                                    and,

accordingly, sought an alternative source of supply from Barr.  (*See* Barr 7(h) Stmnt. ¶¶ 6-12.)

Further, as the CEO of Warner Chilcott testified,                **REDACTED**

                    Ex. AA. at 141, and, moreover, exclusivity was essential to ensure

that safe and reliable supply,  *id.* at 247

**REDACTED**                                              **REDACTED**

                    *see also id.* at 143-44; 257:10-23

        **REDACTED**

        ***Third,*** the undisputed facts demonstrate that the agreement here had the significant pro-

competitive effect of preserving and increasing output and fostering inter-brand competition by

preserving Warner Chilcott's continued and aggressive promotion of Ovcon 35.  (*See* Barr Mem.

at 17-18, 25-26.)  Further, defendants' agreement preserved substantial discounting of Ovcon 35,

*i.e.*, as a direct result of defendants' agreement, Warner Chilcott continued to distribute free

samples of Ovcon 35 to physicians and, ultimately, to consumers until Barr's Balziva® entered

the market in October 2006.  (*See id.* at 17.)  These facts alone are sufficient to find that the

defendants' agreement (viewed as a whole) was not a "naked" restraint of trade or "manifestly

anticompetitive."  *See, e.g., Leegin Creative Leather Prods. v. PSKS, Inc.,* 127 S. Ct. 2705, 2713

(2007) (observing that only those agreements "that would always or almost always tend to

restrict competition and decrease output" are *per se* unlawful); 11 Phillip E. Areeda & Herbert

Hovenkamp, ANTITRUST LAW ¶ 1912c (2d ed. 2005) ("An ancillary restraint is one . . . that, at least upon initial examination, promises to increase output, reduce costs, improve product quality, or otherwise benefit consumers."). Tellingly, Plaintiffs' experts agree. (*See*

**REDACTED**
                    *See also* 11 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1902a (2d ed. 2005) ("Horizontal agreements often increase output, and thus are deemed **procompetitive** . . . ."). In fact, in light of the undisputed evidence in this case, Plaintiffs' expert, Professor Rubinfeld, conceded that application of the *per se* rule here is especially inappropriate because defendants' agreement cannot be considered presumptively anti-competitive. (*See*    **REDACTED**

Contrary to Plaintiffs' assertion that the Court must ignore this undisputed evidence, this evidence is essential to determining whether a challenged restraint was a "naked" restraint. Thus, Plaintiffs' characterization of this evidence as "irrelevant" cannot withstand scrutiny. *See* Part I.B., *infra*. *See also Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1181 (D.C. Cir. 1978) (reversing district court's application of *per se* rule because "considerable evidence" was presented showing that the horizontal restraint preserved "various attendant benefits.") In short, the law is clear that any alleged horizontal restraint in the context of an exclusive supply contract must be assessed under the Rule of Reason, not the *per se* rule.

> **2.    Barr Has Offered Plausible Evidence Of The Pro-Competitive Effects Of Defendants' Agreement.**

As Barr demonstrated in its opening memorandum, the Supreme Court's decision in *Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999), squarely prohibits *per se* treatment here because Barr has proffered "plausible" arguments that its conduct may have pro-competitive effects. (*See* Barr Mem. at 27-28.) Rather than rebut these "plausible" arguments—indeed, actual evidence—put

forth by Barr showing the pro-competitive benefits of the challenged conduct, Plaintiffs instead contend that the Supreme Court's decision in *California Dental* "has nothing to do with the proper treatment of an alleged procompetitive justification in a case involving a class of restraint accorded *per se* [] treatment." (DPP Opp'n at 11.) Plaintiffs are wrong. [5]

Rather, Plaintiffs simply assume the answer to the question before the Court; namely, what is the appropriate standard by which to judge the challenged conduct, *per se* or Rule of Reason. Because Plaintiffs just assume (without analysis) that the challenged conduct *is* subject to the *per se* rule, they wrongly assume that the Supreme Court's (controlling) decision in *California Dental* is irrelevant here. But, in *California Dental*, as here, the issue before the Court was whether the Rule of Reason or some other standard (*i.e.*, "quick look" or *per se*) was appropriate to assess the challenged conduct (in that case, an horizontal agreement among competing dentists to refrain from certain forms of price advertising). 526 U.S. at 764-65. The Court clearly concluded that where an antitrust defendant has proffered "plausible" arguments tending to show that the challenged conduct has pro-competitive effects, application of the Rule of Reason was required. *Id.* at 778. Because there can be no "plausible" pro-competitive benefits associated with a "naked" restraint, evidence demonstrating such "plausible" pro-competitive benefits precludes any finding that the alleged restraint was *per se* unlawful and requires application of a full Rule of Reason analysis. Here, Barr has put forth (substantial) "plausible" evidence of the pro-competitive benefits of the defendants' license and supply

---

[5]    Plaintiffs also wrongly suggest that "none of the parties to the [*California Dental*] case alleged" the *per se* rule applied to the challenged conduct. (DPP Opp'n at 11; State Pls.' Opp'n to Barr's Mot. for Summ. J. ("State Pls.' Opp'n") at 5.) This is false. The FTC condemned the challenged conduct as *per se* unlawful. *See Cal. Dental*, 526 U.S. at 762. The FTC's decision was overturned by the Ninth Circuit and that decision was undisturbed by the Supreme Court. *Id.* at 763, 775-77.

agreement, thus *California Dental* squarely applies and, in fact, requires application of the Rule of Reason.

> ### D.    Mixed Vertical And Horizontal Commercial Arrangements Are Ill-Suited For *Per Se* Treatment.

As discussed above, it is not sufficient for Plaintiffs to assert that defendants' agreement was *per se* unreasonable given their supposedly horizontal character.[6]    Moreover, as demonstrated in Barr's opening memorandum, Barr agreed to supply Warner Chilcott Ovcon 35 in lieu of introducing yet another oral contraceptive product into an already crowded marketplace. By virtue of defendants' agreement, Barr and Warner Chilcott entered into a vertical relationship—through which Warner Chilcott obtained a reliable supply of the product and, as a result, was able to continue to distribute free samples to physicians and consumers. Given the mixed vertical and alleged horizontal nature of the defendants' agreement, the Rule of Reason, not the *per se* rule, is required to assess the impact of the defendants' agreement.[7]

In response, Plaintiffs' point to the Supreme Court's decision in *Palmer* and note that, although the parties there entered into an "exclusive license"—a "quintessentially vertical relationship," according to Plaintiffs—the Supreme Court had no trouble finding the restraint at issue in that case *per se* unlawful.  (DPP Opp'n at 12; State Pls.' Opp'n at 5.)  But, as discussed above, *Palmer* has no application here because it involved a "naked" market allocation agreement, and the exclusive license there was, as the First Circuit found, simply "a sham

---

[6]    *See, e.g., Augusta News Co.*, 269 F.3d at 48 (rejecting the argument that restraints were *per se* illegal by virtue of being "horizontal"); *see also Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 52 (1st Cir. 1998); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C. Cir. 1986); *Rozema v. Marshfield Clinic*, 977 F. Supp. 1362, 1374 (W.D. Wis. 1997) ("Market allocations that accompany and promote the success of larger endeavors are considered ancillary trade restraints and warrant more in-depth analysis under the Rule of Reason.").

[7]    *See, e.g., Int'l Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904 (6th Cir. 1989); *Ill. Corporate Travel, Inc. v. Am. Airlines, Inc.*, 889 F.2d 751 (7th Cir. 1989); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215 (8th Cir. 1987); *Smalley & Co. v. Emerson & Cuming, Inc.*, 13 F.3d 366 (10th Cir. 1993).

transaction to disguise a naked market division arrangement . . . ." *Augusta News Co.*, 269 F.3d at 48.  Here, in contrast, it is undisputed that there could be ***no supply agreement*** without a license to Barr's ANDA because it was the only means to produce Ovcon 35 using an approved manufacturing process, *i.e.*, it was essential to the supply agreement.  (*See* Ex. AA at 141, 247, 143-44, 257.)  Moreover, it is undisputed that the license "had to be exclusive" to accomplish the objectives of the business venture — a safe and reliable supply of Ovcon 35.  (*Id.* at 319.)  The license then was an integral and necessary element of the defendants' supply relationship. *Palmer* therefore is wholly inapposite.[8]

## II.    PLAINTIFFS' CLAIMS FAIL UNDER THE RULE OF REASON BECAUSE THEY HAVE NOT SHOWN ANY ACTUAL ADVERSE EFFECT ON COMPETITION IN A PROPERLY DEFINED RELEVANT MARKET.

Plaintiffs concede that, under the applicable Rule of Reason, they must demonstrate that the defendants' agreement had actual "anticompetitive effects."  (DPP Opp'n at 2; State Pls.' Opp'n at 7.)  Plaintiffs claim that they have satisfied this burden because they are either entitled to "presume" the existence of alleged anticompetitive effects of the agreement, or because they have offered "direct" and "indirect evidence" of "actual" anticompetitive effects of the defendants' agreement.  (*See, e.g.*, DPP Opp'n at 11, 20; State Pls.' Opp'n at 9.)  Plaintiffs are wrong on all counts.  ***First***, the law is clear: under the Rule of Reason, Plaintiffs are not entitled to presume the existence of actual "anticompetitive effects."  *See* Part II.A.  ***Second***, Plaintiffs' so-called "direct evidence" is defective as a matter of law.  *See* Part II.B.  ***Third***, Plaintiffs

---

[8]    Plaintiffs' reliance on *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003), and *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1 (1st Cir. 1979), is equally misplaced.  Neither involved the type of exclusive supply agreement at issue here.  Nor was there evidence of substantial pro-competitive benefits, such as continued substantial discounting and increased output, as here.  Most importantly, they involved purely "naked" restraints of trade.  *Cardizem*, 332 F.3d at 906, 908 & n.13; *see also Addamax Corp.*, 152 F.3d at 52, n.5 (applying Rule of Reason to alleged "horizontal" agreement and distinguishing *Engine Specialties* as involving "naked horizontal restraints that were not ancillary to any actual joint venture.").

likewise fail to prove, in the alternative, the existence of market power. *See* Part II.C. ***Fourth***, Plaintiffs' fail to properly define and prove harm in the relevant antitrust product market, which includes numerous oral contraceptive products. *See* Part II.D. ***Finally***, even if Plaintiffs' flawed market definition was accepted, Plaintiffs have offered no evidence that the agreement actually foreclosed competition within that market. *See* Part II.E. In short, nothing in Plaintiffs' opposition creates a material issue of fact precluding summary judgment in favor of Barr.

### A.    Plaintiffs Cannot Presume An Actual Adverse Impact On Competition.

As a threshold matter, "***in all cases*** the plaintiff must both define the relevant market and prove the degree of foreclosure. This is a prudential requirement." *United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001). Plaintiffs, however, attempt to side-step this "prudential requirement," contending that they are entitled to presume the existence of anticompetitive effects because the defendants' agreement "delayed AB-rated generic competition." (DPP Opp'n at 18; *see also* State Pls.' Opp'n at 9.) This is plainly not the law.

Rather, under the Rule of Reason, Plaintiffs bear the burden of proving "***actual*** detrimental effects" within the relevant market, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 461 (1986), and such effects "cannot be hypothetical or presumed," *Schering-Plough Corp. v. FTC*, 402 F.3d 1056, 1072 (11th Cir. 2005) (citing *Cal. Dental*, 526 U.S. at 775 n.12). Indeed, the very purpose of a Rule of Reason analysis is "to form a judgment about the competitive significance of the restraint" in light of the particular facts and circumstances of each case. *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978). Plaintiffs' sweeping proposition—allowing a plaintiff to "presume" anticompetitive impact—would short-circuit this analysis and transform the Rule of Reason into the *per se* rule by a different name.

Plaintiffs, not surprisingly, fail to cite a single case in which such a sweeping presumption of competitive harm was adopted. In fact, the only authority Direct Purchaser

Plaintiffs cite for this proposition, *In the Matter of Schering-Plough Corp.*, 2003 WL 22989651 (F.T.C. Dec. 8, 2003), an administrative decision, was vacated in its entirety by the Eleventh Circuit (a fact Plaintiffs neglect to mention in their brief). *See Schering-Plough*, 402 F.3d 3d at 1076.[9] In rejecting the FTC's (and Plaintiffs') attempt to presume the existence of "anti-competitive effects," the Eleventh Circuit observed that such a presumption would create a "low threshold" and, in fact, allow the plaintiff to virtually assume the outcome of the Rule of Reason analysis, *id.* at 1065, a proposition at odds with the very purpose of a Rule of Reason and controlling Supreme Court authority. *See, e.g., Chicago Bd. of Trade*, 246 U.S. at 238.

The sole case on which the State Plaintiffs rely is also inapposite. (*See* State Pls.' Opp'n at 8 (citing *Polygram Holding, Inc. v. FTC*, 416 F.3d 29 (D.C. Cir. 2005)).) In fact, the *Polygram* court did not even address proof of anticompetitive effects under the Rule of Reason. Rather, there, the court "accept[ed] the Commission's analytical framework" and addressed whether the FTC had satisfied its burden under an abbreviated or "quick look" analysis. *Polygram*, 416 F.3d at 35-36. State Plaintiffs offer no evidence that such an abbreviated analysis is appropriate here. Rather, State Plaintiffs conclusorily state that defendants' license and supply agreement is "inherently suspect." (State Pls.' Opp'n at 8.) But, as the *Polygram* court observed, even under such an abbreviated analysis, this is not enough. Instead, even under the abbreviated analysis at issue in *Polygram*, an antitrust plaintiff must demonstrate that the challenged conduct is similar in substance to "naked restraints" that are readily condemned as *per se* unlawful. *Polygram*, 416 F.3d at 37. For the reasons stated herein (as well in Barr's

---

[9]    Notably, in *Schering-Plough* – a decision Direct Purchaser Plaintiffs characterize as "directly analogous" and "virtually identical" to the present case, DPP Opp'n at 17 – the FTC did ***not*** employ the *per se* rule, as Plaintiffs advocate the Court adopt here. Rather, the FTC purported to assess the agreement at issue under the (albeit flawed) Rule of Reason analysis. *See Schering-Plough*, 402 F.3d at 1065.

opening memorandum), no court has ever concluded that the type of license and supply agreement at issue here is "*per se*" unlawful. (*See* Barr Mem. at 27-28.) The Supreme Court, moreover, has held such a "quick look" analysis at issue in *Polygram* is inappropriate where, as here, a defendant offers "plausible" pro-competitive justification for the alleged restraint. *Cal. Dental*, 526 U.S. at 778. In short, Plaintiffs' sweeping proposition that they can merely "presume" anticompetitive harm under the Rule of Reason is wholly unsupported and inconsistent with controlling law. [10]

**B.    Plaintiffs' So-Called Direct Evidence Of Anticompetitive Effects Is Legally And Factually Flawed.**

Plaintiffs contend that they need not "define the relevant market and prove the degree of foreclosure [from that market]," *Microsoft*, 253 F.3d at 69, because they have offered so-called "direct evidence" of the alleged "anticompetitive effects" of the defendants' agreement. (*See, e.g.*, DPP Opp'n at 17-19.) Even if Plaintiffs could rely on so-called "direct evidence" of "anticompetitive effects" to avoid properly defining the market, they have offered none. Rather, the "evidence" Plaintiffs point to is both legally defective and factually unsupported. [11]

---

[10]  Because State Plaintiffs may not presume any alleged anticompetitive effects of defendants' agreement, State Plaintiffs' claims must be dismissed for failure to offer any evidence of the relevant market. (*See* Barr Mem. at 30.) Notably, State Plaintiffs do not dispute that they have failed to offer such evidence. Rather, State Plaintiffs contend that there are "disputed issues with regard to *Barr's* definition of a relevant market." (State Pls.' Opp'n at 12.) However, that burden rests squarely with the State Plaintiffs. *See, e.g., Microsoft*, 253 F.3d at 69. Because State Plaintiffs have offered no evidence regarding the relevant antitrust product market (let alone evidence of the degree of foreclosure within any such market), their so-called "disputed issues" – a series of perceived differences among oral contraceptives – are simply irrelevant and cannot save State Plaintiffs from summary judgment on their claims. *See, e.g., Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 390 (8th Cir. 2007).

[11]  Plaintiffs also incorrectly (and repeatedly) contend that summary judgment is inappropriate if they can show "*some potential* for anticompetitive effect" arising from the defendants supply agreement. (DPP Opp'n at 15, 30 (citing *Kreuzer v. Am. Acad. of Periodontology*, 735 F.2d 1479, 1496 n.25 (D.C. Cir. 1984) (emphasis in original)).) This is not the law. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986); *Proctor v. State Farm Auto. Ins. Co.*, 561 F.2d 262, 275 (D.C. Cir. 1977), *vacated on other grounds*, 440 U.S. 942 (1979) (significant evidence must be produced by a plaintiff to defeat a well supported motion for summary judgment).

Plaintiffs first contend that they can demonstrate "actual, anticompetitive effects resulting from the Agreement" by showing that the agreement resulted in "higher *average prices* for Ovcon 35 Products," *i.e.*, that the average of the individual prices for Warner Chilcott's Ovcon 35 and Barr's Balziva® would have been lower but for the defendants' agreement. (DPP Opp'n at 19.) This makes no sense and, in fact, misstates the law.

As an initial matter, if "actual" anticompetitive effects could be shown simply by calculating the average of two different products' prices, virtually *every* exclusive supply agreement would necessarily be condemned as "anticompetitive" and unlawful. Consider, for example, an exclusive supply agreement between a manufacturer of Product A (a heavily promoted product) and the manufacturer of Product B (a product with no promotion). Any agreement whereby the manufacturer of Product B exclusively supplies the manufacturer of Product A would, under Plaintiffs' view, be presumptively "anticompetitive" and unlawful simply because the average of the gross prices of Product A and Product B is lower than the gross price of Product A alone (even though, logically, one would expect a product with no promotion to cost less than a heavily promoted product). Thus, even if such a supply agreement had no impact whatsoever on competition in the market in which either or both products compete, the exclusive agreement would be, according to Plaintiffs' view, "anticompetitive." This cannot be—and is not—the law. *See, e.g.*, *Microsoft*, 253 F.3d at 69 ("[E]xclusivity provisions in contracts may serve many useful purposes" and be pro-competitive); *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 508 (2d Cir. 2004) ("[Exclusive supply contracts] have pro-competitive purposes and effects . . . ."); *see also* **REDACTED**

**REDACTED** . Simply put, the average of any set of product prices says nothing of whether a particular practice *actually* harms

19

competition or consumers. *See, e.g., Leegin*, 127 S.Ct. at 2718 ("Respondent is mistaken in relying on pricing effects absent a further showing of anticompetitive conduct.").

Moreover, to the extent Plaintiffs imply that "direct evidence" of higher prices to direct purchasers somehow ends the analysis, that is clearly not the law. It is well-established that a Sherman Act plaintiff is required to show harm to competition as a whole: "the reasonableness of a restraint is evaluated based on its impact on ***competition as a whole within the relevant market.***" *Oksanen*, 945 F.2d at 708. The fact that Barr may not have been selling a lower priced generic to the Direct Purchasers "does not alone prove an adverse effect on competition as a whole" where, as here, "nothing changed in the relevant product market from the consumer's perspective." *Tops Mkts.*, 142 F.3d at 96.

In light of these principles, the Supreme Court has long stressed that to show actual anticompetitive harm, a plaintiff must demonstrate that the alleged unlawful conduct reduced output. *See, e.g., Ind. Fed'n of Dentists*, 476 U.S. at 460-61 (observing that "proof of actual detrimental effects, such as a ***reduction of output,*** can obviate the need for" traditional market definition analysis under Sherman Act); *Cal. Dental*, 526 U.S. at 776-77. Indeed, the very cases cited by Plaintiffs are consistent with this precedent and none supports their contention that some "average" of different product prices is proof of actual anticompetitive effects. *See, e.g., Toys 'R' Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (holding traditional market definition was not required under Sherman Act Section 2 where the evidence demonstrated the alleged restraints caused "manufacturers to ***reduce output*** . . . and that reduction in output protected [a toy company] from having to lower its prices to meet [warehouse] clubs' price levels."). To the contrary, consistent with controlling Supreme Court precedent, these cases demonstrate that the license and supply agreement at issue could have no actual anticompetitive effects whatsoever

20

because it actually preserved and expanded output—the antithesis of anticompetitive harm. (*See* Barr Mem. at 34-37.) Plaintiffs have failed to offer contrary evidence.[12]

### C.    Direct Purchaser Plaintiffs' So-Called Proof Of Market Power Is Legally Irrelevant.

In apparent awareness of their failure to show a direct adverse effect, Plaintiffs also appear to rely on the alternative method of proof available under the Rule of Reason, *i.e.*, the existence of market power.    As Plaintiffs acknowledge, the Supreme Court has defined "monopoly [or market] power" as the "power to control prices or exclude competition." *United States v. E.I. du Pont Nemours & Co.*, 351 U.S. 377, 391 (1956).    The Supreme Court has long held that proof of "market power" under the antitrust laws requires reference to a properly defined antitrust product and geographic market. *See id.* at 394.    Plaintiffs nevertheless ignore this controlling Supreme Court precedent and, instead, contend that evidence demonstrating that Warner Chilcott priced Ovcon 35 above its so-called "marginal cost" is "proof" of actual anticompetitive effects.    (DPP Opp'n at 21.)    Specifically, Plaintiffs contend that any price in excess of "marginal cost" is "supracompetitive" and evidence of actual anticompetitive effects. (*Id.* at 27.)

But, as the very authority cited by Plaintiffs confirms, defining "market power" by reference to some theoretical measure of "marginal cost" implies that "*every* manufacturer of brand name prescription drugs had some market power" and therefore priced their products

---

[12]    Having no legal (or factual) support for their "direct evidence" of anticompetitive harm, Plaintiffs resort to misrepresenting the record.    In particular, Plaintiffs contend that "Barr's own expert, Dr. Bell, has quantified the adverse effects of the Agreement, concluding that direct purchasers would have saved *at least* $18 million had Barr launched its generic version of Ovcon in August 2004," and suggest that this is direct evidence of anticompetitive harm.  (DPP Opp'n at 2 (emphasis in original); *see also id.* at 19; State Pls.' Opp'n at 11 n.12.)    This contention, however, is simply false and a gross misrepresentation of the record.  Dr. Bell, in fact, plainly concludes that

### REDACTED

Thus, Plaintiffs' claim that Dr. Bell has "quantified" or conceded any evidence of actual anticompetitive harm is, at best, a fiction.

21

supracompetitively. *In re Brand Name Antitrust Litig.*, 186 F.3d 781, 787 (7th Cir. 1999); *see also* Carlton, Dennis W. and Perloff, Jeffrey M., MODERN INDUSTRIAL ORGANIZATION (4th ed. 2005) at 642 ("If this definition [of market power] is applied literally, probably every firm in the United States has . . . market power.").[13]    Thus, *any* agreement among pharmaceutical manufacturers could be condemned as "anticompetitive" simply by demonstrating that the market price exceeded the so-called marginal cost of producing that product.    Moreover, as Plaintiffs' own expert, Professor Leffler, concedes, Plaintiffs' definition of "market power" implies that Warner Chilcott's alleged "market power" over Ovcon 35 substantially *increased* once Barr introduced Balziva® — a patently illogical result under Plaintiffs' theory. *(See*

**REDACTED**

In short, Plaintiffs' test of "market power" is not meaningful, leads to nonsensical results, and would condemn virtually all pharmaceutical manufacturers' pricing as "supracompetitive." Not surprisingly, therefore, no court has ever held that an exclusive agreement is "anticompetitive" if one party prices its product in excess of "marginal cost."    Thus, Plaintiffs' so-called "proof" of market power and anticompetitive effects proves nothing and is insufficient to create a disputed issue of material fact to preclude summary judgment. *See, e.g., Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 829 (D.C. Cir. 1988) (expert declaration does not preclude summary judgment, for the judge must "look behind [the expert's] ultimate conclusion . . . and analyze the adequacy of its foundation").[14]

---

[13]    As Professors Carlton and Perloff explain, "market power," as defined by Plaintiffs, does not shed any light on whether an antitrust violation has occurred and assumes a condition (*i.e.*, that price will equal "marginal cost") that is "rarely, if ever, encountered in the real world." MODERN INDUSTRIAL ORGANIZATION (4th ed.) at 57.

[14]    Plaintiffs again misrepresent the record here, claiming that Barr's "admissions" in another case are "sufficient to defeat its motion for summary judgment" here. (DPP Opp'n at 23 (citing Pls.' Opp'n App. Tab 52).) Even a cursory review of Barr's counterclaim belies that claim.  The product at issue in that case, thalidomide, was a highly controlled substance with highly specialized therapeutic uses. (*See* Pls.' Opp'n App. Tab 52 ¶¶ 21-23,
(Continued...)

**D.    The Undisputed Facts Demonstrate That The Relevant Antitrust Product Market Must Include Numerous Other Oral Contraceptive Products.**

Because "market power" cannot be distilled into a contrived mathematical equation whereby all prices in excess of a firm's "marginal cost" are condemned as "supracompetitive," an antitrust plaintiff must demonstrate that an alleged restraint allowed a firm to exclude competition or control prices within a relevant antitrust product market, defined as all "commodities reasonably interchangeable by consumers for the same purposes." *E.I. du Pont de Nemours*, 351 U.S. at 395. As Barr demonstrated in its opening memorandum, the undisputed facts demonstrate that Ovcon 35 is reasonably interchangeable with a variety of oral contraceptive products and that Ovcon 35 competes with numerous other branded contraceptive products. (*See* Barr Mem. at 10-14, 31-34; *see also* Barr 7(h) Stmnt. ¶¶ 1-5.) Thus, Plaintiffs' proposed product market definition (*i.e.*, Ovcon 35 and any AB-rated generic of Ovcon 35) is not only inconsistent with the undisputed facts, it is legally untenable. *See, e.g., E.I. du Pont de Nemours*, 351 U.S. at 395; *Oksanen*, 945 F.2d at 709 (rejecting plaintiffs proposed market definition because it "violate[d] a fundamental tenet of antitrust law that the relevant market definition must encompass the realities of competition.") (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 572-73 (1966)).

Direct Purchaser Plaintiffs make no effort to rebut this evidence. Nor could they. Their own experts have concluded that, "[i]n the pharmaceutical industry . . . [m]arkets are usually defined in terms of therapeutic classes of drugs," such as all oral contraceptives, rather than a

---

36.) Importantly, unlike the market for oral contraceptives in which there are **over 80 products** available on the market that are prescribed for precisely the same purpose, there are no therapeutic substitutes for thalidomide in the treatment of this condition and there is (currently) only one seller. (Pls.' Opp'n App. Tab 52 ¶ 141.) Thus, far from being inconsistent, the thalidomide case underscores why the agreement here would have no meaningful impact on competition because, as Plaintiffs' experts concede, consumers and physicians alike have "a number of alternatives" to Ovcon 35. **REDACTED**, *see also* Barr 7(h) Stmnt. ¶¶ 1-5.)

23

particular brand and its generic equivalents.  Pindyck, Roberts S. and Rubinfeld, Daniel L.,

MICROECONOMICS (6th ed. 2005) (Am. App. Tab 59) at 10; *see also J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, No. 1:01-CV-704, 1:03-CV-701, 2005 WL 1396940, at *8 (S.D. Ohio June

13, 2005) (Direct Purchaser Plaintiffs' expert, Professor Jeffrey Leitzinger, concluded that the

relevant product market included all "oral ERT [or estrogen replacement therapy] products," a

therapeutic class of drugs which includes several different competing branded and generic

products).    More directly, Plaintiffs' own experts concede that Ovcon 35 is *"relatively*

*interchangeable"* with a variety of other oral contraceptive products.[15]

## REDACTED

Faced with irrefutable evidence (and their own admissions) that Ovcon 35 is

interchangeable with a number of other oral contraceptives, Plaintiffs attempt to save their

proposed market definition by contriving a distinction between other (interchangeable) oral

conceptive products and Ovcon 35.   Specifically, Plaintiffs claim that although other oral

contraceptives may be so-called "therapeutic alternatives" ("treatment alternatives" according to

State Plaintiffs), they are not "economic substitutes" and thus not within the same product

market.  (DPP Opp'n at 26.)  Plaintiffs contend that other oral contraceptive "products would

---

[15]  The Food and Drug Administration is in the process of reviewing certain drug classes to make available to purchase "behind-the-counter," *i.e.*, drugs that may be dispensed *without a prescription*. *See* FDA, 72 Fed. Reg. 56769 (Dep't of Health & Human Servs., Oct. 4, 2007).  Underscoring the safety and interchangeability of oral contraceptive products, it is widely expected that oral contraceptives will be one of the first classes of drugs to receive "behind-the-counter" approval by the FDA. *See, e.g.*, Gary Haber, *Prescription Power from the Pharmacist*, THE NEWS JOURNAL (Wilmington, DE), Nov. 4, 2007, at 1C ("[E]xperts think drugs such as birth-control pills and migraine pain relievers--those that patients already take with little physician supervision--could be among the first to be considered [for behind-the-counter' classification].").

constitute economic substitutes for Ovcon 35 only if they prevented Barr and Warner Chilcott from maintaining the price of Ovcon 35 Products above" their so-called "marginal cost."[16] (*Id.*)

Plaintiffs cite no authority for this proposition, much less any authority supporting their distinction between "therapeutic" and "economic" substitutes. And, tellingly, Plaintiffs' own experts apparently do not share Plaintiffs' view. *See, e.g., J.B.D.L. Corp., supra.* But more directly, the Supreme Court has rejected such contrived distinctions among interchangeable products and held that "[t]he outer boundaries of a product market are determined by the ***reasonable interchangeability of use [by consumers].*" *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (rejecting alternative market definition based on subjective distinctions among competing products and noting that relative prices alone do not establish the boundaries of a product market); *see also United States v. Cont'l Can Co.*, 378 U.S. 441, 449 (1964) (noting products need not be entirely fungible to be considered part of the same relevant market). Here, there is no dispute (indeed, Plaintiffs' own experts agree) that a wide variety of oral contraceptive products are viewed as reasonably interchangeable by consumers and physicians alike. (*See* Barr 7(h) Stmnt. ¶¶ 1-5, 20-23.) Because the Direct Purchaser Plaintiffs' narrow product market definition is inconsistent with the undisputed evidence and based on legally unsupported (and subjective) distinctions among so-called "therapeutic" and "economic" substitutes, Plaintiffs' proposed market definition should be rejected. Absent any evidence

---

[16] Plaintiffs claim that their "experts" defined the relevant product market using the FTC/DOJ Horizontal Merger Guidelines, DPP Opp'n at 24-25, but they have not. Instead, Plaintiffs rely on the false presumption that a "competitive" market price for Ovcon 35 equals the "marginal cost" of its production. *See* III.B.2, *infra.* According to Plaintiffs, because Ovcon 35 was priced above its "marginal cost," Warner Chilcott is a "monopolist" and the relevant market includes only Ovcon 35 and AB-rated generics. (DPP Opp'n at 25.) Not only is this wholly inconsistent with the methodology employed under the Horizontal Merger Guidelines, it leads to the absurd conclusion that *all* brand name drug manufacturers are monopolists and no brand name drugs compete with any other product. *See, e.g., In re Brand Name Antitrust Litig.*, 186 F.3d at 787.

"prov[ing] what market . . . was restrained and that the defendants played a significant role in the relevant market," *Oksanen*, 945 F.2d at 709, Plaintiffs' claims are defective as a matter of law.

   E.   **Defendants' License And Supply Agreement Did Not Preclude Any Competitor From Entering The Marketplace.**

   Even if Plaintiffs' flawed market definition was accepted, Plaintiffs' claims must still fail for the simple reason that Plaintiffs have failed to offer any evidence that defendants' license and supply agreement created any barrier to competition within that market. *See, e.g., United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001). Indeed, Plaintiffs admit that there is nothing in the defendants' license and supply agreement that prevents another manufacturer from entering the marketplace and competing. (*See, e.g.,*                              **REDACTED**

                    **REDACTED**

                                    Further, Plaintiffs do not dispute that at least one other manufacturer, Andrx, had sought regulatory approval to sell a generic version of Ovcon 35 and was free to enter the already crowded marketplace. Thus, the defendants' agreement did not foreclose entry or competition even within Plaintiffs' proposed product market. Absent evidence of such foreclosure, Plaintiffs cannot show any actual adverse effect on competition. *Microsoft*, 253 F.3d at 69. Simply put, "[i]f there is no exclusion of a significant competitor, the agreement cannot possibly harm competition." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984).

**III.   THE SUBSTANTIAL PRO-COMPETITIVE BENEFITS OF INCREASING OUTPUT AND PRESERVING SUBSTANTIAL DISCOUNTING OUTWEIGH ANY ANTI-COMPETITIVE EFFECTS.**

   Rather than rebut evidence Barr presented establishing that defendants' license and supply agreement expanded output and preserved discounting, *see* Barr Mem. at 17-19, Plaintiffs argue that the Court should simply ignore this evidence—contending such evidence relies on an

                                        26

"improper metric" and "contravene[s] controlling law." (DPP Opp'n at 32.) Each of Plaintiffs' arguments in this regard, however, is unavailing.[17]

### A.     The Agreement Had Significant Pro-Competitive Benefits That Plaintiffs Do Not Rebut.

*First,* Plaintiffs contend that whether conduct increases or restricts output is "an improper metric for gauging anticompetitive effects." (DPP Opp'n at 31.) Plaintiffs cite no authority for this proposition.[18] Indeed, Plaintiffs are wrong as wrong as a matter of law. *See Ind. Fed'n of Dentists,* 476 U.S. at 461. Moreover, as Plaintiffs' own expert, Professor Rubinfeld concedes, conduct which, as here, preserves or expands output within a relevant market is the antithesis of anti-competitive harm and, in fact, pro-competitive.                  **REDACTED**

*see also* 7 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1503b (2d ed. 2003) ("An increase in output is procompetitive.").[19]

---

[17]   Plaintiffs also wrongly contend that whether the undisputed pro-competitive benefits outweigh any alleged harm is "up to the *finder of fact,* not the Court." (DPP Opp'n at 38 (emphasis in original).) Plaintiffs cite no authority for this proposition. And, in fact, courts have long "understood that they can often decide questions of reasonableness without many facts or without a jury's aid." 7 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW, ¶ 1508c (2d ed. 2003). In any event, Plaintiffs fail to dispute the substantial evidence showing that the defendants' agreement preserved substantial discounting and expanded output.

[18]   Importantly, Plaintiffs do not dispute evidence cited by Barr demonstrating that the defendants' agreement preserved and expanded output of *Ovcon 35.* Rather, Plaintiffs merely assert that they have "adduced substantial evidence that generic competition does not cause reduced output of *oral contraceptive products.*" (Pls.' Joint Counterstatement of Material Facts ("Pls.' Counter-Stmnt.") ¶ 33.) Plaintiffs' vague assertions about "generic competition" and "contraceptives," however, add nothing – they don't even address the specific product at issue – and are insufficient to create a genuine issue of material fact. *See, e.g., Merit Motors, Inc. v. Chrysler Corp.,* 417 F. Supp. 263, 266-67 (D.D.C. 1976), *aff'd,* 569 F.2d 666 (D.C. Cir. 1977) (to defeat motion for summary judgment something more than naked assertions and broad generalities is required); *Kreuzer,* 735 F.2d at 1496 ("[E]ven in the context of complex antitrust litigation Fed. R. Civ. P. 56 bars a plaintiff from relying on bare allegations coupled with the hope that something could be developed at trial to support those allegations.").

[19]   Plaintiffs falsely claim that "Barr's experts acknowledge, [that] the unusual features of the pharmaceutical industry imply that output expansion or contraction with respect to a particular drug molecule is *not* a reliable measure of competitive impact." (DPP Opp'n at 4 (emphasis in original); *see also id.* at 31 (claiming that "Barr's own expert conceded that output effects" are not evidence of pro- or anticompetitive effects).) This claim is patently false and yet another gross misrepresentation of the record, having no good faith basis (Continued…)

*Second*, Plaintiffs contend that the undisputed evidence of increased output and substantial discounting preserved through the defendants' agreement should be ignored because "Barr's sampling defense is an effort to show that . . . generic competition is economically undesirable." (DPP Opp'n at 32.) Plaintiffs never explain how evidence of substantial discounting is evidence showing "competition is . . . undesirable", yet proceed to argue that "the Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable." (*Id.* quoting *Nat'l Socy of Prof'l Eng'rs v. United States*, 435 U.S. 679, 696 (1978).) Nowhere, however, does Barr contend that competition in any form is unreasonable. To the contrary, the undisputed evidence demonstrates that Ovcon 35 and numerous other oral contraceptives compete vigorously and, importantly, the defendants' license and supply agreement preserved and enhanced that competition. (*See* Barr Mem. at 34-37.)

*Third*, Plaintiffs similarly contend that evidence of substantial discounting through sampling is irrelevant because "harm to direct purchasers . . . is sufficient to establish a violation of the Sherman Act." (DPP Opp'n at 33.) Plaintiffs, however, conflate antitrust standing with evidence of competitive harm under the Rule of Reason. Although injury to a particular purchaser may support antitrust standing, that alone plainly does not support a finding of harm to competition under the Rule of Reason. *See, e.g., NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (Under the Rule of Reason, a plaintiff "must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself.").

---

whatsoever. (*See*

**REDACTED**

Plaintiffs here basically assert that showing an effect on wholesale pricing (*i.e.*, to the direct purchasers) is sufficient to show an "actual adverse effect," but it is not. It is well-established that plaintiff must show harm to competition as a whole: "the reasonableness of a restraint is evaluated based on its impact on ***competition as a whole within the relevant market.***" *Oksanen*, 945 F.2d at 708. The fact that Barr may not have been selling a lower price generic to the Direct Purchasers "does not alone prove an adverse effect on competition as a whole" where, as here, "nothing changed in the relevant product market from the consumer's perspective." *Tops Mkts.*, 142 F.3d at 96. *See also FTC v. H.J. Heinz Co.*, 246 F.3d 708, 719 (D.C. Cir. 2001) (rejecting the FTC's argument that "wholesale competition" should be looked at distinct from "retail competition" and holding that "the wholesale market cannot be separated out for analysis without regard to the merger's effect on other levels of competition.").

***Fourth***, Plaintiffs apparently contend that evidence of substantial free sampling is somehow inadmissible because, according to Plaintiffs, such evidence would "impermissibly require the Court and the jury to determine how much of the illegal overcharge was passed on by wholesalers and retailers." (DPP Opp'n at 34-35.) As an initial matter, Plaintiffs, here too, conflate their burden to prove antitrust standing with their burden to prove harm to competition under the Rule of Reason. Plaintiffs, in fact, expend pages of their brief discussing the Supreme Court's ruling in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977). But in *Illinois Brick*, the Supreme Court held that an indirect purchasing plaintiff could not use the "pass-on" or "cost plus" exception to *Hanover Shoe* to establish ***standing*** to sue; in other words, only direct purchasers had standing to sue under the federal antitrust laws. The Court never prohibited an antitrust defendant from establishing under the Rule of Reason that an alleged restraint was, in fact, output expanding and pro-competitive. In any event, the evidence regarding substantial

29

discounting (in the form of free sampling) relates to the output expanding (*i.e.*, pro-competitive) effects of the defendants' agreement and does not implicate any analysis of whether any alleged "overcharge" was "passed on," as Plaintiffs apparently contend. (*See, e.g.*, Barr Mem. at 38-39.) Thus, *Illinois Brick* and its progeny simply have no application here.

*Finally*, Plaintiffs contend that "Barr's evidence concerning free samples is hotly disputed." (DPP Opp'n at 36.) Plaintiffs, however, miss the point. As Barr pointed out, the factual record, indeed, varies in terms of how many samples patients actually receive. (*Compare*

REDACTED

‚ But the factual record is undisputed that defendants' agreement preserved Warner Chilcott's continued distribution of free samples, and that these free samples constituted a discount to consumers. (*See, e.g.*,                     REDACTED

REDACTED                     This, in turn, resulted in increased output of Ovcon 35 products, which alone is sufficient to find that the agreement were not anti-competitive, but pro-competitive, as Plaintiffs' own expert concedes.          REDACTED          ‚ Therefore, whether patients received six free samples annually or three, the undisputed evidence demonstrates that this sampling represented a discount which increased output.[20]    In short, any dispute regarding the number of samples actually dispensed to each consumer is immaterial.[21]

---

[20]    Plaintiffs point to the opinion of Professor Karp to assert that the evidence presented by Barr demonstrating that the defendants' agreement preserved substantial sampling is "far from clear." (Pls.' Counter-Stmnt. ¶ 29.) Professor Karp's musings regarding this evidence, however, are inconsistent with Plaintiffs' (and their other experts') admissions, *see* Barr 7(h) Stmnt. ¶¶ 29-33. and, more importantly, are insufficient to create a disputed issue of fact. (*See*  
REDACTED

[21]    Plaintiffs elsewhere allege that "Barr's asserted justifications are pretextual." (DPP Opp'n at 39.) The only "evidence" Plaintiffs point to in support of this assertion is an e-mail two years after the agreement (not from Barr but from a packaging manager at Warner Chilcott's Puerto Rico manufacturing facility). (Pls.' Opp'n
(Continued...)

**B.    The Fact That Plaintiffs Would Have Preferred A "Less Restrictive" Alternative Is Irrelevant.**

Plaintiffs contend that Barr and Warner Chilcott should have adopted another, "less restrictive" supply agreement. In essence, Plaintiffs assert that a hypothetical license and supply agreement—one which was non-exclusive but which incorporated (hypothetical) contractual provisions that, according to Plaintiffs, would accomplish the same economic objectives—would have permitted greater competition. (*See* DPP Opp'n at 39-40.) This, Plaintiffs contend, is evidence that the license and supply agreement at issue was not pro-competitive, but *anti*competitive. (*Id.*) The antitrust laws, however, do not permit the courts to determine what the "best possible" outcome of commercial transactions would be for third parties, nor does the Hatch-Waxman Act somehow graft onto the antitrust laws additional obligations in order to promote generic entry. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 298, 415-16 (2004) (holding that the Sherman Act "does not give judges *carte blanche* to insist" that private parties alter their "way of doing business whenever *some other approach might yield greater competition*."); *see also* 7 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1505b (2d ed. 2003) ("[O]ne can frequently conceive of a less restrictive approach. . . . Yet, to require the very least restrictive choice might interfere with the legitimate objectives at issue without, at the margin, adding that much to competition.").

Plaintiffs would have the Court impose upon private commercial parties an obligation to enter into the "best possible" supply agreements, the terms and conditions evidently determined *ex post facto* by an antitrust plaintiff. Such a rule "would be an invitation to antitrust litigation,"

---

App. Tab 45; *see also*

**REDACTED**

31

*In re Cipro*, 261 F. Supp. 2d at 252, and render virtually all commercial transactions subject to pain of antitrust liability (and treble damages) whenever an imaginable alternative arrangement might be considered *more* competitive. As the Supreme Court warned, however, such "[j]udicial oversight under the Sherman Act would seem destined to distort investment and lead to a new layer of interminable litigation." *Trinko*, 540 U.S. at 414. Regardless of whether Barr and Warner Chilcott could have entered into other non-exclusive arrangements (and there is absolutely no evidence that any of the arrangements that Plaintiffs now imagine were realistic or viable alternatives), the fact that Plaintiffs can imagine theoretical contractual terms that they, as bystanders, would have preferred does not establish that the actual supply agreement really *harms* competition or void the legitimate pro-competitive benefits of that agreement.

## IV.     APART FROM THE RULE OF REASON ANALYSIS, PLAINTIFFS' CLAIMS FAIL BASED ON MOOTNESS AND STANDING GROUNDS.

### A.     State Plaintiffs' Federal Injunctive Relief Claims Are Moot.

"The [State Plaintiffs] have brought this action under federal law *for injunctive relief only*," that is, State Plaintiffs seek to enjoin Barr from operating under the exclusive license and supply agreement at issue. (State Pls.' Opp'n. at 21.) But, as discussed in Barr's opening memorandum, Warner Chilcott has publicly and irrevocably waived the exclusivity provision of the parties' license and supply agreement—the sole basis of State Plaintiffs' claims—and Barr has introduced a generic version of Ovcon 35 that is still on the market today. (*See* Barr Mem. at 15.) For this reason alone, the State Plaintiffs' federal claims are moot. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs (TOC), Inc.*, 528 U.S. 167, 189 (2000). Furthermore, even if the State Plaintiffs, as *parens patrie*, could conceivably obtain injunctive relief for other "similar and related" conduct in the future, Barr is already permanently enjoined from entering into such conduct by virtue of this Court's Order and Stipulated Permanent Injunction, entered in

November 2007. (*See* Nov. 27, 2007 Final Order and Stip. Permanent Inj., Case No. 05-2179, D.E. 138.) There is, therefore, no justicable case or controversy to sustain a claim for injunctive relief under federal law. *See, e.g.*, *County of Los Angeles v. Davis*, 440 U.S. 625, 633 (1979) (no reasonable expectation that allegedly wrongful conduct would recur where that conduct was barred by a district court injunction); *Douglas v. Donovan*, 704 F.2d 1276, 1278 (D.C. Cir. 1983) (case mooted where settlement agreement made it "virtually impossible" for allegedly wrongful conduct to recur.). As such, State Plaintiffs' federal claims must be dismissed as moot.

**B.    Direct Purchaser Plaintiffs Lack Standing.**

**1.    Direct Purchasers' Assignments Of Claims Are Contractually Barred.**

Direct Purchaser Plaintiffs contend that the plain language of the distribution agreement between McKesson and Warner Chilcott prohibiting assignments to these plaintiffs (without prior express consent of Warner Chilcott) "merely prohibits the parties from assigning (i.e., delegating) their *duties under that contract*" and it does not prohibit "assignment of a party's *rights* under the contract." (DPP Opp'n at 40 (emphasis in original).) In addition, these plaintiffs contend that McKesson's breach of the controlling non-assignment provision is harmless and "does not invalidate the resulting assignment." (*Id.* at 41.) This makes no sense. Quite simply, these plaintiffs argue that the provision expressly barring any assignment by McKesson (or Warner Chilcott) without written consent has no meaning whatsoever. Not surprisingly, courts that have addressed this very issue have disagreed with plaintiffs' view and dismissed (for lack of standing) indirect purchasers' claims based on assignments obtained in violation of contractual non-assignment provisions. *See, e.g.*, *In re Ditropan XL Antitrust Litig.*, No. M:06-CV-01761-JSW, 2007 WL 2978329 (N.D. Cal. Oct. 11, 2007).

33

## 2.  The *Meijer* Plaintiffs' Purported Assignment Is Facially Defective.

The Meijer plaintiffs do not dispute that their purported assignment agreement was executed nearly two years *before* Barr entered into the license and supply agreement at issue in this case (in October 2002). Instead, the Meijer plaintiffs contend that their October 2002 assignment agreement "assigns to Meijer all legal claims relating to post-October 4, 2002 purchases" because the assignment provided that sales after October 4, 2002 "shall incorporate, without further action of the parties, an assignment to Meijer." (DPP Opp'n at 43.) The Meijer plaintiffs thus contend that the October 2002 assignment agreement perpetually assigned any and all claims that Kerr may or may not have against any manufacturer in the future. But, as a matter of law, Kerr could not assign to Meijer that which it did not possess at the time the purported assignment agreement was executed, *i.e.*, any antitrust claims against either Warner Chilcott or Barr arising from its purchases of Ovcon 35. *See, e.g., Radio Corp. of Am. v. Hohenstein*, 289 F. 757, 759 (2d Cir. 1923) ("There can be no assignment of a future tort action" because "[o]ne assignor can only assign that which is his."); *Amboy Nat'l Bank v. Generali-U.S. Branch*, 930 F. Supp. 1053, 1059 (D.N.J. 1996) ("[A]nd an assignor can only assign the rights possessed at the time of assignment."); 6A C.J.S. *Assignments* § 19 (2007).[22]  Because Kerr did not (and could not) possess any cognizable antitrust claims against Barr or Warner Chilcott relating to Ovcon 35 at the time it executed the assignment, it could not assign such claims. Therefore, the Meijer plaintiffs' purported assignment is defective on its face and cannot confer standing.[23]

---

[22]  *See also Gulf Stream III Assocs. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 440 (3d Cir. 1993) (a general assignment "without specific reference to antitrust claims, cannot validly transfer the right to pursue those claims.").

[23]  The Meijer plaintiffs half-heartedly argue that any ambiguity within their defective assignment agreement "constitutes a factual question which cannot be resolved on summary judgment." (DPP Opp'n at 43 & n.65.) A plaintiff, however, cannot create ambiguity where none exists to avoid summary judgment. *See, e.g., Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1172 (D.C. Cir. 2003).

34

3.  **Several Direct Purchaser Plaintiffs Lack Standing Under The Well Established "Cost Plus" Exception To *Hanover Shoe*.**

Plaintiffs do not dispute that their assignor-wholesalers resold pharmaceutical products, including Ovcon 35, to the plaintiffs pursuant to pre-existing "cost plus" contracts, *i.e.*, the wholesalers' contracts with the Plaintiffs expressly provided that Ovcon 35 would be priced for resale to the Plaintiffs at the wholesalers' cost from Warner Chilcott plus a fixed markup. (*See* Am. App. Tabs 27-28, 30-35.)   Instead, Plaintiffs contend that the "cost plus" exception enunciated by the Supreme Court is only "hypothetical" and, in any event, it does not apply unless the Plaintiffs were also contractually required to purchase a *fixed* quantity of Ovcon 35. (DPP Opp'n at 44-45.)  The Supreme Court, however, has not grafted such a "fixed quantity" requirement onto the "cost plus" exception.  *See, e.g.*, *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1163-66 (5th Cir. 1979) (recognizing "cost plus" exception applies absent fixed-quantity contract where middlemen apply a "rigid" mark up formula to determine resale prices), *cert. denied*, 499 U.S. 905 (1980).  Because national wholesalers such as McKesson resold Ovcon 35 (to the Plaintiffs) pursuant to pre-existing "cost plus" contracts and would not have standing to sue under the antitrust laws, any of their assignees, including Albertsons, Brooks, Eckerd, Hy-Vee, and Safeway, do not have standing to sue.  Finally, while Plaintiffs also contend that if the "cost plus" exception to *Hanover Shoe* does apply, it would simply "make the [Plaintiffs'] assignments unnecessary," DPP Opp'n at 45, the "cost plus" exception does not magically transform indirect purchasers into direct purchasers within the ambit of *Illinois Brick*.

## CONCLUSION

For the foregoing reasons, Barr's Motion for Summary Judgment should be granted.

Dated: February 1, 2008

Respectfully submitted,

*Karen N. Walker /ee*

Karen N. Walker (D.C. Bar # 412137)
Mark L. Kovner (D.C. Bar # 430431)
Patrick M. Bryan (D.C. Bar # 490177)
Eunnice H. Eun (D.C. Bar # 500203)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Suite 1200
Washington, DC 20005
Tel. (202) 879-5000
Fax (202) 879-5200

*Counsel for Barr Pharmaceuticals, Inc.*